ORIGINAL

FILED
SEP 2 9 2004
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LUCENT TECHNOLOGIES INC.

Plaintiff,

vs.

UNITED STATES,

Defendant.

04-1511C
Case No. ________

**COMPLAINT**

Plaintiff, Lucent Technologies Inc. ("Lucent"), files its Complaint against the United States of America (the "government"). For its Complaint, Lucent alleges as follows.

**PARTIES**

1. Lucent is a corporation organized and existing under the laws of the State of Delaware.

2. The government is acting through the Department of Defense and, more specifically, the Defense Contract Management Agency ("DCMA").

**JURISDICTION**

3. This Court has jurisdiction over this action pursuant to the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 609(a)(1) and 28 U.S.C. § 1491(a)(1) and (2).

4. On September 30, 2003, a Divisional Administrative Contracting Officer ("DACO") with DCMA, J. Wesley Gilliam, issued a final written decision asserting government entitlement to $28,260,630, plus interest in the amount of $16,181,845 under

48 C.F.R. § 9904.413-50(c)(12), known as Cost Accounting Standard ("CAS") 413, based upon an alleged segment closure when Lucent sold certain assets to General Dynamics Corporation ("GD").

5. The DACO's September 30, 2003 final decision and demand for payment constitutes a government claim.

6. Lucent has appealed the government's claim within one year of the DACO's final decision.

7. On September 30, 2003, Lucent submitted a claim for recovery of amounts the government owes to Lucent relating to postretirement benefit ("PRB") liabilities.

8. The government made a request for information within 60 days after Lucent's submission of the claim.

9. Lucent provided the requested information in March, 2004.

10. The government has not rendered a final decision on the claim.

11. The government's failure to render a final decision is a deemed denial of Lucent's claim.

## STATEMENT OF THE CASE

### A. Lucent and AT&T Before AT&T's Spin-off of Lucent

12. As of 1996, AT&T Corp. ("AT&T") performed government contracts.

13. As of 1996, AT&T's business units that performed government contracts were performing firm, fixed-price ("FFP"), fixed-price incentive and cost-type prime contracts with the government and subcontracts under prime government contracts

(collectively the "AT&T Contracts"). Such business units also performed commercial contracts.

14. Certain of the AT&T Contracts were subject to all of the CAS ("full CAS coverage") and contained the CAS clauses located at Federal Acquisition Regulation §§ 52.230-2 and –5 or their predecessors located at Defense Acquisition Regulation § 7-104.83 and Armed Services Procurement Regulation § 7-104.83.

15. Certain of the AT&T Contracts were subject to less than all of the CAS ("modified CAS coverage").

16. AT&T Contracts subject to modified CAS coverage were not subject to any CAS addressing the measurement and assignment of pension costs.

17. The CAS clauses in AT&T Contracts subject to full CAS coverage awarded prior to March 30, 1995, required that AT&T comply with 4 C.F.R. § 413.50(c)(12) upon a "segment closure."

18. The CAS clauses in AT&T Contracts subject to full CAS coverage awarded after March 29, 1995, required that AT&T comply with 48 C.F.R. § 9904.413-50(c)(12) upon a "segment closure."

19. AT&T maintained two qualified defined benefit pension plans, namely the AT&T Management Pension Plan ("ATTMPP") and the AT&T Pension Plan ("ATTPP"), since the 1950s.

20. On November 29, 1995, the corporate entity known as Lucent Technologies Inc. came into existence through the filing and approval of articles of incorporation with the State of Delaware.

21. At its formation, Lucent owned no assets other than a minimal amount of cash.

22. As of November 29, 1995, AT&T owned all outstanding shares of Lucent.

23. On March 29, 1996, AT&T executed a Separation and Distribution Agreement, dated February 1, 1996, and amended on March 29, 1996, providing for the transfer of certain assets and liabilities to Lucent. These assets and liabilities included the government contracts of those AT&T business units that were being transferred to Lucent.

24. AT&T and Lucent executed an Employee Benefits Agreement ("EBA"), dated February 1, 1996, as amended and restated on March 29, 1996.

