Electronically Filed on August 2, 2005.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LUCENT TECHNOLOGIES INC.<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 04-1511C<br>(Judge Braden) |

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"), Plaintiff Lucent Technologies Inc. ("Lucent") respectfully moves for summary judgment on the grounds that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter law with respect to Count I of Lucent's Complaint and Count I of the Defendant's, the United States government (the "government"), Answer and Counterclaim (the "Counterclaim").

Count I of Lucent's Complaint and Count I of the government's Counterclaim relate to the government's allegation that Lucent closed a segment, pursuant to 48 C.F.R. § 9904.413-50(c)(12), when it sold some, but not all, of the assets of its ATS business to General Dynamics Corporation ("GD") on October 1, 1997. As a result of the sale of assets to GD, the government claims it is entitled to recovery of $44,442,475, inclusive of interest, under 48 C.F.R. § 9904.413-50(c)(12).

The government's claim should be denied because Lucent did not close a segment under the undisputed facts and the law. Accordingly, Lucent is entitled to summary

judgment. In support of this Motion, Lucent relies on the pleadings and the supporting Memorandum of Points and Authorities, Plaintiff's Proposed Findings of Uncontroverted Fact and related Appendix containing exhibits and testimony submitted in support of this motion.

Respectfully submitted this 2nd day of August, 2005.

s/Thomas A. Lemmer
Thomas A. Lemmer
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
(303) 634-4000
FAX: (303) 634-4400

ATTORNEY FOR PLAINTIFF
LUCENT TECHNOLOGIES INC.

OF COUNSEL:

Corey R. Sanchez
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202

Michael Garson
Corporate Counsel
Lucent Technologies Inc.
450 Spring Park Place
Herndon, VA 20170-5243
(703) 394-1450

Electronically Filed on August 2, 2005.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LUCENT TECHNOLOGIES INC.<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 04-1511C<br>(Judge Braden) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Thomas A. Lemmer
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
(303) 634-4000
FAX: (303) 634-4400

ATTORNEY FOR PLAINTIFF LUCENT TECHNOLOGIES INC.

OF COUNSEL:

Corey R. Sanchez
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202

Michael Garson
Corporate Counsel
Lucent Technologies Inc.
450 Spring Park Place
Herndon, VA 20170-5243
(703) 394-1450

August 2, 2005

**TABLE OF CONTENTS**

**Page**


TABLE OF AUTHORITIES ..... iii

APPENDIX TABLE OF CONTENTS ..... vi

I. INTRODUCTION ..... 1

II. SUMMARY OF THE FACTS ..... 3

III. RELEVANT LEGAL STANDARDS FOR SUMMARY JUDGMENT ..... 8

IV. ARGUMENT ..... 8

A. A Sale of Assets Results in a Segment Closure Under New CAS 413 When All CAS-Covered Contracts Under Performance and Related Assets are Sold, Precluding the Future Adjustment of Previously Determined Pension Costs ..... 9

1. The Plain Meaning of New CAS 413 Requires the Sale of All CAS-Covered Contracts Under Performance and Related Assets ..... 11

a. The Plain Meaning of the Words Used in the Definition of Segment Closure is that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold ..... 11

b. The Plain Meaning of the Words Not Used in the Definition of Segment Closure is that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold ..... 14

2. The Policy Underlying Segment Closures is Consistent with the Plain Meaning that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold ..... 18

B. Lucent Did Not Close ATS Because Lucent Did Not Sell All of the ATS CAS-Covered Contracts Under Performance, and Related Assets, and, Thus, Lucent Could Continue to Adjust Previously Determined Pension Costs ..... 21

1. Lucent Did Not Sell All of the ATS CAS-Covered Contracts or Related Assets ..... 21

**Page**

2. The Retention of CAS-Covered Contracts and Related Assets Means that the Connection Between Lucent's Pension Plans and the ATS CAS-Covered Contracts Did Not End and No Segment Closure Occurred. 23

V. CONCLUSION 25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003) ................ 10, 21

*Allis-Chalmers Mfg. Co. v. United States*, 79 Ct. Cl. 453, 462-63 (1934) .......................... 9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................... 8

*Arnold v. N. Am. Chem. Co.*, 122 N.E. 283 (Mass. 1919) ................................................ 13

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) ........................................... 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................. 8

*Curtis v. United States*, 168 F. Supp. 213, 216 (Ct. Cl. 1958) ........................................... 8

*Gould, Inc.*, ASBCA No. 46759, 97-2 B.C.A. ¶ 29,254 ............................................ 11, 16

*Gould, Inc.*, ASBCA No. 46759, 98-1 B.C.A. ¶ 29,469 .................................................. 11

*In Re Bicoastal Corp.*, 124 B.R. 593 (Bkrtcy. M.D. Fla. 1991) ................................. 10, 21

*In Re Bicoastal Corp.*, 125 B.R. 659 (Bkrtcy. M.D. Fla. 1991) ...................................... 11

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ................................................................ 15

*Kearfott Guidance & Navigation Corp. v. Rumsfeld*, 320 F.3d 1369 (Fed. Cir. 2003) ............................................................................................................................ 13

*Lockheed Corp. and Lockheed Missiles & Space Co.*, ASBCA No. 27921, 86-1 B.C.A. ¶ 18,614 ............................................................................................................ 17

*Lockheed Corp. v. Widnall*, 113 F.3d 1225 (Fed. Cir. 1997) ...................................... 11, 15

*Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed. Cir. 1987) ..................... 8

*Perrin v. United States*, 444 U.S. 37 (1979) ..................................................................... 12

*Perry v. Martin Marietta Corp.*, 47 F.3d 1134 (Fed. Cir. 1995) ....................................... 11

*Russello v. United States*, 464 U.S. 16 (1983) .................................................................. 16

*Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560 (Fed. Cir. 1987) ................. 8

*Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (2001) .......... passim

*Tesoro Haw. Corp. v. United States*, 405 F.3d 1339 (Fed. Cir. 2005) .......... 15

