# Exhibit 2

# Part 3 of 12

(k) any of the Completed Contracts; and

(l) any assets, properties or rights relating exclusively to the Excluded Programs.

**2.3 Purchase Price**

In consideration of the sale, transfer, assignment, conveyance and delivery by Seller of the Purchased Assets to Buyer, Buyer shall pay to Seller at the Closing Two Hundred Eighty Four Million and 00/100 Dollars ($284,000,000) in cash (the "Purchase Price") by wire transfer of immediately available funds to the account of Seller designated by Seller's written instructions. The Purchase Price shall be subject to adjustment as provided in Sections 2.9, 5.9, 5.10 and 9.3(e).

**2.4 Assumed Liabilities**

On the Closing Date, Buyer shall execute and deliver to Seller an assumption agreement in a form reasonably acceptable to Seller and one or more lease assignment agreements in a form reasonably acceptable to Seller pursuant to which Buyer shall accept, assume and agree to pay, perform or otherwise discharge, in accordance with the respective terms and subject to the respective conditions thereof, all of the liabilities and obligations of Seller pursuant to and under the Assumed Liabilities. "Assumed Liabilities" shall mean all liabilities and obligations set forth in this Section 2.4, whether or not any such obligation has a value for accounting purposes or is carried or reflected on or specifically referred to in Seller's books or financial statements:

(a) All Accounts Payable, other than the Intracompany Payables;

(b) All liabilities and obligations of Seller under the Contracts, excluding any liability or obligation, whether arising prior to, on or after the Closing Date, in connection with any claim, action, suit, proceeding or investigation relating to or involving criminal conduct or civil fraud occurring prior to the Closing Date;

(c) All liabilities and obligations of Seller under the Licenses;

(d) All liabilities and obligations of Seller with respect to the Transferred Employees set forth in Section 5.5;

(e) All liabilities and obligations of Seller

under the Governmental Permits;

(f) All liabilities and obligations of Seller under the Assumed Leases;

(g) All Permitted Encumbrances and all other Encumbrances and other obligations attaching to the Purchased Assets that are identified in this Agreement or the Schedules hereto;

(h) All Assumed Environmental Liabilities; and

(i) All other liabilities and obligations of Seller in connection with the Business to the extent they are set forth on the Closing Balance Sheet (as defined in Section 5.10(b)).

**2.5 Excluded Liabilities**

Buyer shall not assume or be obligated to pay, perform or otherwise assume or discharge any liabilities or obligations of Seller or any of its Affiliates, whether direct or indirect, known or unknown, or absolute or contingent, except for the Assumed Liabilities (all of such liabilities and obligations not so assumed being referred to herein as the "Excluded Liabilities"), and, without limiting the generality of the foregoing and notwithstanding the provisions of Section 2.4, none of the following shall be assumed by Buyer (and each shall be deemed to be an Excluded Liability):

(a) any Intracompany Payables;

(b) any liabilities or obligations in respect of Excluded Assets;

(c) any liabilities or obligations with respect to any current or former employees, consultants or agents of Seller or any of its Affiliates other than (i) as set forth in Section 5.5 or (ii) liabilities and obligations under the employment and consulting agreements included in the Contracts identified on Schedule 3.12(a);

(d) any liability or obligation with respect to the matters identified on Schedule 2.5(d);

(e) any liability or obligation (whether assessed or unassessed) of Seller, any of its Affiliates or any their respective predecessors with respect to Taxes (with respect to the Business or otherwise), including any Taxes arising by reason of the transactions contemplated by this Agreement other than as provided in Section 2.9, as of or for any period

ending prior to, on or after the Closing Date;

(f) except for the Assumed Environmental Liabilities, any liability or obligation (contingent or otherwise) of Seller, any of its Affiliates or any of their respective predecessors arising under any Environmental Law.

**2.6 Consent of Third Parties; Further Assurances**

(a) From time to time following the Closing, Seller shall execute and deliver, or cause to be executed and delivered, to Buyer such additional instruments of conveyance and transfer as Buyer may reasonably request or as may be otherwise necessary to more effectively convey or transfer to, and vest in, Buyer and put Buyer in possession of, any part of the Purchased Assets.

