# Exhibit 2

# Part 5 of 12

Buyer. Buyer agrees to provide Seller a list of those Business Employees hired by Buyer and, for a period of 18 months following the Closing, reasonable notice of any change in the employment status of any Business Employee hired by Buyer, including death, retirement or other termination of employment with Buyer of such Business Employee.

(e) All rights of access to information and documents granted under this Section 5.1 is subject to restrictions on access to classified facilities and information imposed by governmental authorities.

5.2 **Conduct of Business**

From and after the date of this Agreement and until the Closing Date, except as set forth on Schedule 5.2 or as otherwise contemplated by this Agreement or the Schedules hereto or as Buyer shall otherwise consent to in writing, Seller, with respect to the Business:

(a) will carry on the Business in the ordinary course and in substantially the same manner as heretofore including taking or refraining from taking any actions likely to significantly change its existing relationships with customers, suppliers, employees and others having business relationships with the Business;

(b) other than in the ordinary course of business or as may be required by law or governmental authority, will not permit all or any of the assets (real or personal, tangible or intangible) presently and actively used in the operation of the Business to be sold, licensed or subjected to any Encumbrance (other than a Permitted Encumbrance);

(c) except in accordance with applicable collective bargaining agreements or in the ordinary course of business, will not, with respect to Dedicated Business Employees, grant any material increase in the rates of pay of any such hourly paid Dedicated Business Employees, or grant any material increase in the salaries or other compensation of such salaried Dedicated Business Employees, or grant any material increase in the pension, retirement or other employment benefits of any character of, or grant any material new benefits to, any of such Dedicated Business Employees, except for changes in benefits generally applicable to Seller's hourly and/or salaried employees; and

(d) will not make any material change in the method of accounting or keeping of books of account or accounting practices with respect to the Business.

5.3 Tax Reporting and Allocation of Consideration

(a) Seller and Buyer acknowledge and agree that (i) Seller will be responsible for and will perform all Tax withholding, payment and reporting duties with respect to any wages and other compensation paid by Seller to any Business Employee in connection with operating the Business prior to or on the Closing Date and (ii) Buyer will be responsible for and will perform all Tax withholding, payment and reporting duties with respect to any wages and other compensation paid by Buyer to any employee in connection with operating the Business after the Closing Date.

(b) Buyer and Seller recognize their mutual obligations pursuant to Section 1060 of the Code to timely file IRS Form 8594 (the "Asset Acquisition Statement") with each of their respective federal income Tax returns. Accordingly, on the Closing Date or as soon thereafter as reasonably practicable, Buyer and Seller agree to (i) enter into a Purchase Price allocation agreement in a form to be agreed upon by the parties providing for the allocation of the Purchase Price and the Assumed Liabilities among the Purchased Assets consistent with the provisions of Section 1060 of the Code and the Treasury Regulations thereunder and (ii) cooperate in the preparation of the Asset Acquisition Statement for timely filing in each of their respective federal income Tax Returns.

(c) For purposes of the foregoing allocation agreement, the amount of the Purchase Price and Assumed Liabilities allocated to the Eagle Premises shall be equal to the fair market value of the Eagle Premises as determined by an appraiser selected by Seller, the cost of such appraisal to be borne by Seller. If Buyer disagrees with such appraisal, Buyer shall select an appraiser to appraise the Eagle Premises, the cost of such appraisal to be borne by Buyer. If Buyer's appraisal differs from Seller's appraisal by 10% or less, then the average of the two appraisals shall be the fair market value for the purposes of this Section 5.3(c). If Buyer's appraisal differs from Seller's appraisal by over 10%, then Seller's and Buyer's appraisers shall select a third appraiser to appraise the Eagle Premises, the appraisal of such third appraiser to be final and binding on both parties and the cost of such appraisal to be borne equally by both parties. In the case of Purchased Assets other than the Eagle Premises, the allocation of the Purchase Price and the Assumed Liabilities to such Purchased Assets shall be as agreed to by Buyer and Seller or, if Buyer and Seller cannot agree, then the Purchased Assets on which agreement has not been reached shall be subject to an appraisal by an independent appraiser

