# Exhibit 2

# Part 6 of 12

deliver to Buyer as of the Closing Date or as otherwise required by this Agreement, Seller shall timely provide Buyer with any and all other information (and in such format and media) as it shall reasonably request to properly comply with the requirements in the preceding sentence, which in no event shall be more than 10 business days from the date of a written request for such information.

(s) Seller acknowledges that for state unemployment tax purposes, it will permit Buyer to apply for a transfer of its rating account or accounts with respect to the business in any state where such a transfer is permitted. Seller shall deliver to Buyer within twenty business days from the date hereof, copies of its respective (i) Form 940, Employer's Annual Federal Unemployment Tax Return for 1994, 1995 and 1996, (ii) relevant applicable state unemployment tax rate notices for 1994, 1995 and 1996, and (iii) benefit charge statements (if available) that itemize claims charged against the various state accounts of Seller for the four most recent calendar quarters.

(t) Buyer shall continue to provide relocation, tuition and other educational assistance benefits to those Transferred Employees who are receiving such benefits as of the Closing Date.

(u) Buyer shall assume Seller's obligation to make incentive compensation payments to the Transferred Employees under the Lucent Technologies Inc. Short-Term Incentive Plan with respect to Seller's fiscal year ending September 30, 1997. Seller shall determine the incentive compensation benefits payable to the Transferred Employees in accordance with the terms and conditions of its incentive compensation plan in the same manner as if the Transferred Employees had remained employees of Seller and shall deliver a schedule indicating the incentive compensation payments to be made to the Transferred Employees by Buyer promptly following the date Seller makes its determination of the payments to be made generally under its incentive compensation plan. Buyer shall make the payments of incentive compensation indicated on the schedule delivered by Seller at such time as Seller makes payments of incentive compensation to its employees generally. If the amount of incentive compensation payments to be made by Buyer pursuant to this Section 5.5(u) exceeds an amount equal to (i) $3 million plus (ii) the amount of interest payable at a rate of 8% per annum on an obligation of $3 million incurred as of the Closing Date and satisfied on the date such payments of incentive compensation are made by Buyer, Seller shall promptly pay to Buyer an amount equal to such excess.

### 5.6 Collateral Agreements

On or prior to the Closing Date, Buyer shall execute and deliver to Seller and Seller shall execute and deliver to Buyer the following Collateral Agreements : Intellectual Property Agreement, Lease Assignment, Shared Leases, Transition Agreement, the Subcontracts and the Basic Order Agreement.

### 5.7 Regulation Compliance

Each of Buyer and Seller shall cooperate with the other in making filings under the HSR Act and shall use its Best Efforts to resolve such objections, if any, as the Antitrust Division of the Department of Justice or the Federal Trade Commission or state antitrust enforcement or other Governmental Body may assert under the antitrust laws with respect to the transactions contemplated hereby. In the event an action is instituted by any Person challenging the transactions contemplated hereby as violative of the antitrust laws, each of Buyer and Seller shall use its Best Efforts to resist or resolve such action.

### 5.8 Environmental

(a) Each party agrees that the ________________, Eagle Premise Phase I Environmental Report relating to the Eagle Premise prepared on behalf of Seller and Buyer's Environmental Report (if prepared by Buyer) as described in Section 5.8(c) constitute non-exclusive evidence of the environmental condition of the Principal Premises at or near the date of Closing.

(b) Prior to the Closing, upon reasonable notice from Buyer to Seller, Seller will afford to the officers, attorneys, accountants or other authorized representatives of Buyer reasonable access during normal business hours to the Principal Premises and the environmental books and records of Seller relating to the Principal Premises excepting only those books and records which are subject to attorney-client privilege or attorney work-product privilege (which Seller shall identify), so as to afford Buyer full opportunity to make such review, examination and investigation of the environmental matters and environmental conditions of the Principal Premises as Buyer may reasonably desire to make. Buyer will be permitted to make extracts from or to make copies of such books and records to which access is granted under this Section 5.8 as may be reasonably necessary in connection therewith, subject to Section 6.1 below and to employees' privacy rights and Seller's policies pertaining thereto.