25. Under the EBA, Lucent was to assume certain specified pension liabilities existing under the ATTMPP and ATTPP.

26. Under the EBA, AT&T was to transfer pension assets to Lucent pursuant to a stated formula.

27. Under the EBA, Lucent was to establish the Lucent Technologies Management Pension Plan ("LTMPP") and the Lucent Technologies Pension Plan ("LTPP"), both qualified defined benefit pension plans, effective immediately after AT&T had distributed Lucent stock to AT&T shareholders.

28. On September 30, 1996, AT&T distributed to AT&T shareholders of record as of September 30, 1996 all shares of Lucent stock that AT&T owned and Lucent became a corporation independent from AT&T.

29. Effective October 1, 1996, AT&T transferred to Lucent pension assets and liabilities in accordance with the EBA, and Lucent established the LTMPP and LTPP.

30. As of September 30, 1996, the assets in both the ATTMPP and ATTPP exceeded the liabilities for each of these plans (the " AT&T Surplus").

31. The pension assets that AT&T transferred from its ATTMPP and ATTPP to Lucent's LTMPP and LTPP exceeded the liabilities that AT&T transferred from its pension plans to Lucent's pension plans.

32. On May 5, 1997, the government, AT&T and Lucent executed a novation agreement covering the government contracts transferred as part of the assets and liabilities under the Separation and Distribution Agreement.

33. Following the spin-off transaction and continuing through the current date, Lucent has maintained the LTMPP and the LTPP.

34. Following the spin-off transaction, Lucent accounted for the cost of the LTMPP and LTPP in accordance with government contract cost accounting requirements.

35. As the result of AT&T's spin-off of Lucent, the government claims in a final decision issued to AT&T, dated September 30, 2002, that AT&T's spin-off of Lucent represented a "segment closure," as that term is defined in 48 C.F.R. § 9904.413-50(c)(12).

36. In its September 30, 2002 claim against AT&T, the government claims $7,194,000 from AT&T based upon alleged rights under 48 C.F.R. § 9904.413-50(c)(12) because of the alleged segment closure.

37. AT&T has appealed the September 30, 2002 final decision, and AT&T's appeal is pending in the United States Court of Federal Claims.

**B. Lucent After the Spin-off**

38. Commencing in February 1996, Lucent did CAS-covered business with the government.

39. The CAS-covered government business was performed by Lucent in fiscal year 1996 in a single segment, named Advanced Technology Systems, for performing CAS-covered business with the U.S. government and higher tier U.S. government contractors.

40. Lucent's single segment for performing CAS-covered government contracts was comprised of several business groups, including those known as Navy Programs, Advanced Programs, Integrated Solutions and Secure Communications

41. Lucent's single segment for performing CAS-covered government business in 1996 was the subject of a single CAS Disclosure Statement, a single set of overhead rates and a single general and administrative rate.

**C. Asset Sale to GD**

42. In early 1997, Lucent made a corporate decision to sell certain, but not all, assets of Lucent's single segment that was performing CAS-covered government contracts, intending to retain certain contracts, personnel and facilities.

43. In 1997 and coincident with the planning for the proposed asset sale, Lucent reorganized its CAS-covered government business segment into two units: (a) one referred to as Advanced Technology Systems which was comprised of elements

of Navy Programs, Advanced Programs and Secure Communications; and (b) one referred to as Integrated Solutions which was comprised of the previously described Integrated Solutions group and the remaining elements of Navy Programs, Advanced Programs and Secure Communications.

44. Effective October 1, 1997, Lucent sold certain assets of its CAS-covered government business to GD pursuant to an Agreement for the Purchase and Sale of Assets dated as of August 20, 1997 ("Asset Purchase Agreement").

45. The Asset Purchase Agreement transferred some, but not all, of the assets, personnel and contracts of the Advanced Technology Systems unit, and the government contracts activity of this unit continued within Lucent. The DCAA auditors who audited Lucent's asset sale to GD to assess Lucent's compliance with 48 C.F.R. § 9904.413-50(c)(12), and their supervisor, concluded that Lucent did not transfer to GD all assets, personnel and contracts of the Advanced Technology Systems Unit. These auditors and their supervisor stated that conclusion in writing in the Audit Report attached to the DACO's final decision

46. The Asset Purchase Agreement did not transfer any contracts, facilities or personnel of the Integrated Solutions unit except those affiliated with Secure Communications.