*Thermalon Indus., Ltd. v. United States*, 51 Fed. Cl. 464 (2002) .......... 9

*Unisys Corp.*, ASBCA No. 41135, 94-2 B.C.A. ¶ 26,894 .......... 9

*Whelan v. United States*, 529 F.2d 1000 (Ct. Cl. 1976) .......... 15

**<u>Other Authorities</u>**

40 Fed. Reg. 43,873 (Sept. 24, 1975) .......... 19

60 Fed. Reg. 16,534 (March 30, 1995) .......... 19

Note to Board Members, May 14, 1976 .......... 16

Staff Draft CAS 413, June 18, 1976 .......... 16

**<u>Rules</u>**

Rule 56 of the Rules of the Court of Federal Claims .......... 1, 8

**<u>Treatises</u>**

*Black's Law Dictionary* (4th ed. 1968) .......... 13

*Webster's Ninth New Collegiate Dictionary* (1990) .......... 12

**<u>Regulations</u>**

4 C.F.R. § 413.50(c)(12) .......... 16, 17, 19, 20

48 C.F.R. § 42.1204 .......... 23

48 C.F.R. § 9904.412-30 .......... 18

48 C.F.R. § 9904.412-40 .......... 18, 19

48 C.F.R. § 9904.412-50 .......... 18, 19

48 C.F.R. § 9904.413 .......... passim

48 C.F.R. § 9904.413-30 .......... passim

48 C.F.R. § 9904.413-40 .......... 9, 18, 19

48 C.F.R. § 9904.413-50 .......... 15, 18, 19

48 C.F.R. § 9904.413-50(c)(12) .......... passim

48 C.F.R. § 9904.413-60 .......... 12, 14, 23

# APPENDIX TABLE OF CONTENTS


| Tab | Description | Page |
|---|---|---|
| 1. | Advance Technology Systems Confidential Offering Memorandum | P001 |
| 2. | Agreement for the Purchase and Sale of Assets by and between Lucent Technologies, Inc. and General Dynamics Corporation, dated August 20, 1997 | P054 |
| 3. | Intellectual Property Agreement between General Dynamics Advance Technology Systems, Inc. and Lucent Technologies, Inc., effective as of October 1, 1997 | P192 |
| 4. | Chart entitled: GS Reporting Structure, dated May 30, 1997 | P205 |
| 5. | Chart entitled: Advanced Technology Systems Leadership Quality Council, dated May 30, 1997 | P206 |
| 6. | Spreadsheet entitled: ATS Employees on Roll Before and After Sales to General Dynamics | P207 |
| 7. | Spreadsheet entitled: Fixed Assets Transferable Balance Sheet, dated October 16, 1997 | P224 |
| 8. | Spreadsheet entitled: 1997 Incurred Costs for all ATS Contracts | P225 |
| 9. | Spreadsheet entitled: 1998 Incurred Costs for All Contracts | P232 |
| 10. | Spreadsheet entitled: ATS Employees Contract Charging in 1998 after Sale | P246 |
| 11. | Defendant's Answer and Counterclaim, dated January 28, 2005 | P249 |
| 12. | Declaration of Michael J. Geller, dated July 28, 2005 | P278 |
| 13. | Declaration of Thomas R. Suher, dated July 28, 2005 | P285 |
| 14. | Declaration of Debra B. Pfaff, dated July 28, 2005 | P291 |
| 15. | DCAA Audit Report No. 6201-2001K19200001, dated September 22, 2003, regarding Report on Noncompliance with Cost Accounting Standard 413 Lucent Technologies, Inc. Sale of Advance Technology Systems to General Dynamics Corporation | P302 |

Pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"), plaintiff, Lucent Technologies Inc. ("Lucent"), respectfully submits this Memorandum of Points and Authorities in support of its Motion for Summary Judgment.

## QUESTION PRESENTED

Whether, pursuant to Count I of Lucent's Complaint and Count I of the government's Counterclaim, Lucent closed a segment under 48 C.F.R. § 9904.413-50(c)(12) ("New CAS 413"), when Lucent sold some, but not all, of the contracts subject to the Cost Accounting Standards ("CAS") and related assets of its Advanced Technology Systems ("ATS") business organization to General Dynamics Corporation ("GD"), retaining and performing certain contracts subject to CAS ("CAS-covered contracts"), which were used to adjust previously determined pension costs in future years.

## I. INTRODUCTION

Even assuming ATS were a segment,[1] Lucent's sale of certain ATS contracts and related assets was not a segment closure under New CAS 413 because Lucent did not sell all of ATS' CAS-covered contracts and related assets. As discussed below, a segment closure occurs only when all of a segment's CAS-covered contracts in performance at the

---

1 For purposes of this motion only, Lucent does not contest the government's assertion that ATS was a "segment" under CAS at all relevant times. This motion establishes that even if the government's assertion were correct, Lucent is entitled to judgment as a matter of fact and law. Should the court deny Lucent's motion, Lucent reserves the right to challenge the government's assertion that ATS was a segment under CAS for purposes relevant to segment closing issues arising under New CAS 413.

time of the sale and its capability to perform CAS-covered contracts in the future are sold and the sale causes the assets and costs of pension plan(s) applicable to the segment's CAS-covered contracts to be separated from these contracts. It is only in such a circumstance that "normal" pension accounting rules applicable to CAS-covered contracts that require adjusting previously determined (*i.e.*, estimated) pension costs over future accounting periods become ineffective because the absence of CAS-covered contracts means that there are no future adjustment periods. For example, when prior estimated pension costs have been too high, the pension plan will have surplus assets that, under normal practices, will eliminate or reduce future pension costs for ongoing and future CAS-covered contracts. When there will be no future CAS-covered contract, however, such future reductions cannot occur, necessitating an immediate adjustment. Accordingly, absent a complete break between a pension plan and CAS-covered contracts, there is no segment closure, as occurred here.