(b) Nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign any Purchased Asset, including any license, certificate, approval, authorization, agreement, contract, lease, or other right, which by its terms or by law is nonassignable without the consent of third Persons ("Nonassignable Assets") unless and until such consents shall be given. Seller agrees to cooperate with Buyer at its request in endeavoring to obtain such consent promptly; provided, however, that such cooperation shall not require Seller to remain secondarily liable with respect to any Nonassignable Asset other than in connection with the novation of government contracts subject to Part 42 of the Federal Acquisition Regulations. Buyer and Seller agree to use their respective Best Efforts to obtain, or to cause to be obtained, any consent, substitution, approval, or amendment required to novate all obligations under any and all Contracts or other obligations or liabilities that constitute Assumed Liabilities or to obtain in writing the unconditional release of Seller so that, in any such case, Buyer and its Affiliates shall be solely responsible for such liabilities and obligations. To the extent permitted by applicable law, in the event consents to the assignment thereof cannot be obtained, such Nonassignable Assets shall be held, as and from the Closing Date, by Seller in trust for Buyer and the covenants and obligations thereunder shall be performed by Buyer in Seller's name and all benefits and obligations existing thereunder shall be for Buyer's account. Seller shall take or cause to be taken at Buyer's expense such action in its name or otherwise as Buyer may reasonably request so as to provide Buyer with the benefits of the Nonassignable Assets and to effect collection of money or other consideration to become due and payable under the Nonassignable Assets, and Seller shall promptly pay over to Buyer all money or other

consideration received by it in respect to all Nonassignable Assets. As of and from the Closing Date, Seller authorizes Buyer, to the extent permitted by applicable law and the terms of the Nonassignable Assets, at Buyer's expense, to perform all the obligations and receive all the benefits of Seller under the Nonassignable Assets and appoints Buyer its attorney-in-fact to act in its name on its behalf with respect thereto.

(c) From and after the Closing Date, Buyer shall perform, at its own expense, all of the liabilities and obligations of Seller which constitute Assumed Liabilities.

**2.7 No Licenses**

Unless expressly set forth in the Intellectual Property Agreement, no right or license of any kind is granted to Buyer pursuant to this Agreement with respect to Seller's Proprietary Information, either directly or indirectly, by implication, by estoppel or otherwise.

**2.8 Bulk Sales Law**

Buyer hereby waives compliance by Seller with the requirements and provisions of any "bulk-transfer" laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

**2.9 Taxes**

Buyer and Seller agree to share equally all applicable sales, transfer, excise, value added, use or other similar Taxes and all recording and filing fees, whether levied on Seller or Buyer, that are payable by reason of the sales, transfers, leases, rentals, licenses, and assignments contemplated hereby, except for Seller's income and capital gains Taxes or franchise or other Taxes based on Seller's income. To effect the intent of this Section 2.9, Buyer and Seller shall, as provided by law or regulation, file the appropriate Tax returns or other documentation, and pay the Taxes and all recording and filing fees due, in their separate and respective capacities. To the extent the payments by either party under this Section 2,9 are in excess of that party's equal share of the total of such payments, the parties shall treat such excess payment as and adjustment to the Purchase Price in the manner provided in Section 5.10(d).

**3. Representations and Warranties of Seller**

Seller represents and warrants to Buyer that, except as disclosed in the Disclosure Schedule:

### 3.1 Organization and Authority

Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware and has full corporate power and authority to carry on the Business as now conducted and to own or lease and operate its properties as, and in the places where, the Business is now conducted and such properties are now owned, based or operated.

### 3.2 Authorization; Binding Obligations

Seller has all necessary corporate power and authority to execute and deliver this Agreement and the Collateral Agreements and to effect the transactions contemplated hereby and thereby and has duly authorized the execution, delivery and performance of this Agreement and the Collateral Agreements by all necessary corporate action. This Agreement has been duly executed and delivered by Seller and this Agreement is, and the Collateral Agreements when duly executed and delivered by Seller will be, valid and legally binding obligations of Seller, enforceable against it in accordance with their terms, except to the extent that enforcement of the rights and remedies created hereby and thereby may be affected by bankruptcy, reorganization, insolvency and similar laws of general application affecting the rights and remedies of creditors and by general equity principles.