which shall be acceptable to both parties, the cost of such appraisal to be borne equally by both parties. The amount of the Purchase Price and Assumed Liabilities allocated to such Purchased Assets so appraised shall be equal to their respective appraised fair market values. Unless otherwise prohibited by law, all foreign, federal, state and local income Tax returns of Buyer and Seller shall be filed consistently with the allocations made pursuant to the foregoing allocation agreement.

(d) Seller shall be responsible for the preparation and filing of all Tax Returns required to be filed with respect to the Business or the Purchased Assets in connection with any Taxes arising out of, relating to or otherwise attributable to the Business for all Tax periods ending on or prior to the Closing Date (including consolidated, unitary and combined Tax Returns for Seller which include the operations of the Business for any period ending on or prior to the Closing Date). Seller shall make all payments required with respect to such Tax Returns.

(e) Seller and Buyer shall each provide the other party with such assistance as may reasonably be requested in connection with the preparation of any Tax Return, audit or other examination by any taxing authority or judicial or administrative proceeding relating to liability for Taxes, shall each retain and provide to the other party all records and other information that may be relevant to any such Tax Return, audit or examination, proceeding or determination and shall each provide the other party with any final determination of any such audit or examination, proceeding or determination that affects any amount required to be shown on any Tax Return of the other party for any period.

### 5.4 Use of Seller's Name

(a) Buyer agrees that it shall mark product, both internally and externally, with Buyer's name and mark and shall cease, immediately upon the Closing, to mark product with the names, marks or other indicia of "Lucent Technologies," except for those marks assigned or licensed for use by Buyer pursuant to the Intellectual Property Agreement. Buyer further agrees that, to the extent that the Inventory consists of product that is marked with the name or mark "Lucent Technologies" or with other indicia of Seller (the "Marked Inventory"), Buyer shall, consistent with customer requirements, use its Best Efforts to ship such Marked

Inventory prior to shipping the same or similar products of Buyer. In no event shall Buyer ship Marked Inventory more than nine months after the Closing Date without Seller's prior written consent, which consent may be withheld for any, or no, reason.

(b) Seller agrees that Buyer shall not be required to remove the names, marks or other indicia of "Lucent Technologies" from tools, dies, drawings, models, business forms or other written or printed materials existing as of the Closing Date; provided that Buyer shall discontinue its use of stationary and business forms bearing such names, marks or other indicia as soon as the stocks thereof existing as of the Closing Date are depleted and in any event within 90 days after the Closing Date. Within 30-days after the Closing Date, Buyer shall remove from the Eagle Premises all signs and other markings bearing such names, marks or other indicia.

(c) Seller shall use its Best Efforts to obtain an agreement by AT&T to permit Buyer to use AT&T marks in a manner similar to the uses of Seller's marks permitted by Sections 5.4(a) and 5.4(b).

(d) The provisions of this Agreement shall not limit the use by Buyer and its Affiliates of the "Advanced Technology Systems" or "ATS" names or marks.

**5.5 Business Employees; Collective Bargaining Agreements**

(a) Buyer shall employ all Dedicated Business Employees who are actively employed on the Closing Date or who are receiving short-term disability benefits or on approved leave of absence on the Closing Date.

(a)

(b) As promptly as possible after the date of this Agreement, Seller shall make available to Buyer a list of those support personnel who are performing work for the benefit of the Business and who are available to be hired by the Buyer (the "Available Employees"). Buyer shall make offers of employment to those individuals among the Available Employees that it wishes to hire as promptly as possible following the date such list is made available to Buyer.