(c) Between the date of this Agreement and the Closing the Buyer, at its sole cost and expense, may have an independent environmental consultant (the "Buyer's Consultant") perform an environmental inspection and audit of the Principal Premises (the "Buyer's Inspection") provided that the Buyer's Inspection shall be conducted in a manner that does not unreasonably interfere with the operation of the Seller's business nor does unreasonable damage to the Seller's property. Seller shall make available books and records as well as appropriate personnel to assist Buyer and Buyer's Consultant. Prior to conducting an inspection other than a Phase I environmental audit, Buyer's Consultant shall first prepare a work plan describing the proposed Buyer's Inspection. The Seller shall have five Business Days to review and comment on Buyer's Consultant's work plan before it is implemented. The Seller shall have the right to receive split samples. The Buyer and Seller agree that the results of Buyer's Inspection shall be treated as privileged and confidential as shall the documents constituting and the documents utilized in or for the Buyer's Inspection ("Buyer's Environmental Report"), provided, however, Buyer's Environmental Report may be disclosed as required by law or as required by Buyer's advisors, its lenders and its lenders' advisors. If any lender to, or advisor or representative of, the Buyer requires a copy of any such documents or Buyer's Environmental Report, it shall first agree to treat such documents and Buyer's Environmental Report as confidential. The Buyer shall promptly restore any disturbance to the Principal Premises which results from Buyer's Inspection to the same or reasonably similar pre-disturbed condition.

(c) In the event a dispute arises concerning environmental matters, the Seller shall, after the Closing Date, be entitled to reasonable discovery in order to ascertain relevant facts, including reasonable access to the Principal Premises, reasonable access to the Buyer's records (excepting only those books and records which are subject to attorney-client privilege or attorney work-product privilege) and the Buyer's employees with relevant knowledge and sampling.

(d) All environmental, health, and safety records ("Environmental Records") will be retained at the Principal Premises. Before Closing, however, Seller will make and retain copies of selected Environmental Records which Seller wishes to keep. After the date of Closing, Buyer will afford to Seller access to Environmental Records from time to time on reasonable notice from Seller. On such occasions Seller will be entitled to copy such Environmental Records as Seller may require, at Seller's expense.

**5.9 Settlement of Overhead Rates**

Schedule 5.9 sets forth the overhead rates that have been or are being used by the Seller for each of the cost plus contracts for the open years not yet settled with the United States government. Schedule 5.9 also sets forth, for each of such open years and for each of the cost plus contracts, the amount of direct charges billed to the customer to which overhead rates were applied. The Buyer and Seller recognize and agree that, as to those cost plus contracts which are assigned to and novated to the Buyer, the Buyer shall be responsible, as a result of adjustments to provisional billing rates for such open years, for refunding to the United States government (or higher tier contractor) any amounts due, or rendering an invoice to the government for any additional billings (which the Buyer agrees to diligently seek). Seller shall take responsibility for reaching a settlement with the United States government as to the final overhead rates applicable to each of the open years. In the event the final rates negotiated with the government are lower than the rates set forth in Schedule 5.9, the Seller shall reimburse the Buyer for the difference. In the event the final rates negotiated with government are higher than the rates set forth in Schedule 5.9, the Buyer shall reimburse the Seller for the difference assuming the additional billings are within the funded value of the contract and Buyer is actually able to recover such additional costs. The method of measurement of the difference will be the application of the final negotiated rates to the direct bases by year at the contract level compared to the totals using the rates contained in Schedule 5.9. An underrun of one rate may be used to offset an overrun of another rate within the same year. This measurement will be accomplished within 30 days following the negotiation of final rates with the government.

**5.10 Post Closing Price Adjustment**

(a) Promptly following the Closing Date, the Seller will prepare and deliver to Coopers & Lybrand (the "Auditor") a balance sheet for the Business dated the Closing Date (the "Preliminary Closing Balance Sheet"). The Preliminary Closing Balance Sheet shall be prepared in accordance with generally accepted accounting principles consistently applied in accordance with past practices of the Seller. The Preliminary Closing Balance Sheet will be reviewed by the Auditor, and copies of such reviewed Preliminary Closing Balance Sheet shall be delivered to the Buyer no later than sixty (60) days after the Closing Date. The Seller and the Auditor will be given full access by the Buyer, during regular business hours, to the relevant records

and working papers of the Business necessary to prepare and review the Preliminary Closing Balance Sheet.