47. After October 1, 1997, Lucent continued to perform its CAS-covered business with the U.S. government, combining in fiscal year 1998 the remaining elements of its Advanced Technology Systems unit and its Integrated Solutions unit into a single segment known as Integrated Solutions.

48. The Integrated Solutions segment had a single set of overhead rates, a single general and administrative expense rate and a single CAS Disclosure Statement

49. The Lucent government contracts that the Asset Purchase Agreement transferred to GD were never the subject of an executed novation agreement.

**D. Transfer of Pension and Other PRB Assets And Obligations**

50. The asset sale to GD included the transfer of approximately 1000 active employees Lucent had working on CAS-covered government contracts.

51. The asset sale to GD did not include the transfer of any inactive or retired personnel ("inactive personnel").

52. After the asset sale, Lucent remained fully liable for the pension and PRB liabilities of the remaining active Lucent employees of the Advanced Technology Systems unit and the active Lucent employees of the Integrated Solutions unit working on CAS-covered government contracts.

53. In order to ensure the continuing entitlement to pension and PRBs of the transferred active employees, the Asset Purchase Agreement provided for the transfer of pension and PRB assets as required under the Internal Revenue Code and Employment Retirement Income Security Act, 29 U.S.C. § 1001, *et seq*.

54. In the case of the pension plan, such assets were conveyed from the LTMPP and the LTPP to mirror pension plan trusts established by GD. Such conveyances were effected in a series of transfers with a final true-up based upon the final number of personnel actually transferred.

55. The pension assets that Lucent transferred from its LTMPP and LTPP exceeded the liabilities that Lucent transferred from its pension plans to GD's pension plans.

56. In the case of the PRBs (which included postretirement medical, dental, and life insurance benefits), assets were to be transferred to GD equal to the accumulated postretirement benefit obligation ("APBO") liability measured under Statement of Financial Accounting Standard No. 106.

57. The APBO for PRBs as of October 1, 1997, exceeded the assets in Lucent's Voluntary Employee Beneficiary Association ("VEBA") trust for PRBs.

58. Regarding the active personnel Lucent transferred to GD, Lucent transferred to GD the $2,623,000 of assets out of its VEBA trust and reduced the cash purchase price paid by GD to Lucent by $13,000,000.

**E. <u>The Government's Claim</u>**

59. In the September 30, 2003 final decision of the DCMA, the government claimed that the sale of assets by Lucent to GD constituted a segment closure under 48 C.F.R. § 9904.413-30(a)(20).

60. The DCMA further claimed that the pension assets transferred were not allocated in accordance with 48 C.F.R. § 9904.413-50(c)(5)(ii).

61. The DCMA claimed entitlement under 48 C.F.R. § 9904.413-50(c)(12) to an adjustment to previously determined pension costs for the allegedly closed segment in the amount of $31,611,444 of which the government's asserted share of 89.4% equaled $28,260,630. Such claimed amount included an adjustment in pension cost for both the

active personnel transferred to GD and the inactive personnel that the government assigned to the allegedly closed segment.

62. The government also claimed $16,181,845 in interest.

63. The government's claim demanded payment from Lucent totaling $44,442,475.

64. During the period between the establishment of the LTMPP and LTPP and Lucent's sale of assets to GD in October 1997, Lucent did not make any contributions to its pension plans and it did not seek to include, or have included, any pension costs in its CAS-covered government contracts other than a minimal amount for administrative expenses related to the plans. After Lucent's sale of assets to GD, neither Lucent, nor GD (based on information and belief), have made any contributions to their pension plans and have not sought to include, or have included, in their CAS-covered government contracts any pension costs or amounts for contribution to their pension plans other than a minimal amount for administrative expenses related to the plans.

**F. <u>Lucent's Claim For PRBs</u>**

65. On September 30, 2003, Lucent submitted a claim to the DCMA in respect to PRB liabilities and the amounts Lucent transferred to GD in respect of these liabilities.