Indeed, here, the continued performance of retained CAS-covered contracts, as well as the performance of subsequently awarded CAS-covered contracts, using the assets not sold to GD, has permitted the government from October 1, 1997, through the present, to benefit from the pension plan surpluses existing as of October 1, 1997, the very surplus pension plan assets that the government seeks to benefit from under its claim. During that period, Lucent has been adjusting previously overestimated pension costs by consuming the resulting surplus assets that existed in its pension plans as of October 1, 1997, to eliminate any pension costs. As a result, during the period beginning October 1, 1997 through the present, almost five years later, Lucent has not charged <u>any</u>

pension costs to any retained or subsequently awarded CAS-covered contract performed with the retained assets, even though the related business has grown to over $77 million in annual sales.

## II. SUMMARY OF THE FACTS

In 1997, Lucent maintained the ATS business organization, which was engaged in providing advanced networking and communications equipment and services to the government using intellectual property that was critical to ATS' success.[2] *See* PPF, ¶¶ 3-5. On August 20, 1997, Lucent and GD entered into an agreement in which Lucent agreed to sell to GD some of the assets of ATS, effective October 1, 1997 (the "Agreement"). PPF, ¶¶ 17-18.

As of September 30, 1997, the ATS business organization had approximately 360 active contracts with the government (the "active contracts"), including approximately 140 CAS-covered contracts. ATS also had approximately 250 contracts for which performance had been completed, but close-out of the contract had not occurred (the "inactive contracts" or "completed contracts"). PPF, ¶¶ 6, 8.

Pursuant to the Agreement with GD, Lucent excluded from the sale certain assets of ATS, including CAS-covered contracts, personnel, intellectual property and technological capabilities and fixed assets (collectively, the "retained assets"). PPF, ¶¶ 20-22, 25-28.

---

[2] This section includes a brief summary of the facts applicable to the motion for summary judgment. The complete recitation of the proposed undisputed facts applicable to the motion are in Plaintiff's Proposed Findings of Uncontroverted Facts ("PPF").

The retained CAS-covered contracts, included, among others, the cost-plus-fixed-fee ("CPFF") contracts summarized in Table 1 below. PPF, ¶¶ 7, 22. Table 1 also shows information for a proposal that ATS had been working on prior to the sale of assets to GD for which Lucent was awarded a contract shortly after September 30, 1997. PPF, ¶¶ 7, 22.

**Table 1: ATS Contracts and Proposals**

| Contract No. | Description | Type | Execution Date | CAS-Covered | 1997 Incurred Cost | 1998 Incurred Cost |
|---|---|---|---|---|---|---|
| **Contracts** | | | | | | |
| DAAH0392C0054 | TAMP (including CLIN 0007) | CPFF | 4/1/92 | Yes | $1,107,700.87 | $1,017,726.53 |
| N0001992C0064 | Lithography Collimeter Dev. | CPFF | 7/23/92 | Yes | 194,058.77 | 168,484.01 |
| DAAB0797CS616 | Advanced Cellular | CPFF | 1/10/97 | Yes | 599,638.48 | 135,523.74 |
| 4358 | BTS-LL | CPFF | 2/18/97 | Yes | 996,537.57 | 1,209,400.02 |
| F3060297C0274 | Proactive Problem Avoidance | CPFF | 9/15/97 | Yes | 2,004.09 | 462,808.25 |
| CLASS0040 | Sapporo | CPFF | 7/14/97 | Yes | 31,682.41 | 554,371.55 |
| CLASS0310 | Flamingo | CPFF | 8/25/97 | Yes | 7,949.01 | 217,484.68 |
| 4369 | BTS-Reliability Study | CPFF | 9/19/97 | Yes | 9,912.90 | 3,495,962.41 |
| N0001497C2064 | Robust RF Tags | CPFF | 9/30/97 | Yes | * | 988,955.70 |
| **Proposals** | | | | | | |
| 3338 | BTS-DC | CPFF | 5/29/98 | Yes | * | 470,471.54 |
| | | | | Total | **$2,949,484.10** | **$8,721,188.43** |

Lucent remained primarily responsible to the government for the contracts it did transfer to GD because Lucent, GD and the government did not enter into a novation

agreement regarding these contracts. PPF, ¶ 24. Moreover, none of the "completed contracts" were sold to GD. PPF, ¶ 23.

In addition to the retained contracts, the retained assets included approximately 230 employees out of the 1047 individuals working on ATS contracts as of September 30, 1997. PPF, ¶ 25. Notably, over 160 of the retained employees were managerial employees. PPF, ¶ 25.

Many of the retained employees continued to work on the CAS-covered contracts shown in Table 1. PPF, ¶ 34. These employees also worked to obtain, and did obtain, additional CAS-covered contracts after September 30, 1997. PPF, ¶¶ 29, 34. The contracts in Table 2 below, which are CPFF and time and materials ("T&M") contracts, are examples of the type of CAS-covered contracts that the retained employees have obtained and performed since the sale. PPF, ¶ 29. Relying upon the managerial and technical personnel of ATS, its intellectual property, as well as sufficient fixed assets and support systems and personnel, the CAS-covered contracts in Tables 1 and 2 have formed the core of the business that generates significant annual sales, which currently are estimated to equal or exceed $77 million. PPF, ¶¶ 21, 29.

**Table 2: New CAS-Covered Contracts**

| Contract No. | Description | Type | Execution Date | CAS-Covered | 1998 Incurred Cost |
|---|---|---|---|---|---|
| 9810348YXG | ELB Phase 1B | CPFF | 5/13/98 | Yes | 556,528.24 |

| Contract No. | Description | Type | Execution Date | CAS-Covered | 1998 Incurred Cost |
|---|---|---|---|---|---|
| MDA 90498CB266 | Flexible Routing System | T&M | 6/2/98 | Yes | 154,048.39 |
| MDA 90498CB641 | 672-1 | CPFF | 8/1/98 | Yes | 65,546.36 |
| 98A810600000 | Woodland | CPFF | 9/17/98 | Yes | 49,286.78 |
| | | | | Total | **825,409.77** |

Lucent formed the defined benefit "Lucent Management Pension Plan" ("LMPP") and the defined benefit "Lucent Pension Plan" ("LPP") in 1996. PPF, ¶¶ 13-14. Since that time, Lucent has accounted for costs of the LMPP and the LPP for government contract purposes in accordance with its disclosed government contract accounting practices for pension costs. PPF, ¶¶ 14-15, 32-33. That is, before and after the sale of assets to GD, Lucent would measure for each fiscal year the "composite" costs of each pension plan in accordance with its practices. PPF, ¶¶ 14-15, 32-33. Lucent then would allocate this composite cost to each segment covered by the respective plan based upon payroll dollars. PPF, ¶¶ 14-15, 32-33. Each segment then would allocate these pension costs to contracts, including the CAS-covered contracts in Tables 1 and 2, based upon payroll dollars. PPF, ¶¶ 14-15, 32-33.