### 3.3 No Violations

(a) Assuming that all consents, approvals, authorizations and other actions described in Section 2.6 have been obtained and all filings and notifications listed in the Disclosure Schedule have been made, the execution, delivery and performance of this Agreement and the Collateral Agreements by Seller and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) result in a breach or violation of any provision of Seller's charter or by-laws or in a material violation of any statute, rule, regulation or ordinance applicable to Seller, (ii) violate or result in a breach of or constitute an occurrence of default (or an event that might, upon the passage of time or the giving of notice, or both, constitute an occurrence of default) under any provision of, result in the acceleration or cancellation of any obligation under, or give rise to a right by any party to terminate or amend its obligations under, any material mortgage, deed of trust, conveyance to secure debt, note, loan, indenture, lien, lease, agreement, instrument, order, judgment, decree or other

material arrangement or commitment to which Seller is a party or by which it is bound and which relates to the Business or the Purchased Assets, which violation, breach or default could be reasonably expected to have a Material Adverse Effect on the Business, or (iii) violate any order, judgment, decree, rule or regulation of any court or any Governmental Body having jurisdiction over Seller or any of its Purchased Assets, and which violation could be reasonably expected to have a Material Adverse Effect on the Business or on the performance by Seller of its obligations under this Agreement.

(b) No consent, approval, order or authorization of, or registration, declaration or filing with, any Person is required by Seller in connection with the execution and delivery of this Agreement and the Collateral Agreements or the consummation of the transactions contemplated hereby or thereby, except for (i) any filings required to be made under the HSR Act and (ii) consents of third Persons which are required to transfer or assign to Buyer any Purchased Assets or assign the benefits of or delegate performance with regard thereto.

### 3.4 Financial Statements

The Business Financial Statements, attached as Schedule 3.4, (i) have been compiled from and are in accordance with Seller's books and records for the Business, (ii) fairly present in all material respects the financial condition of the Business as of their respective dates and the results of operations (before interest and income Taxes) of the Business for the periods then ended, and (iii) have been prepared in all material respects in accordance with GAAP except as disclosed therein.

### 3.5 Absence of Changes

Since December 31, 1996:

(a) Seller has conducted the Business only in the usual and ordinary course and in accordance with past practices in all material respects;

(b) There has been no change in the condition (financial or otherwise, results of operations, assets, liabilities or earnings of the Business, other than changes arising in the ordinary course of business, none of which changes, individually or in the aggregate, has had a Material Adverse Effect on the Business;

(c) Seller has not made or promised to make any increase in any salaries, rates of pay or other compensation

or benefits of any Dedicated Business Employees, except for customary increases and progressions for employees not covered by collective bargaining agreements, which increases and progressions were made in the ordinary course of business or in accordance with applicable collective bargaining agreements or changes in benefits generally provided to all of Seller's hourly and/or salaried employees;

(d) The Business has not suffered any strike or other material labor trouble, and Seller has not entered into any material agreement or material negotiation with any labor union or other collective bargaining representative of any Dedicated Business Employees;

(e) The Business has not suffered any material damage, destruction or loss (whether or not covered by insurance);

(f) There has been no change in the method of accounting or keeping of books of account or accounting practices with respect to the Business; and

(g) Seller in connection with the Business has not accelerated, delayed or postponed payment of accounts payable or the collection of accounts receivable outside the ordinary course of business consistent with past practice.

**3.6 Assets**

(a) Seller has good and marketable title to, or a valid leasehold interest in, all the tangible Purchased Assets free and clear of any Encumbrance, except for Permitted Encumbrances.

(b) All Inventory is stored at the Principal Premises, on a customer's or potential customer's premises or is in transit to a customer or potential customer. The values at which the Inventory is shown on the Balance Sheet have been determined in accordance with the normal valuation policy of Seller and in accordance with GAAP.

**3.7 Personal Property**

To Seller's knowledge, the items of personal property included in the Purchased Assets and presently and actively used in the operation of the Business are in reasonable operating condition, in light of their respective ages, and are suitable for the purposes for which they are currently being used.

**3.8 Permits, Licenses**

Except for government approval for access to classified facilities and information, to Seller's knowledge, there are no material Governmental Permits necessary for or used by Seller to carry on the Business as now being conducted or to use and occupy the Principal Premises as now being used, which Governmental Permits are required by currently effective laws, rules and regulations.

**3.9 Leases**

Schedule 3.9 contains a complete and accurate list of the Assumed Leases. Buyer has been provided with a complete and correct copy of each Assumed Lease. Each Assumed Lease is in full force and effect and, to Seller's knowledge, Seller has not violated, and the landlord has not waived, any of the material terms or conditions of any Assumed Lease and all the material covenants to be performed by Seller and the landlord under each Assumed Lease prior to the date hereof or the Closing Date, as applicable, have been fully performed.