(c) Employment with Buyer of individuals desirable in Section 5.5(a) and (b) shall be effective immediately following the close of business on the Closing Date, except the employment of individuals receiving short-term disability benefits or on approved leave of absence on the Closing Date will become effective as of the date they present themselves for work with Buyer at the termination of the short-term

disability benefits or approved leave of absence, respectively.

(d) Buyer shall, on and as of the Closing Date, assume, adopt and succeed to any and all collective bargaining agreements and other labor agreements, as identified in Schedule 3.12(a), applicable to the individuals to be employed by Buyer who are represented by a union (other than provisions of such agreements that are specific to Seller or its predecessors or Affiliates and that are therefore impracticable for Buyer to perform).

(e) Seller shall use its Best Efforts to assist Buyer in connection with Buyer's employment of the Dedicated Business Employees, shall not cause or permit the solicitation of employment or hiring of any Dedicated Business Employee by or on behalf of any other division, unit or Affiliate of Seller, and shall not otherwise take any action intended to discourage any Dedicated Business Employee from becoming Buyer's employee pursuant to this Section 5.5.

(f) For purposes of this Section 5.5, the term "Transferred Employees" shall mean all Dedicated Business Employees who are employed by Buyer pursuant to Section 5.5(a) and all Available Employees who are employed by Buyer pursuant to Section 5.5(b) Buyer shall maintain aggregate cash compensation levels (i.e., salary plus cash bonus) for all Transferred Employees at least comparable to the levels in effect on the Closing Date for at least one year following the Closing Date, including any reasonable salary action disclosed to Buyer approved as of the Closing Date in accordance with this Agreement but not yet implemented.

(g) As of the Closing Date or, if later, the first day of their employment with Buyer, all Transferred Employees will cease to participate in or accrue benefits under the Benefit Plans. Buyer agrees that effective as of the Closing Date, it will provide to all Transferred Employees, at a minimum, the benefits required to be provided by Buyer to the Transferred Employees pursuant to this Section 5.5(the "Post-Closing Benefits") which include pension plans and post retirement medical, dental and life plans that duplicate in all material respects those of the Seller. The pension plans included in the Post-Closing Benefits shall, as of the Closing Date and through the Second Transfer Date (as defined in Section 5.5(i)), replicate all of the benefits and benefit rights and features (within the meaning of the regulations promulgated under Section 411(d)(6) of the Code) provided under the Lucent pension plans referred to in Section 5.5(i). The Post-Closing Benefits shall be benefit plans or arrangements sponsored or provided by Buyer and shall not be

deemed to be continuations of or successors to any of Benefit Plans maintained by Seller. Seller shall remain responsible for any benefits payable under a Benefit Plan with respect to claims incurred by Business Employees prior to the Closing Date except to the extent that the liability for such benefits has been transferred to and assumed by Buyer and the Post-Closing Benefits in accordance with this Section 5.5.

(h) Buyer shall recognize all service, compensation and position with Seller, including service with predecessor employers that was recognized by Seller, for purposes of the Post-Closing Benefits, including, but not limited to, vacation entitlement, retirement and other welfare plan participation, vesting and benefits, and severance pay. No pre-existing condition exclusions or waiting periods may be imposed under Buyer's employee welfare benefit plans within the meaning of Section 3(1) of ERISA upon any Transferred Employee. Buyer shall permit all Transferred Employees who have satisfied any relevant eligibility requirements as of the Closing Date to immediately commence participation in any plans used to satisfy Buyer's obligations under Section 5.5(g). The Post-Closing Benefits provided by the Buyer shall recognize as dependents of the Transferred Employees any Class 2 dependents recognized by Seller and shall give each Transferred Employee credit for any deductibles, co-pays, and out-of-pocket maximums paid by such employees during 1997. The Buyer will be responsible for all vacation accrued by the Transferred Employees but not taken prior to the Closing Date.