(b) The Buyer and its external auditors shall be given full access, during regular business hours, to the relevant records and working papers used by the Seller and the Auditor to prepare and review the Preliminary Closing Balance Sheet. If the Buyer or its external auditors believe that any changes are required to be made to the Preliminary Closing Balance Sheet, or if either of them states that it is unable to confirm whether such balance sheet has been prepared in accordance with the scope of review and generally accepted accounting principles consistently applied (a "Material Uncertainty"), the Buyer shall, within thirty (30) days after the receipt by it of such Preliminary Closing Balance Sheet, give written notice to the Seller and the Auditor of any such proposed change or Material Uncertainty, describing the change or Material Uncertainty and the basis for the change or Material Uncertainty in reasonable detail. Failure to so notify the Seller and the Auditor shall constitute acceptance and approval of such Preliminary Closing Balance Sheet. If the Auditor agrees that a proposed change is appropriate, the change shall be made to the Preliminary Closing Balance Sheet. If the Auditor does not agree that any proposed change is appropriate, and the Buyer and the Seller cannot agree on the treatment of the proposed change, the Auditor and the Buyer's external auditors shall select a third auditor from a national certified public accounting firm who shall decide if the change is appropriate, and the Preliminary Closing Balance Sheet will be adjusted in accordance with the third auditor's decision. The balance sheet so adjusted shall be referred to as the "Closing Balance Sheet." The Buyer and the Seller shall each pay one-half of the fee charged by the third auditor.

(c) An amount equal to $61,712,000 (the Book Value of the Selected Net Assets as of June 30, 1997, which book value and the computation thereof is set forth on Schedule 5.10(c)), less the aggregate book value of the Selected Net Assets as of the Closing Date, shall be designated as the Payment Adjustment. If the Payment Adjustment is greater than $1,000,000, the Seller shall pay the amount of the excess to the Buyer, and if the Payment Adjustment is less than a negative $1,000,000, the Buyer shall pay the amount by which a negative $1,000,000 exceeds the Payment Adjustment (stated as an absolute value) to the Seller, any such payment to be made on or before 120 calendar days after the Closing Date. For purposes of this Section 5.10(c), the Selected Net Assets as of the Closing Date shall be calculated in a manner consistent with the calculation of the Selected Net Assets as of June 30, 1997, as set forth in Schedule 5.10(c). (d) The parties shall treat any payments made or received pursuant to this Section 5.10 as an adjustment to the Purchase Price. Buyer and Seller agree to cooperate in the preparation of a supplemental Asset Acquisition Statement as required by Section 5.3 and Treasury Reg. § 1.1060-1T(f) and (h)(2)(ii), and in the manner provided in Section 5.3, as a result of any adjustment to the Purchase Price pursuant to the preceding sentence.

**5.11 Contacts with Suppliers, Employees and Customers**

Buyer agrees it shall provide Seller prior notice of and shall permit representative of Seller to participate in any substantive communications between Buyer and any suppliers to or customers of the Business or any Business Employees in connection with or pertaining to any subject of this Agreement.

**5.12 Post-Closing Refunds**

If Seller receives any Tax refund relating to the Business for periods prior to the Closing Date and the Tax liability to which such refund relates was included as a cost in a cost-reimbursement or fixed-price incentive (cost-redeterminable) Government Contract, then Seller shall cooperate with Buyer to determine the appropriate portion of such Tax refund due to any Governmental Body as if Buyer had pursued and obtained an identical tax refund. Once the appropriate portion due any Government Body is determined, Seller shall promptly remit to Buyer such amount to be paid to such Governmental Body in an appropriate manner to be determined by Buyer. If Buyer is liable for any Taxes (net of any Tax benefit to Buyer in making payment to the Governmental Body) as a result of such reimbursement by the Seller, Seller

shall also pay to Buyer such additional amounts required to pay such Taxes.

**5.13 Contingent Performance of Certain Completed Contracts**

The parties acknowledge and agree that the rights and obligations of Seller under the Completed Contracts identified on Schedule 5.13 (the "Subject Contracts") are not included in the Purchased Assets or Assumed Liabilities. Notwithstanding the foregoing, in the event Seller, as a result of the settlement or other disposition of any currently pending or future claims, suits, actions or proceedings relating to the Subject Contracts, is required to supply any product or perform any service pursuant to the Subject Contracts which would be impracticable for Seller and its Affiliates to supply or perform as a result of the sale of the Business to Buyer as contemplated by this Agreement, then Buyer, upon Seller's written request, shall supply such products and perform such services pursuant to the Subject Contracts on behalf of Seller. Seller agrees to reimburse Buyer promptly for all costs incurred by Buyer in connection with its performance of the Subject Contract on behalf of Seller to the extent such costs are not subject to government reimbursement, including any such costs incurred in connection with resolving any warranty claims arising out of Buyer's performance of the Subject Contracts. Buyer's costs shall be based on Seller's fully allocated cost of performance, including overhead and other indirect costs, but shall exclude any profit.