66. Lucent asserted in its claim that under the very same CAS-covered contracts transferred to GD which are the subject of the government's claim, Lucent had not recovered its fair share of PRB costs from the government, resulting in underfunded PRB liabilities.

67. Lucent incurred a reduction in the purchase price it received from GD of $13,000,000 to cover the assumption by GD of the underfunded PRB liabilities for transferred personnel.

68. With respect to the same population of inactive personnel for which the government assets a surplus in pension plan assets, the PRB liabilities were under funded by an amount of $1,384,784.

69. Lucent's claim in respect of PRB liabilities stated that it was a "protective claim" filed based upon the government's assertion that Lucent's sale of assets to GD constituted a segment closure.

70. Lucent's PRB claim asserted that if a segment closure were to have occurred because of Lucent's sale of assets to GD, then this sale of assets triggered the government's obligation to pay in full its fair share of Lucent's PRB liability in respect to the same population of active and inactive personnel included in the government's pension claim.

71. Lucent applied a government share ratio of 62% to the unfunded PRB liability.

72. Lucent claimed an entitlement to $11,593,308.

## COUNT I

### Lucent Did Not Close A Segment Under 48 C.F.R. § 9904.413-50(c)(12)

73. Lucent realleges paragraphs 1 through 72 as if fully set forth herein.

74. The government's claim alleges that when Lucent sold assets to GD on October 1, 1997, a segment closing, as defined at 48 C.F.R. § 9904.413-30(a)(2), occurred, triggering the application of 48 C.F.R. § 9904.413-50(c)(12), because, as a result of the sale, "a [Lucent] segment has (i) been sold or ownership has been otherwise transferred, (ii) discontinued operations, or (iii) discontinued doing or actively seeking Government business under contracts subject to this Standard." .

75. The government's claim alleges that under 48 C.F.R. § 9904.413-50(c)(12), the government is entitled to recover $44,442,475 inclusive of interest.

76. The assets, liabilities, contracts and personnel Lucent transferred to GD derived individually from Lucent business groups, and no assets, liabilities, contracts or personnel of a single Lucent segment were transferred in full to GD. Relevant DCAA personnel responsible for assessing whether Lucent had closed a segment under 48 C.F.R. § 9904.413 when Lucent sold assets to GD concluded that Lucent did not transfer assets, liabilities, contracts or personnel of a single Lucent segment in full to GD.

77. After the sale of assets to GD, the Lucent segment and business groups that existed prior to the asset sale continued to perform untransferred contracts with the government, receive award of new CAS-covered contracts from the government and employ personnel and use assets to perform these government contracts.

78. The Lucent segment and business groups that existed prior to the asset sale continued to be subject to CAS coverage, have continuously conducted business with the government and have grown the level of their business with the government substantially

during the intervening period, as well as being responsible for the contracts transferred to GD because of the lack of a novation agreement.

79. The Lucent segment and business groups that existed prior to the asset sale continue to operate with much of the same management, locations and assets (buildings, personal property, etc.) as were utilized prior to the sale of assets to GD.

80. Since the asset sale to GD, there have been, and continue to be, Lucent government contracts available for government participation in any surplus or deficit relating to Lucent's pension plans, should any such participation be found to exist.

81. The government's claim fails to establish that as the result of the asset sale to GD, any Lucent segment was transferred in its entirety to GD.

82. Lucent's sale of assets to GD did not result in a segment closing under 48 C.F.R. § 9904.413-30(a)(2), and, therefore, did not trigger 48 C.F.R. § 9904.413-50(c)(12).

83. The government's claim to recover $44,442,475 based upon the closure of a Lucent segment as a result of the asset sale is contrary to 48 C.F.R. § 9904.413-50(c)(12).

84. Lucent requests a declaratory judgment that the government's claim is contrary to fact and law and nonmonetary relief in the nature of a finding that no liability exists.