Since their inception in 1996, and through September 30, 1997, the LMPP and the LPP have been fully-funded because plan assets have exceeded plan liabilities by an amount that, under Lucent's government contract cost accounting practices, has been sufficient to absorb all pension liabilities as these liabilities accrued for plan participants, eliminating any pension costs. PPF, ¶ 33. Because no pension costs have existed,

Lucent's government contract cost accounting practices for allocating pension costs have resulted in the allocation of no pension costs to government contracts.

Specifically, prior to October 1, 1997, the ATS employees working on CAS-covered contracts generated payroll dollars that were charged to CAS-covered contracts. The charging of these payroll dollars to CAS-covered contracts created the base for allocating pension costs to these contracts under Lucent's disclosed government contract cost accounting practices for pension costs. Because Lucent had no pension costs, however, no pension costs were allocated to these CAS-covered contracts. Thus, Lucent's government contract cost accounting practices ensured that ATS' CAS-covered contracts absorbed, and, therefore, benefited from, their fair share of the assets in the Lucent pension plans. PPF, ¶ 33.

Subsequent to September 30, 1997, the retained ATS employees have continued to work on the retained CAS-covered contracts and to work on subsequently obtained CAS-covered contracts. PPF, ¶¶ 29, 34. The efforts of these employees have resulted in payroll dollars being charged to these CAS-covered contracts. PPF, ¶ 34. As occurred prior to October 1, 1997, these payroll dollars charged to CAS-covered contracts have created the base for allocating pension costs to these contracts under Lucent's disclosed government contract cost accounting practices for pension costs. PPF, ¶¶ 14-15. As occurred prior to October 1, 1997, however, Lucent has had no pension costs and no pension costs have been allocated to these CAS-covered contracts. PPF, ¶¶ 14-15, 32-34. Thus, exactly as occurred prior to the sale to GD, these CAS-covered contracts have

continued to absorb, and, therefore, benefit from, their fair share of the assets in Lucent's pension plans. PPF, ¶¶ 14-15, 32-34.

## III. RELEVANT LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. RCFC 56; *Celotex Corp. v. Catrett*; 477 U.S. 317 (1986). Although this Court must examine the factual issues in a light most favorable to the nonmoving party, *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987), the Federal Circuit has explained:

> Where a movant has supported its motion with affidavits and other evidence which, unopposed, would establish its right to judgment, the non-movant may not rest upon general denials in its pleadings or otherwise, but must proffer countering evidence sufficient to create a genuine factual dispute. A dispute is <u>genuine</u> only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant.

*Sweats Fashions, Inc. v. Pannill Knitting Co*., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (emphasis in original), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those that are outcome determinative to the results of the case. *See id.; Curtis v. United States*, 168 F. Supp. 213, 216 (Ct. Cl. 1958).

## IV. ARGUMENT

Count I of Lucent's Complaint and Count I of the government's Counterclaim relate to a government claim of entitlement under New CAS 413 because of an alleged segment closure when Lucent sold certain ATS assets to GD. As explained below, no segment closure occurred under New CAS 413 because of that sale. Accordingly, Lucent

requests this Court to hold that: (a) the sale to GD did not result in a segment closure under New CAS 413; (b) the government has no entitlement to an immediate adjustment of pension costs under New CAS 413; and (c) Lucent is entitled to summary judgment, as a matter of fact and law, under Count I of its Complaint and on Count I of the government's Counterclaim.[3]

### A. A Sale of Assets Results in a Segment Closure Under New CAS 413 When All CAS-Covered Contracts Under Performance and Related Assets are Sold, Precluding the Future Adjustment of Previously Determined Pension Costs

New CAS 413 provides that:

> If a segment is closed, if there is a pension plan termination, or if there is a curtailment of benefits, the contractor shall determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The difference between the market value of the assets and the actuarial accrued liability for the segment represents an adjustment of previously determined pension costs.

48 C.F.R. § 9904.413-50(c)(12). Thus, when a segment is closed, a plan terminates or a plan is curtailed, previously determined pension costs are to be adjusted immediately and not in the future as normally required under CAS 413. *See* 48 C.F.R. § 9904.413-40(a).

---

[3] While Lucent bears the burden that it is entitled to summary judgment, this Court should consider when assessing Lucent's right to summary judgment that the government bears the ultimate burden in this case. *See Unisys Corp.*, ASBCA No. 41135, 94-2 B.C.A. ¶ 26,894, at 133,900 ("[i]n any appeal that involves alleged noncompliance with cost accounting standards, the burden is on the Government to establish the noncompliance"); *Thermalon Indus., Ltd. v. United States*, 51 Fed. Cl. 464, 472 (2002) (the burden is on the defendant to establish its counterclaim), *citing Allis-Chalmers Mfg. Co. v. United States*, 79 Ct. Cl. 453, 462-63 (1934).

The government has asserted a claim against Lucent under New CAS 413 for the immediate adjustment of pension costs previously determined for the purported ATS segment, alleging that the purported ATS segment closed when Lucent sold certain ATS assets to GD. As discussed below, the sale of a contractor's assets results in government entitlement only when the sale is a segment closure under New CAS 413. A sale of assets is a segment closure under New CAS 413 only when the sale transfers all of a segment's CAS-covered contracts under performance at the time of the sale and all assets that could be used to perform CAS-covered contracts in the future, but the contractor retains the related pension assets. In that circumstance, the contractor becomes unable to adjust in future accounting periods the previously determined pension costs for the sold segment, requiring an immediate adjustment (or "true-up") of those previously determined pension costs. *See Teledyne, Inc. v. United States*, 50 Fed. Cl. 155, 163 (2001), *aff'd Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003).