**3.10 Compliance With Laws and Litigation**

(a) With respect to the Business, Seller has complied and is in compliance in all material respects with all applicable laws, rules, regulations, ordinances, decrees, orders, judgments, permits and licenses of or from Governmental Bodies, including those relating to the use and operation of the Principal Premises. Seller with respect to the Business is not subject to any material decree, order or unsatisfied judgment.

(b) There are no actions, suits, proceedings or governmental investigations pending or, to Seller's knowledge, threatened against it that could be reasonably expected, individually or in the aggregate, to have a Material Adverse Effect on the Business.

(c) Notwithstanding anything contained in this Section 3.10 to the contrary, (i) no representation or warranty made by Seller in this Section 3.10 shall apply to compliance by Seller with any applicable Environmental Law, it being expressly understood and agreed that any and all representations and warranties of Seller with respect to the compliance by Seller with any applicable Environmental Law are set forth in Section 3.13 and (ii) no representation or warranty made by Seller in this Section 3.10 shall apply to compliance by Seller with respect to any applicable building, zoning, safety or fire laws, ordinances, resolutions or codes, it being expressly understood and agreed that any and all representations and warranties of Seller with respect to such

matters are set forth in Section 3.15.

**3.11 Business Employees**

(a) Seller has delivered to Buyer a complete and accurate list of all the Dedicated Business Employees as of the date of this Agreement, showing for each the position held and present rate of base salary and bonus compensation (including any future changes therein that have been communicated to such Dedicated Business Employees) and designating those Dedicated Business Employees who are union-represented. Except as disclosed in such list, none of the Dedicated Business Employees is covered by any union, collective bargaining or similar agreements. Seller has also delivered to Buyer a complete and accurate list of (i) all former employees of the Business (excluding former union-represented employees) whose employment in connection with the Business terminated for any reason (including reassignment to any other division, unit or Affiliate of Seller) on or later than January 1, 1997, showing for each the position held, and (ii) all unfilled employee positions with respect to the Business as of the date of this Agreement.

(b) Except as set forth in Schedule 3.11(b), with respect to the Dedicated Business Employees, the Seller does not presently maintain, contribute to or have any liability under any Benefit Plan. With respect to each of the Benefit Plans, the Seller has made available to the Buyer true and complete copies of the following, as applicable: (i) the plan documents, including any related trust agreements, insurance contracts or other funding arrangements, or a written summary of the terms and conditions of the plan if there is no written plan documents; (ii) the most recent IRS Form 5500 and PBGC-1; (iii) the most recent actuarial valuation; (iv) the most recent financial statement; and (v) the most recent summary plan description and in the case of any plan that has been amended on or after October 1, 1996, a description of any material amendment.

(c) Seller represents and warrants that:

(i) each Benefit Plan (and each related trust, insurance contract or fund) complies in form and in operation in all material respects with applicable requirements of ERISA, the Code and other applicable laws;

(ii) each Benefit Plan has been administered in all material respects consistently with its written terms;

(iii) all material required reports and descriptions (including Form 5500 Annual Reports, summary annual reports, PBGC-1's and summary plan descriptions) which must be filed before the Closing have been filed or distributed appropriately with respect to each Benefit Plan;

(iv) Seller and its affiliates have never contributed to any multiemployer plan, as defined in Section 3(37) of ERISA, which could result in any material liability to Buyer as a result of this Agreement;

(v) no party has engaged in a "prohibited transaction" (as that term is defined in Section 4975 of the Code and Section 406 of ERISA) with respect to any Benefit Plan which could result in any material liability to Buyer as a result of this Agreement;

(vi) all previous contributions (including all employer contributions and employee salary reduction contributions) or other payments that are due on or before the date of this Agreement have been paid to the respective Benefit Plans and all contributions for any period ending on or before the Closing Date that are not yet due have been paid to each such Benefit Plan or accrued in accordance with the past custom and practice of the Seller;

(vii) each such Benefit Plan that is an Employee Pension Benefit Plan as defined in Section 3(2) of ERISA (other than a plan that is exempt from the requirements of Parts 2, 3 and 4 of Title I of ERISA) meets the requirements of a "qualified plan" under Section 401(a) of the Code, application has been made or will be made for a favorable determination letter from the Internal Revenue Service (the "IRS") and no event has occurred with respect to any such Benefit Plan which could reasonably be expected to cause the loss or denial of such qualification under Code Section 401(a);

(viii) no Benefit Plan that is an Employee Pension Benefit Plan has been completely or partially terminated or been the subject of a