(i) In connection with the performance of its obligations under Section 5.5(g), the Buyer shall, on or prior to a date (the "First <u>Transfer Date</u>") to be mutually agreed by the Buyer and the Seller but in no event more than 30 days after the Closing Date, establish a trust (the "<u>Management Trust</u>") for the purpose of holding the pension plan assets of the Post-Closing Benefits management pension plan and shall establish a further trust (the "<u>Represented Trust</u>") for the purpose of holding the pension plan assets of the Post-Closing Benefits pension plan for represented employees. On the First Transfer Date, Seller (i) will transfer or cause to be transferred from the Lucent Technologies Inc. Management Pension Plan (the "Lucent Management Plan") to the Management Trust cash or, to the extent agreed by the parties, marketable securities in an amount equal to 90% of the Pension Transfer Amount for the Transferred Employees who are, immediately prior to the Closing, management employees of the Seller, which obligation and associated liability shall be assumed by the Management Trust and the Post-Closing Benefits management pension plan of the Buyer, and (ii) will transfer or cause to be transferred from the Lucent Technologies Inc.

Pension Plan (the "Lucent Occupational Plan") to the Represented Trust cash or, to the extent agreed by the parties, marketable securities in an amount equal to 90% of the Pension Transfer Amount for the Transferred Employees who are, immediately prior to the Closing, represented employees of the Seller, which obligation and associated liability shall be assumed by the Represented Trust and the Post-Closing Benefits pension plan of the Buyer for represented employees, in each case plus interest on the amounts transferred from the Closing Date through the First Transfer Date at a rate equal to 8% per annum. As of the date six months after the Closing Date (the "Second Transfer Date"), Seller shall transfer from the Lucent Management Plan and the Lucent Occupational Plan to the Management Trust and the Represented Trust, respectively, cash or marketable securities in an amount equal to remaining balance of the Pension Transfer Amount, plus interest on the amounts transferred from the Closing Date through the Second Transfer Date at a rate equal to 8% per annum. The amount to be transferred as of the Second Transfer Date shall be reduced by the aggregate amount of any pension benefit payments made by Seller on Buyer's behalf prior to the Second Transfer Date. Subject to the completion of the foregoing asset transfers, as of the Closing Date, all of the obligations and associated liabilities of the Lucent Management Plan and the Lucent Occupational Plan relating to the Transferred Employees shall be assumed in full by the Management Trust, the Represented Trust and the Post-Closing Benefits pension plans. For purposes of this Section 5.5(i), any Dedicated Business Employee who becomes an employee of Buyer within six months after the Closing Date shall be deemed to be a Transferred Employee.

(j) For purposes of this Section 5.5, "<u>Pension Transfer Amount</u>" shall mean the minimum required transfer amount determined in accordance with the terms of Seller's pension plans (including the changes described in Schedule 3.11(d)) and the requirements of Section 414(l) of the Code, utilizing the "safe harbor" rates and assumptions set forth in the regulations promulgated under Section 4044 of ERISA as of the Closing Date, except that the termination and retirement rate assumptions utilized for purposes of this Section 5.5(j) shall be the assumptions used by Seller as reported on the Attachments to Schedule B to Form 5500 for the plan year ending December 31, 1996.

(k) On the Closing Date, Buyer shall cause its Post-Closing Benefit plans to undertake and discharge Seller's obligations with respect to the Transferred Employees under the Benefit Plans providing for post-retirement medical, dental and life insurance benefits. On or prior to the Second Transfer Date, Seller or Buyer, as appropriate, shall transfer

(or cause its VEBAs to transfer) to the other party (or their VEBAs) an amount in cash equal the amount by which the OPEB Transfer Amount exceeds or is less than $ 13 million. For purposes of this Section 5.5(k), "OPEB Transfer Amount" shall mean (i) the APBO liability under FAS 106 for Transferred Employees for post retirement medical and life insurance benefits determined by Seller as of the Closing Date using the methods and assumptions (as reported by Seller's financial disclosures for its fiscal ending September 30, 1997) for determining FAS 106 liability for its plans providing those benefits to its employees.