**5.14 Noncompetition Agreement**

(a) Seller agrees that, during the five-year period commencing as of the Closing Date, it shall not, and shall not cause or permit any present or future Subsidiary to, (i) compete for the programs under contract or the subject of proposals in which the Business is engaged as of the Closing Date or (ii) engage anywhere in the world in the development, manufacture, production, provision or sale of and products or services for the defense business with any United States or other Governmental Body in the areas of undersea surveillance systems, signal and information processing for anti-submarine warfare, active structural control products or secure analog communications terminal products, in each case as generally described in the Confidential Offering Memorandum dated April 1997 delivered by Seller to Buyer. Neither Seller nor its Subsidiaries shall be deemed to violate the foregoing restriction if an existing Subsidiary is as of the Closing active in a proscribed field with a foreign Governmental Body or if subsequently Seller or a Subsidiary acquires control or

ownership of an entity active in a proscribed field at the time of such acquisition so long as the portion of the business of such entity which involves activities in proscribed fields represents less than 50% of the aggregate revenues of such entity during the three year period immediately preceding the date of such acquisition.

(b) Buyer agrees not to use Proprietary Information which Seller currently owns or has a right to use and which is being transferred to Buyer under the Intellectual Property Agreement or is otherwise known to Transferred Employees in the development, manufacture, production, provision or sale of products or services for non-tactical terrestrial network infrastructure without Seller's prior consent.

(c) Notwithstanding anything in Section 5.14(a) to the contrary, the undertakings set forth therein shall not limit Seller's provision of non-custom communications products and services or integrated network solutions related thereto, whether or not such solutions include secure communications capabilities based on analog, digital or any other technology; the design, developments, manufacture, license or sale by Seller's Micro Electronics division of semiconductor and optoelectronic devices and components, power supplies and components, energy systems, and software and firmware associated with any of the foregoing; the performance by Seller of the Excluded Programs or the settlement or close-out of the Completed Contracts, the provision of field support and O&M services by Seller's Services Companies under contracts designating the provision of such support and services by Seller's Services Companies or other contracts of a similar nature, or participation in basic research programs in the defense business of the general nature heretofore conducted by Seller other than through the Business accruing in the aggregate not more than $20 million in revenues in any fiscal year.

(d) If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 5.14 is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision and this Agreement shall be enforceable as so modified. In connection with any breach or violation of the provisions of this Section 5.14, Buyer shall be entitled to enforce such provisions

specifically, without posting a bond or other security, to recover damages by reason of any such breach or violation and to exercise all other rights and remedies granted by law.

**5.15 Nonsolicition Agreement**

(a) Seller agrees that, during the 15-month period commencing as of the Closing Date, Seller shall not, and shall not cause or permit any of its present or future Subsidiaries to, solicit the employment of or hire any Dedicated Business Employee, including any Dedicated Business Employee who does not become an employee of Buyer in accordance with Section 5.5(a); provided, however, that a solicitation of employment shall not be deemed a breach of this Agreement if (i) the persons who perform such solicitation are not in the Seller's Human Resources organization and have no knowledge of this Agreement, (ii) none of the Seller's employees with knowledge of this Agreement have actual advance knowledge of such solicitation and (iii) the solicited employee is not hired by Seller or any of its Subsidiaries. The term "solicit the employment" shall not be deemed to include generalized searches for employees, through media advertisements, employment firms or otherwise, that are not focused on persons employed by the Buyer.

(b) The above restrictions shall not apply to any Transferred Employee whose employment with the Buyer is involuntarily terminated by the Buyer after the Closing Date. In the case of an involuntarily terminated Transferred Employee who obtains a job with the Seller within six months after the Closing Date, the Buyer agrees to transfer, or cause to be transferred, back to the trusts for the Lucent Management Plan or the Lucent Occupational Plan , as the case may be, the present value of the accrued benefit obligation and the amount of the APBO liability for post-retirement medical, dental and life benefits associated with such Transferred Employee, in each case, calculated on a basis consistent with the calculations performed pursuant to Section 5.5 as of the date such Transferred Employee's employment with the Buyer was terminated.

**5.16 Subcontracts; Basic Order Agreement**

(a) As of the Closing Date, each interdivisional invoice, work assignment request and work assignment authorization between Seller with respect to the Business and any other division, unit or Affiliate of Seller for products or services (other than of the types to be provided by Seller to Buyer pursuant to the Transition Agreement) provided to or by the Business which are outstanding as of such date shall be converted into a subcontract (collectively, the