## COUNT II

**The Government Claim Is Overstated As 48 C.F.R. § 9904.413-50(c)(12) Allows Recovery Of Surplus Only In Which The Government Has Participated And Only Which Is Attributable To Certain Contracts**

85. Lucent realleges paragraphs 1 through 84 as if fully set forth herein.

86. The government claims $28,260,360 plus interest under 48 C.F.R. § 9904.413-50(c)(12), which requires the determination of an "adjustment of previously determined pension costs," equaling the difference between pension assets and liabilities as of segment closing (the "adjustment amount") and a determination of the government's share of this adjustment amount. .

87. 48 C.F.R. § 9904.413-50(c)(12)(vi) provides that the government's share of a segment closing adjustment amount is to be based on a fraction (or percentage) where the numerator equals the amount of pension costs allocable to certain contracts of the segment and the denominator equals total pension costs allocable to the segment, with the amounts in both the numerator and the denominator being measured during a "period of years representative of the Government's participation" in the contractor's pension plan (the "government participation percentage").

88. The government's claim used an 89.4% government participation percentage.

89. The representative period of the government's participation in Lucent's pension plans does not include any period prior to the formation of Lucent's pension plans.

90. Since the formation of Lucent's pension plans, there have been no Lucent pension costs assigned and Lucent has neither sought nor charged any pension costs to its government contracts, other than a minimal amount for administrative expenses related to the plans.

91. The government's participation percentage in Lucent's pension costs during the proper representative period is zero.

92. Regardless of the length of the representative period, 48 C.F.R. § 9904.413-50(c)(12) does not entitle the government to any portion of the pension surplus attributable to FFP prime contracts or subcontracts awarded prior to March 30, 1995.

93. Regardless of the length of the representative period, 48 C.F.R. § 9904.413-50(c)(12) does not entitle the government to any portion of the pension surplus attributable to contracts or subcontracts with commercial customers.

94. Regardless of the length of the representative period, 48 C.F.R. § 9904.413-50(c)(12) does not entitle the government to any portion of the pension surplus attributable to any subcontract.

95. Regardless of the length of the representative period, 48 C.F.R. § 9904.413-50(c)(12) does not entitle the government to any portion of the pension surplus attributable to any government prime contract or subcontract not subject to CAS, including those awarded prior to March 10, 1978.

96. Regardless of the length of the representative period, 48 C.F.R. § 9904.413-50(c)(12) does not entitle the government to any portion of the pension

surplus attributable to any prime or subcontract subject to modified CAS coverage under 48 C.F.R. § 9903.201-2.

97. Regardless of the length of the representative period, 48 C.F.R. § 9904.413-50(c)(12) does not entitle the government to any portion of the pension surplus attributable to any contract or subcontract to which no pension costs were allocable.

98. Regardless of the length of the representative period, 48 C.F.R. § 9904.413-50(c)(12) does not entitle the government to any portion of the pension surplus attributable to any contract or subcontract performed by unclosed segments.

99. Assuming that the government's participation percentage is not zero, that percentage must be measured after excluding from the numerator, the contracts and subcontracts described in paragraphs 92 through 98 that create no government entitlement under 48 C.F.R. § 9904.413-50(c)(12) because they do not establish any government participation in Lucent's pension plans for purposes of CAS 413.

100. Assuming a segment closure occurred, Lucent requests a declaratory judgment that, under 48 C.F.R. § 9904.413-50(c)(12), the government's claim based on a government participation percentage of 89.4% is contrary to fact and law and nonmonetary relief in the nature of a finding that the proper government participation percentage is zero or, if greater than zero, must reflect that the government has no entitlement to recover any portion of the pension surplus attributable to contracts and subcontracts that create no government entitlement under 48 C.F.R. § 9904.413-50(c)(12).

## COUNT III

### The Government Has Utilized Incorrect Figures In Calculating The Asserted Segment Closing Adjustment Amount

101. Lucent realleges paragraphs 1 through 100 as if fully set forth herein.

102. Under 48 C.F.R. § 9904.413-50(c)(12), the government's participation percentage is to be multiplied by the adjustment amount (which equals the difference between pension liabilities and the market value of the pension assets attributable to the closed segment on the date of closing).