In this case, Lucent's sale to GD did not result in the transfer of all CAS-covered contracts under performance by ATS at the time of the sale and related assets. Rather, certain CAS-covered contracts that ATS was performing were retained and performed using other retained assets, and these contracts continued to absorb, and benefit from, the assets in Lucent's pension plans.

This is an issue of first impression because none of the previous cases relating to segment closures have addressed whether the sale of less than 100% of a segment's CAS-covered contracts under performance at the time of the sale constitutes a segment closure. *See In Re Bicoastal Corp.,* 124 B.R. 593 (Bkrtcy. M.D. Fla. 1991), *aff'd* 125

B.R. 659 (Bkrtcy. M.D. Fla. 1991), *Gould, Inc.,* ASBCA No. 46759, 97-2 B.C.A. ¶ 29,254, *aff'd* 98-1 B.C.A. ¶ 29,469, and *Teledyne, Inc., supra*. Without previous precedent on this issue, the Court should look to the plain meaning of CAS 413 and its underlying policy, which establish that when less than 100% of the CAS-covered contracts of a segment are sold, a segment closure does not occur, as explained below. *Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed. Cir. 1995) (the courts responsibility "is ultimately to ascertain the CASB's intended meaning when it promulgated the CAS").

**1. The Plain Meaning of New CAS 413 Requires the Sale of All CAS-Covered Contracts Under Performance and Related Assets**

CAS 413 defines a "segment closing" as occurring when, as the government claims here, "a segment has . . . been sold or ownership has been otherwise transferred." *See* 48 C.F.R. § 9904.413-30(a)(20). The plain meaning of these words is that the sale must include all the segment's CAS-covered contracts under performance and related assets to result in a segment closure. This meaning comes from the words used in the definition of segment closure, as well as the words not used in this definition.

**a. The Plain Meaning of the Words Used in the Definition of Segment Closure is that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold**

To interpret a regulation, the court must look at the plain language and interpret its terms in accordance with their common meaning. *Lockheed Corp. v. Widnall,* 113 F.3d 1225, 1227 (Fed. Cir. 1997) (look at regulation's plain language and consider terms in

accordance with their common meaning), *citing Perrin v. United States*, 444 U.S. 37, 42 (1979); *see also Teledyne, Inc.*, 50 Fed. Cl at 161-62 (look to the plain meaning of a CAS regulation to interpret it). The key words with substantive meaning regarding the definition of "segment closing" due to a sale are "segment," "closing" and "sold." These words together show that there must be a definite end to the segment's performance of CAS-covered contracts, which can only happen when all of the segment's CAS-covered contracts under performance are transferred to the buyer and no assets remain to permit the continued performance of CAS-covered contracts.

CAS states that a "segment" is "one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service." 48 C.F.R. § 9904.413-30(a)(19). Accordingly, a segment is defined by the operations necessary to produce the products and services it sells under its contracts. *See, e.g.,* 48 C.F.R. § 9904.413-60(c)(8) (segment closed when facility lost five-year contract to operate government-owned facility).

According to the dictionary, to "close" something means to bring it to an end or to cease operations. *See Webster's Ninth New Collegiate Dictionary* 250 (1990); *see also Teledyne, Inc.*, 50 Fed. Cl. at 170. In other words, no part of the object that closes continues. Accordingly, when a segment closes, its operations to produce goods or services sold under its contracts end or cease.

This meaning is consistent with the other terms used in CAS § 413.30(a)(20) to define a segment closing when a sale is not involved; *i.e.*, the discontinuance of

operations or a discontinuance of performing or seeking government contracts. 48 C.F.R. § 9904.413-30(a)(20). The discontinuance of something means that it ends or ceases, which further supports that the products and services are no longer provided. *Black's Law Dictionary* 551 (4th ed. 1968). In terms of the government, this means that the contractor no longer continues to provide, or have the capability or desire to provide, goods and services under government contracts.

Consistent with the plain meaning of "segment" and "closing" is the plain meaning of "sale." According to *Black's Law Dictionary*, a "sale" is achieved when something is "sold," and something is "sold" when a "contract [exists] whereby property is transferred from one person to another for a consideration of value, implying the passing of the general and absolute title, as distinguished from a special interest falling short of complete ownership." *Black's Law Dictionary* 1503 (4th ed. 1968), *citing Arnold v. N. Am. Chem. Co.*, 122 N.E. 283, 284 (Mass. 1919). Accordingly, when something is sold, there is a complete transfer of ownership. The seller does not retain any rights. In the case of the sale of assets of a segment, this means that the contractor must retain no ownership in the contracts under which it currently provides the products and services. Anything less means that the segment has not been sold.

CAS 413 also contains several Illustrations that support the interpretation that the entire segment must close. *See Kearfott Guidance & Navigation Corp. v. Rumsfeld*, 320 F.3d 1369, 1377 (Fed. Cir. 2003) (regulations are to be read in harmony). Specifically, under Illustrations 8, 12 and 14 to CAS 413, when the contractor no longer has any CAS-covered contracts under which pension assets could be adjusted, a true-up of

pension costs is required. *See* 48 C.F.R. §§ 9904.413-60(c)(8) (loss of a contract results in the cessation of operations), (12) (sale of a segment and novation of all contracts) and (14) (no government contracts). From the plain meaning of the terms "segment," "closing" and "sold," a segment closing occurs when a segment performing government contracts is sold in its entirety such that the segment no longer provides, or is able to provide, services and products to the government through its prior owner.

The decision in *Teledyne, Inc.* is consistent with this interpretation. In *Teledyne, Inc.*, the court found that Teledyne sold the entire segment because Teledyne did not retain "responsibility for . . . the contracts over which gains and losses attributable to the government's share of pension costs would ordinarily be amortized." 50 Fed. Cl. at 170-71. Thus, "[a]s far as Teledyne is concerned, . . . the TES segment is closed." *Id.* at 171. In other words, from Teledyne's perspective, the segment's operations ended or ceased because Teledyne sold all of the segment's contracts and assets.