(l) Buyer shall have no obligation to provide severance or other benefits to any Business Employee who fails to accept Buyer's offer of employment or who claims entitlement to any severance or other benefits, under any Benefit Plan or otherwise, in connection with the transactions contemplated by this Agreement notwithstanding acceptance of such offer.

(m) If Buyer terminates the employment of a Transferred Employee on an involuntary basis, other than for intentional misconduct (but otherwise for reasons that include, without limitation, the sale or closure of any portion of the Business), during the first twelve (12) months after the Closing Date, Buyer shall provide severance benefits equivalent to the benefits, if any, that would have been paid to such Transferred Employees under Seller's severance plans as in effect as of the Closing Date had such Transferred Employees continued to be participants under Seller's plans.

(n) Seller, on or prior to the Second Transfer Date, shall notify Buyer in writing of Seller's determination of the amounts of assets required to be transferred in accordance with the provisions of Sections 5.5(i) and (k), shall provide Buyer with a copy of the actuarial reports relating to the determination of such amounts, together with such related materials as Buyer may reasonably request, and, in the case of the transfers of pension assets contemplated by Section 5.5(i), shall provide Buyer with a written determination by Seller's actuary that the amounts of assets proposed to be transferred are not less than the required amounts determined in accordance with this Agreement.

(o) Buyer shall notify Seller in writing of Buyer's disagreement with any determination made by Seller pursuant to Section 5.5(n) as soon as practicable and in any event within 75 days after the date on which the information specified in Section 5.5(n) is provided to Buyer. If no such notice is given by Buyer prior to the expiration of the foregoing period, the determinations contained in Seller's

notice to Buyer shall be conclusive and binding upon the parties. If Buyer gives written notice to Seller prior to the expiration of the foregoing period setting forth any objections to the determinations made by Seller, the parties shall attempt in good faith to reach an agreement as to all matters in dispute. Buyer shall not be entitled to object to the determinations of Seller based on any disagreement as to the rates or assumptions used by Seller so long as such rates and assumptions are those specified in this Section 5.5. If the parties, notwithstanding such good faith effort, fail to resolve all matters in dispute within 30 days after Buyer advises Seller of its objections, then any remaining disputed matters shall be finally and conclusively determined by a qualified independent actuary selected by Seller and Buyer, which actuary shall not be the regular actuary of either party. Promptly, but in no event later than 30 days after its acceptance of its appointment, the actuary shall determine (based solely on presentations by Seller and Buyer and not by independent review) only those matters in dispute and shall render a written report as to the disputed matters and the resulting calculation of the pension or other assets required to be transferred by Seller in accordance with the provisions of Section 5.5(i) or (k), which report shall be conclusive and binding upon the parties. The fees and expenses of the actuary shall be shared equally by the parties.

(p) The covenants and agreements of the parties set forth in this Section 5.5 shall, in all respects, be subject to the provisions of Section 10.8.

(q) Buyer shall be solely liable for and shall indemnify and hold harmless Seller against all workers' compensation claims with respect to any injuries to Transferred Employees which are incurred after the Closing Date. In the event state law provides for apportionment of any such claim, the claim shall be apportioned in accordance with such law.

(r) Seller hereby acknowledges that for FICA and FUTA tax purposes, Buyer qualifies as a successor employer with respect to the Transferred Employees. In connection with the foregoing, at Buyer's option, Seller agrees to follow the "Alternative Procedures" set forth in Section 5 of Revenue Procedure 84-77, 1984-2 CB 753. Buyer shall notify Seller of its intention to follow the "Alternative Procedures" on or immediately after the Closing Date. If the "Alternative Procedures" are followed, Seller and Buyer understand that Buyer shall assume Seller's entire obligation to furnish a Form W-2, Wage and Tax Statement, to the Transferred Employees. In addition to all personnel files and records relating to the Transferred Employees that Seller shall