103. Based upon its allegation that a segment closure occurred, the government claims an adjustment amount equaling the difference between the pension plan assets and related liabilities in respect of both the employees who transferred to GD and the inactive personnel who remained with Lucent that the government associates with the sold assets.

104. No dispute exists regarding the amount of pension liabilities as of the date of alleged segment closure except for adjustments to such liabilities based upon final true-up numbers for the GD sale provided by Lucent to the government.

105. With respect to the pension assets, the amount of pension assets the government has used in its claim relating to active employees is overstated because the government based its claim upon an asset amount transferred to GD, with respect to employees transferred to GD, that is too low because it failed to use the correct, and higher amount, of assets transferred to GD.

106. With respect to pension assets, the amount of pension assets the government has used in its claim relating to inactive personnel is overstated because the

government has used a highly inflated and unsupported calculation of the market value of the assets remaining with Lucent in respect to inactive personnel.

107. Assuming a segment closure occurred and the government's participation percentage is greater than zero, Lucent requests a declaratory judgment that the amounts of pension assets and liabilities the government uses in its claim to determine the adjustment amount are improper under fact and law and nonmonetary relief in the nature of a finding that the amounts of assets and liabilities used to determine the adjustment amount must reflect accurately the amount of assets transferred to GD and the related liabilities in respect to the active personnel, and the assets relating to inactive personnel that Lucent retained.

## COUNT IV

### The Government Is Not Entitled to Recover Under 48 C.F.R. § 9904.413-50(c)(12) Surplus Attributable To Inactive Personnel

108. Lucent realleges paragraphs 1 through 107 as if fully set forth herein.

109. Included in the $28,260,360 adjustment amount that the government claims is $10,638,600 of assets that relate to the inactive personnel that the government alleges were affiliated with the business assets sold to GD.

110. The pension liabilities for all inactive personnel remain fully with Lucent as no inactive personnel were transferred to GD and no related pension liabilities were transferred. No dispute exists regarding the amount of pension liabilities in respect of such inactive personnel.

111. The assets to discharge such liabilities appropriately remained with Lucent.

112. The business groups constituting the Advanced Technology Systems unit with which these inactive personnel are purportedly affiliated continued to perform CAS-covered government business after the sale of assets to GD and continue to do so at an expanded level today so there remain government contracts available to absorb any surplus pension assets relating to inactive personnel.

113. Lucent requests a declaratory judgment that the government's claim for adjustment of previously determined pension cost in respect of any inactive personnel is contrary to fact and law and nonmonetary relief in the nature of a finding that no liability exists.

**COUNT V**

**The Government Utilized An Inflated And Incorrect Interest Factor In The Claim Asserted In Its Final Decision**

114. Lucent realleges paragraphs 1 through 113 as if fully set forth herein.

115. The government has claimed a principal amount of $28,260,630 plus interest in the amount of $16,181,845 computed through September 30, 2003, under paragraph (a)(5) of 48 C.F.R. § 52.230-2.

116. The amount of interest the government claims is erroneous under fact and law.

117. Lucent requests a declaratory judgment that, assuming a segment closure occurred and an appropriate participation level and adjustment amount are calculated, that the government's interest claim is inflated and is therefore improper under fact and

law and nonmonetary relief that the government is entitled to recover only that interest provided for by contract.

## COUNT VI

### The Government Is Liable For Breach Of Contract For Failure To Pay Its Fair Share Of Lucent's PRB Liabilities

118. Lucent realleges paragraphs 1 through 117 as if fully set forth herein.

119. On September 30, 2003, Lucent submitted to DCMA a claim for the cost of PRBs that had not been paid by the government as of the date of sale of assets to GD.

120. Lucent's claim was a protective claim if it were to be found that the sale of assets to GD constituted a segment closure and an adjustment of previously determined cost was appropriate.

121. Lucent asserted in its claim that in respect of the very same government contracts, business assets, contracts and personnel that are the subject of the government's pension cost claim. Lucent is entitled to recover the government's fair share of PRB costs.

122. In its claim for adjustment of pension costs, the government asserts that the sale of assets to GD amounted to a segment closure and the constructive end of the performance by Lucent of government contracts by the transferred segment.