**b. The Plain Meaning of the Words Not Used in the Definition of Segment Closure is that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold**

Words not used in CAS 413 support the meaning that a segment closure does not occur when less than all of a segment's CAS-covered contracts and capability to perform CAS-covered contracts are sold. This is true under the definition of segment closing in 48 C.F.R. § 9904.413-30(a)(20), as well as the text of New CAS 413.

"'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it

has earlier discarded in favor of other language.'" *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987); s*ee also Teledyne, Inc.*, 50 Fed. Cl. at 165. Regulations are to be interpreted in the same manner as statutes. *Tesoro Haw. Corp. v. United States*, 405 F.3d 1339, 1346-47 (Fed. Cir. 2005), *citing Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414-15 (1945) (focus on "plain words of the regulation" to ascertain the meaning of the regulation); *Lockheed Corp. v. Widnall*, 113 F.3d at 1227) ("[t]o interpret a regulation we must look at its plain language and consider the terms in accordance with their common meaning"); *Whelan v. United States*, 529 F.2d 1000, 1002-03 (Ct. Cl. 1976) (rules of statutory construction apply to the interpretation of administrative regulations). Accordingly, when language is not used that could have been used, significance should be given to that fact. This principle is important to both the meaning of the segment closure definition and New CAS 413.

First, the definition of segment closure in CAS 413 does not contemplate anything less than the whole closure of the segment because it does not include any qualifying language. 48 C.F.R. § 9904.413-30(a)(20). The definition is not qualified by terms like "partially," "in part," "materially," "significant" or any other similar words meaning something less than the whole. This is in contrast, for example, to the conditions in CAS 413 that require contractors to calculate separate segment pension costs under CAS 413. *See* 48 C.F.R. § 9904.413-50(c)(2). There, the CAS Board specifically requires that when the conditions of a segment change such that it has a "material" affect on the amount of pension costs allocated to the segment, a contractor shall calculate separate pension costs for the segment. *Id.* Thus, the CAS Board's decision not to qualify the

amount of the segment that must be sold to result in a segment closure reinforces that the closure must be the complete end of the segment. *See, e.g., Russello v. United States*, 464 U.S. 16, 23 (1983) (where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion"); *Teledyne, Inc.*, 50 Fed. Cl. at 178, n. 27 (CAS Board elected not to incorporate recovery under firm, fixed-price contracts).

Second, the text of the original segment closure provision in 4 C.F.R. § 413.50(c)(12) ("Old CAS 413") was modified in a manner that underscores this interpretation of segment closure under New CAS 413.[4] During the writing of the original segment closing provision in 1977, the CAS Board dropped several words that would have qualified the amount of segment closing required. The CAS Board originally drafted the Old CAS 413 to read "[i]f all, or substantially all, of a segment is closed, and a significant number of employees are thereby separated from the plan, the contractor shall compute a net gain or loss from the plan applicable to that segment . . . ." *See* Note to Board Members, May 14, 1976, Staff Draft CAS 413, June 18, 1976, *cited in Teledyne, Inc.*, 50 Fed. Cl. at 164 (emphasis added); *see also, Gould*, *Inc.*, ASBCA No. 46759, 97-2 B.C.A. ¶ 29,254 (Accounting Principles Board ("APB") No. 8 required "substantially all"). The final version of Old CAS 413 did not include the text "all, or substantially all,

[4] For purposes of understanding the CAS Board's reason for promulgating the segment closing regulations generally, as explained further in Section IV.A.2. below, the differences between the segment closing adjustment in Old CAS 413 and New CAS 413 are not significant. *Teledyne, Inc., supra.*

of" nor did it include the text "and a significant number of employees are thereby separated from the plan." *Teledyne, Inc.*, 50 Fed. Cl. at 165.

When the CAS Board deliberately discarded the "substantially all" language that was originally contemplated in the draft of Old CAS 413, the CAS Board made a statement that a segment should not be considered closed if the contractor sold or transferred something less than the entire segment. That intent was reinforced by the CAS Board also discarding the language "a significant number of employees are thereby separated from the plan."

This evolution of the text of Old CAS 413 shows that the CAS Board understood how to define a closure that was something less than a complete cessation of operations. It also shows that the old CAS Board intended Old CAS 413 to require a complete closure. Certainly, when New CAS 413 was drafted, the new CAS Board was aware of the history of Old CAS 413. *See, e.g., Lockheed Corp. and Lockheed Missiles & Space Co.*, ASBCA No. 27921, 86-1 B.C.A. ¶ 18,614, at 93,540 (CAS Board presumed to have had the requisite understanding of the regulations). Nevertheless, the new CAS Board did not adopt the rejected language or include other language that might allow for closure when something less than all is sold. Thus, the absence of any words of qualification relating to segment closing supports that the plain meaning is that a segment's operations must end in their entirety for a closure to occur.

### 2. The Policy Underlying Segment Closures is Consistent with the Plain Meaning that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold

The policy underlying the requirement in New CAS 413 for an immediate adjustment when a segment is closed is consistent with, and, therefore, supportive of, the plain meaning of New CAS 413. *See Teledyne, Inc.*, 50 Fed. Cl. at 161 (it is important to interpret the CAS to accomplish the policy of the regulation). The policy underlying New CAS 413 is to require an immediate period adjustment when it is no longer possible to allocate adjustments of previously determined pension costs to any CAS-covered contract, a circumstance that will exist only when there are no CAS-covered contracts.

Specifically, pension accounting measures pension costs for a given fiscal year based on estimates regarding the future. *See* 48 C.F.R. §§ 9904.412-30(a)(3), -40(a)(1) and -50(a)(1)(iv); and 413-40(a) and -50(a). Pension accounting recognizes, however, that estimates regarding the future will not equal what actually occurs in the future. 48 C.F.R. § 9904.413-30(a)(5) ("[a]ctuarial gain or loss means the effect on pension cost resulting from differences between actuarial assumptions and actual experience"). Thus, CAS pension accounting requires that, in each accounting period, contractors assess the differences between past estimates and actual experience and adjust previously determined pension costs by including these differences in current pension costs. 48 C.F.R. §§ 9904.412-40(a)(1) and -50(a)(1)(v); 413-40(a) and -50(a). Then, because the current year pension costs, including the adjustments to previously determined costs, are allocated to any current year CAS-covered contracts, this process effectively adjusts

previously determined pension costs allocated to CAS-covered contracts through allocations to current CAS-covered contracts. *See* 48 C.F.R. §§ 9904.412-40(d) and -50(d); 413-40(c) and -50(c).