123. If such a segment closure were to have occurred as the government alleges, the closure triggered an assignment of $18,708,562 of deferred and unfunded PRB costs existing as of the date of the alleged segment closing to the year of the segment closing under government-mandated rules for accounting for PRB costs found in FAR Part 31

(and its predecessors) and imposed upon Lucent pursuant to: FAR § 52.216-7 (and its predecessors); FAR § 52.216-16 (and its predecessors); FAR §§ 52.215-22 and -24 (and their predecessors); and FAR § 52.230-2 (and its predecessors).

124. Lucent is entitled to recover the government's fair share of PRB costs assignable to the year of segment closure, assuming one occurred, under contracts in existence on the date of segment closure pursuant to: FAR § 52.216-7; FAR § 52.216-16; FAR § 52.230-2; FAR §§ 52.243-1 and -2; and/or an implied contractual obligation arising out of the conduct of Lucent and the government in implementing government-mandated cost accounting practices for PRB costs, which conduct resulted in Lucent's deferral of PRB costs in exchange for immediate recognition and payment of deferred and unfunded PRB costs upon a segment closure.

125. The government's fair share of Lucent's PRB liability is the government participation percentage based upon the government's participation in PRB costs under covered contracts applied to the PRB deficit, as of the alleged segment closure, of $18,708,562.

126. Assuming that segment closure occurred, the government's failure to pay Lucent the government's fair share of the $18,708,562 of deferred and unfunded PRB costs existing as of segment closure is a breach of contract that has caused Lucent damages.

127. Assuming that a segment closure occurred, Lucent requests that Court grant judgment in favor of Lucent on its breach of contract claim and find Lucent entitled to recover breach of contract damages in the amount of $18,708,562 times an appropriate

government participation percentage based upon the government's participation in PRB costs under covered contracts.

## PRAYER FOR RELIEF

WHEREFORE, Lucent prays for the following relief:

A. That the Court enter under Count I a declaratory judgment that the government's pension claim is contrary to fact and law and nonmonetary relief that Lucent has no liability because no segment closure occurred; and

B. That, assuming a segment closure occurred, the Court enter under Count II declaratory judgment that the government's pension claim based on a participation percentage of 89.4% is contrary to fact and law and nonmonetary relief that the government's participation percentage is either zero or must exclude all contracts to which 48 C.F.R. § 9904.413-50(c)(12) does not apply; and

C. That, assuming a segment closure occurred and the government's participation percentage is greater than zero, enter under Count III a declaratory judgment that the adjustment amount upon which the government bases its pension claim is improper and nonmonetary relief in the nature of a finding that the adjustment amount must reflect accurately the amount of assets transferred to GD and the amount of related liabilities in respect to the active personnel, and the amount of assets relating to the inactive personnel; and

D. That, assuming a segment closure occurred and the government's participation percentage is greater than zero, the Court enter under Count IV a declaratory judgment that the government's claim to participate in surplus assets in respect to

inactive personnel is contrary to law and nonmonetary relief in the nature of a finding that no liability relating to inactive personnel exists; and

E. That, assuming a segment closure occurred and the government's participation percentage is greater than zero, the Court enter under Count V a declaratory judgment that the interest the government claims in its pension claim is improper and nonmonetary relief that the government is entitled to recover under its pension claim only that interest provided for by contract; and

F. That, assuming a segment closure occurred, the Court enter judgment under Count VI for Lucent in the amount of $18,708,562 times an appropriate government participation percentage based upon the government's participation in covered contracts, plus interest under the CDA (41 U.S.C. § 611); and

G. That the Court grant such other relief as it deems appropriate.

Respectfully submitted this 28th day of September, 2004.

Thomas A. Lemmer
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
(303) 634-4000
FAX: (303) 634-4400

ATTORNEY FOR PLAINTIFF
LUCENT TECHNOLOGIES INC.

OF COUNSEL:

Michael Garson
Corporate Counsel
Lucent Technologies Inc.
450 Spring Park Place
Herndon, VA 20170-5243
(703) 394-1450

DN:32063035.5