In contrast:

> The Board believes a current period adjustment is appropriate when there is a disruption of the contracting relationship, a discontinuance of the operational segment, or a discontinuance of the pension plan. When such events occur, pension costs can no longer be computed and adjusted on an on-going basis since there are either no future accounting periods in which credits or charges can be allocated to contracts or no future periods in which benefits will be earned.

60 Fed. Reg. 16,534 (March 30, 1995). In the circumstance of only a partial sale of a segment's CAS-covered contracts and the continued ability to perform these retained contracts, as well as future CAS-covered contracts, future periods will exist in which adjustments of previously determined pension costs can be allocated to CAS-covered contracts. That circumstance, therefore, eliminates the need for a current period adjustment.

The policy underlying New CAS 413 is reinforced by the policy underlying Old CAS 413. Like New CAS 413, Old CAS 413 required "an adjustment of previously determined pension costs" upon a segment closure. 4 C.F.R. § 413.50(c)(12); 48 C.F.R. § 9904.413-50(c)(12). This requirement existed because the old CAS Board recognized that pension costs resulted from "long-range projections." *See Teledyne, Inc.*, 50 Fed. Cl. at 163, *quoting* 40 Fed. Reg. 43,873-74 (Sept. 24, 1975). The old CAS Board further recognized that these projections required annual adjustments through the recognition of

actuarial gains and losses spread over future years. *See Teledyne, Inc.*, 50 Fed. Cl. at 163-64. Thus, as stated in *Teledyne, Inc.*:

> Important to this case, CAS 413 also addresses how actuarial gains and losses relating to pension costs should be treated when there is a "segment closing." *Id.* § 413.50(c)(12). The CASB recognized that a "segment closing" presents a unique situation that requires a separate accounting treatment because the contractor no longer has the ability to amortize ongoing actuarial gains or losses over future periods. As the CASB noted in the preamble accompanying the final rule published in the Federal Register:
>
> > As a general rule, [CAS 413] . . . is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost accounting periods in determining the costs for the segment. <u>However, a problem arises in cases where a segment is closed. Because there are no future periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs.</u> This adjustment is not an actuarial gain or loss as defined in the Standard.
>
> *Id.* Pt. 413, Preamble A (emphasis added). Thus, the CASB included the segment closing provision "to serve as a basis for recognizing and adjusting pension costs previously allocated to the segment being terminated." *Id.*

*Teledyne, Inc.*, 50 Fed. Cl. at 164.[5] Thus, like New CAS 413, Old CAS 413 applied when adjustments to previously recognized costs could not occur because of the absence

---

[5] The original CAS Board stated "[r]ecognizing gains and losses in the current year generally is not appropriate because gains or losses are often an adjustment of costs for a number of years. In this regard, the Board noted that APB No. 8, Accounting for the Costs of Pension Plans, issued November 1966 by the Financial Accounting Standards Board, stated that gains and losses should be

of CAS-covered contracts and the ability to perform CAS-covered contracts. *See Allegheny Teledyne Inc.*, 316 F.3d at 1374; *Bicoastal Corp.*, *supra*; *see also, Gould, Inc.*, *supra*.

Accordingly, the policy underlying New CAS 413 is that when less than 100% of a segment's CAS-covered contracts are sold and the ability to perform these contracts is retained, future accounting periods will exist that will permit the continued adjustment of pension costs and protect the government from the separation of the pension assets from the contracts. That policy is consistent with the plain meaning of New CAS 413.

### B. Lucent Did Not Close ATS Because Lucent Did Not Sell All of the ATS CAS-Covered Contracts Under Performance, and Related Assets, and, Thus, Lucent Could Continue to Adjust Previously Determined Pension Costs

Even assuming that ATS were a segment, ATS did not close because Lucent did not sell all ATS CAS-covered contracts. PPF, ¶¶ 20, 22. Thus, previously determined pension costs of the LMPP and LPP may be adjusted against the CAS-covered contracts that were retained, as explained below.

#### 1. Lucent Did Not Sell All of the ATS CAS-Covered Contracts or Related Assets

Under the terms of the agreement with GD, Lucent did not sell or transfer all of the ATS CAS-covered contracts or the assets necessary to perform these contracts. PPF, ¶¶ 20, 22. Thus, there was no end to ATS' contractual relationship with the government

recognized immediately only if they arise from a single occurrence not directly related to the operation of the pension plan such as the closing of a plant." Preamble A to 48 C.F.R. § 9904.413, ¶ 3 (emphasis added).

and no elimination of future accounting periods over which adjustments of previously determined pension costs could occur.

The government admits that Lucent did not sell all of the ATS CAS-covered contracts or the assets necessary to perform these contracts. Specifically, the government admits that Lucent transferred <u>some, but not all</u>, of the assets, personnel and contracts of ATS. PPF, ¶¶ 18, 30. The government further admits that Lucent agreed to sell to GD only the "<u>vast majority of the active Government contracts</u> being performed by [ATS]." PPF, ¶ 31 (emphasis added). Moreover, even DCAA concluded that Lucent did not transfer to GD all assets and contracts of ATS, including the CAS-covered contracts. PPF, ¶ 30.

In addition, Table 1 above establishes that the government's admissions reflect the undisputed facts. PPF, ¶ 22. Table 1 lists some of the specific ATS CAS-covered contracts under performance at the time of the sale of assets to GD that were not sold and that continued to be performed after the sale using the same tangible and intellectual property assets as had been used prior to the sale. PPF, ¶¶ 21-22. These contracts resulted in over $8.7 million in incurred costs in 1998. PPF, ¶¶ 7, 32-33.

Out of approximately 1000 employees working on ATS contracts prior to the sale, approximately 230 employees (including over 160 managers) were retained and continued to work on the contracts that were not sold. PPF, ¶ 25. These employees incurred payroll costs that were part of the costs incurred for performing the retained CAS-covered contracts that, as discussed in the next section below, allowed for the

continued adjustment of previously determined pension costs of the LMPP and the LPP. PPF, ¶¶ 32-34.[6]

In addition, these remaining employees sought (and continue to seek) and have obtained (and will continue to obtain) new CAS-covered contracts, including those in Table 2 above. PPF, ¶ 29. Since the date of sale, these employees have been the reason Lucent has obtained significant annual revenues under CAS-covered contracts, which currently are estimated to equal or exceed $77 million. PPF ¶¶ 20-21, 29.

### 2. The Retention of CAS-Covered Contracts and Related Assets Means that the Connection Between Lucent's Pension Plans and the ATS CAS-Covered Contracts Did Not End and No Segment Closure Occurred

As just described, ATS CAS-covered contracts, employees and other assets were not sold to GD and these employees, using these other retained assets, continued to perform the remaining CAS-covered contracts and have performed new CAS-covered contracts, as well. PPF, ¶¶ 20-21, 29. Moreover, the pension plans in existence prior to the sale (*i.e.*, the LMPP and the LPP) have continued in existence. PPF, ¶¶ 32-34. Thus, as explained below, future accounting periods have continued to exist that have permitted

6 Unlike the contractor in Illustration 12 of CAS 413 (*see* 48 C.F.R. § 9904.413-60(c)(12)), the government contracts that ATS did transfer were not novated, which means that Lucent remains liable for those contracts even today. PPF, ¶ 24. Federal Acquisition Regulation ("FAR") allows the government to recognize the successor in interest when there is a transfer of: (a) all the contractor's assets; or (b) the entire portion of the assets involved in performing the contract. 48 C.F.R. § 42.1204(a). Pursuant to FAR, when a novation does not occur, "the original contractor remains under contractual obligation to the Government . . . ." *Id.* at (c). The failure of the government to have these contracts novated further supports that all of the rights in contracts being performed by ATS did not transfer to GD.

the adjustment of previously determined pension costs allocated to ATS contracts and, thus, no segment was closed because of the sale of assets to GD.

Prior to the sale, LMPP and LPP pension costs were to be measured on a composite basis. PPF, ¶¶ 13-14. Measured costs were to be allocated to segments on payroll dollars based on the assumption that the segments would be performing contracts to which payroll dollars would be charged. PPF, ¶¶ 13-14. Costs allocated to segments were then to be allocated to segment contracts on the basis of payroll dollars charged to each contract. PPF, ¶ 14. This resulted in ATS being allocated any measured pension costs because ATS incurred payroll costs performing contracts, including CAS-covered contracts and, in turn, any pension cost allocated to ATS being allocated to its contracts, including CAS-covered contracts.

After the sale to GD, these accounting practices remained in place. PPF, ¶¶ 13-14, 32-34. Moreover, after the sale, the retained ATS employees generated payroll dollars charged to retained CAS-covered contracts and then to subsequently obtained CAS-covered contracts. PPF, ¶¶ 32-34. In fact, the total amount of direct labor dollars charged by the individuals to the contracts in Tables 1 and 2 for 1998 was approximately $1 million. PPF, ¶ 34. As a result, future accounting periods have continued to exist in which CAS-covered contracts were performed that have permitted the adjustment of previously determined pension costs.

In fact, since the date of the sale, the retained contracts and subsequently obtained CAS-covered contracts performed using retained employees have been allocated no pension costs. PPF, ¶¶ 32-34. This has occurred because under Lucent's government

contract cost accounting practices, the surplus assets in the LMPP and LPP have been able to absorb the cost of the pension liabilities that accrued as retained employees worked on CAS-covered contracts. PPF, ¶¶ 32-34. This establishes that the adjustment of previously determined pension costs, which costs were based on estimates that resulted in the surplus assets, have continued to be recognized to the government's benefit. Indeed, this continued recognition of adjustments to previously determined pension costs has given the government exactly what it seeks in this litigation — the benefit of the asset surplus in the LMPP and LPP as of September 30, 1997.

These facts are in contrast to those found in *Teledyne, Inc.* In contrast to Teledyne, as far as Lucent is concerned, ATS did not close because Lucent has remained responsible for CAS-covered contracts of the segment allegedly closed. Moreover, in further contrast to Teledyne, because it retained responsibility over CAS-covered contracts that have been performed, Lucent has remained able to continue to adjust previously determined pension costs applicable to ATS contracts. Accordingly, no segment closure occurred when certain ATS assets were sold to GD in 1997.

## V. <u>CONCLUSION</u>

The government might wish that New CAS 413 had been written to find a segment closure when something less than the entire segment is sold, but that is not what New CAS 413 provides. New CAS 413 requires the entire segment be sold because this is the only circumstance that terminates the relationship between previously determined pension costs and the contracts that have a relationship to such costs, making it impossible to adjust these previously determined pension costs in future years.

As a result, even if ATS were to have been a segment of Lucent on September 30, 1997, the sale of only some of ATS' CAS-covered contracts and other assets to GD did not dispose of ATS in its entirety. Accordingly, Lucent respectfully requests that this Court grant Lucent's motion for summary judgment that under Count I of Lucent's Complaint the government has no entitlement against Lucent because of the sale of some of the ATS assets and that the government's Counterclaim fails as a matter of law based on the undisputed facts.

Respectfully submitted this 2nd day of August, 2005.

s/Thomas A. Lemmer
Thomas A. Lemmer
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
(303) 634-4000
FAX: (303) 634-4400

ATTORNEY FOR PLAINTIFF
LUCENT TECHNOLOGIES INC.

OF COUNSEL:

Corey R. Sanchez
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202

Michael Garson
Corporate Counsel
Lucent Technologies Inc.
450 Spring Park Place
Herndon, VA 20170-5243
(703) 394-1450

DN:32108026.4