# Exhibit 3

# INTELLECTUAL PROPERTY AGREEMENT

**between**

**GENERAL DYNAMICS ADVANCED TECHNOLOGY SYSTEMS, INC.**

**and**

**LUCENT TECHNOLOGIES INC.**

**Effective as of October 1, 1997**

# INTELLECTUAL PROPERTY AGREEMENT

This Intellectual Property Agreement dated as of October 1, 1997 between Lucent Technologies Inc. ("Lucent"), a Delaware corporation having an office at 600-700 Mountain Avenue, Murray Hill, New Jersey 07974-0636, and General Dynamics Advanced Technology Systems, Inc. ("GDATS"), a Delaware corporation having an office at 3190 Fairview Park Drive, Falls Church, Virginia 22024-4523 is being entered into pursuant to the Agreement For The Purchase And Sale Of Assets dated August 20, 1997, between Lucent and General Dynamics Corporation ("General Dynamics") (hereinafter referred to as the "Purchase Agreement"), and shall become effective as of the Closing Date specified in the Purchase Agreement.

WHEREAS, Lucent has agreed to sell and General Dynamics has agreed to buy a part of the Advanced Technologies Systems Division of Lucent pursuant to the Purchase Agreement;

WHEREAS, General Dynamics has formed GDATS for purposes of purchasing such assets and entering into certain collateral agreements;

WHEREAS, pursuant to an Assignment and Assumption Agreement dated as of September 30, 1997, General Dynamics has assigned all of its right, title, interest and responsibilities under the Purchase Agreement and such collateral agreements to GDATS; and

WHEREAS, in connection with the above sale and purchase of part of the Advanced Technologies Systems Division, Lucent agrees to assign certain patent rights to GDATS and to license certain intellectual property rights to GDATS to enable GDATS to conduct the Business properly and as a going concern.

NOW, THEREFORE, IT IS HEREBY AGREED BETWEEN THE PARTIES AS FOLLOWS:

## Article 1
## Definitions

Capitalized terms without definition in this Intellectual Property Agreement shall have the meaning as defined in the Purchase Agreement.

1.01 "Business" shall have the meaning defined in the Purchase Agreement.

1.02 "Code" shall mean both Object Code and Source Code of the Lucent Software previously or currently used in the Business as of the Closing Date.

1.03 "Commercial Businesses of the Business" shall mean solely:

(a) the development, manufacture, production, provision, and sale of active structural control components and systems, including actuators, actuator amplifiers, controllers and sensors, algorithms and software, and manufacturing processes for such systems; and

(b) the development, manufacture, production, provision, and sale, of the following products to the extent such products are developed, manufactured or sold prior to or as of the Closing Date, and natural extensions and evolutions of such products:

(i) shore-based power feed equipment and terminal test equipment for commercial undersea fiber optic cable systems;

(ii) secure communications terminal products (e.g., STU III and C-STU); and

(iii) acoustic detection and analysis systems for buried object detection.

1.04 "Defense Businesses of the Business" shall mean the development, manufacture, production, provision, and sale to Government Customers of products developed pursuant to any development projects performed prior to or under contract, or projects out for bid/proposal, as of the Closing Date, and natural extensions and evolutions of such products.

1.05 "Derivative Work" shall mean any work that is based, in whole or in part, upon one or more pre-existing works, such as a revision, modification, translation, abridgment, condensation, expansion or any other form in which such pre-existing works may be recast, transformed or adopted and which, if prepared without authorization of the owner of the copyright in such pre-existing work, would constitute a copyright infringement. For purposes of this Intellectual Property Agreement, a Derivative Work shall also include any compilation that incorporates such a pre-existing work.

1.06 "Documentation" shall mean all information in human and/or machine-readable form, relating to Code, including but not limited to user manuals and materials useful for design (for example, logic manuals, flow charts, and principles of operation).

1.07 "Government Customer" shall mean: (1) the Department of Defense, the Central Intelligence Agency, and their respective agencies and departments, and other departments and agencies of the United States Government primarily involved in matters of U.S. national security; (2) a prime contractor performing work under a contract with a department or agency identified in subparagraph (1) hereof; (3) a subcontractor at any tier of the contracting hierarchy under a prime contractor identified in subparagraph (2) hereof; (4) a government other than the United States Government when work performed for such other government is sponsored by the United States Government (i.e., sales commonly referred to as "Foreign Military Sales"); and (5) a government other than the United States Government for military or national security applications.

1.08 "Know How" shall mean all technical and commercial information, data and documents of whatever kind, including trade secrets, drawings, specifications, photographs, samples, models, processes, procedures, reports and correspondence, including the underlying copyright in works of authorship (other than Lucent Software) embodying the foregoing, all of which relate to the products of the Business.

1.09 "Lucent's Patents" shall mean every patent (including utility models but excluding design patents and design registrations) owned by Lucent and issued on or claiming priority from an application filed prior to ninety (90) days after the Closing Date in any country of the world, with respect to which and to the extent that Lucent has a right, as of the date of execution of this Intellectual Property Agreement, to grant the licenses granted herein.

1.10 "Lucent Software" shall mean all software used prior to or as of the Closing Date within the Business and owned by Lucent.

1.11 "Object Code" shall mean code in machine-readable form generated by compilation, assembly or other translation of Source Code and contained in a medium which permits it to be loaded into and operated on by a computer.

1.12 "Source Code" shall mean code in any programming language contained in any format, including human and machine-readable formats, such code including all comments and procedural code plus all related development documents such as, but not limited to, flow charts; schematics, statements of principles of operations or any other specifications.

1.13 "Subsidiary" of a company means a corporation or other legal entity (i) greater than fifty percent (50%) of whose shares or other securities entitled to vote for election of directors (or other managing authority) is now or hereafter controlled by such company either directly or indirectly; or (ii) which does not have outstanding shares or securities but greater than fifty percent (50%) of whose ownership interest representing the right to manage such corporation or other legal entity is now or hereafter owned and controlled by such company either directly or indirectly; but any such corporation or other legal entity shall be deemed to be a Subsidiary of such company only as long as such control or ownership and control exists.

## Article 2
## Assignment Of Patents to GDATS

2.01 Lucent hereby assigns all patents and patent applications identified on Exhibit A of this Intellectual Property Agreement, and any corresponding counterpart foreign patent applications and foreign patents issuing thereon, to GDATS, subject to all prior agreements and prior commitments of Lucent and its Subsidiaries to third parties entered into prior to the Closing Date and to Lucent and its Subsidiaries retaining a personal, non-exclusive, non-transferable, irrevocable, world-wide, royalty-free license under such

patents, subject to the non-competition clause of the Purchase Agreement, to make, have made, use, offer to sell, sell and import any and all products.

2.02 GDATS and Lucent shall share equally any and all recording fees related to the assignment of the patents from Lucent to GDATS pursuant to Section 2.01 above. Lucent shall execute all documents required for the assignment of such patents to GDATS.

2.03 With respect to pending applications set forth in Exhibit A, Lucent shall use reasonable efforts to ensure the cooperation of Lucent's and its subsidiaries' employee inventors with GDATS in the preparation, filing and prosecution of all such patent applications. All preparation, filing and prosecution of such patent applications shall be the responsibility of GDATS and at the expense of GDATS, and GDATS shall reimburse Lucent for its reasonable out-of-pocket expenses incurred in complying with this Section.

## Article 3
## Patent Licenses to GDATS

3.01 Lucent grants to GDATS, under Lucent's Patents, personal, nonexclusive, non-transferable, irrevocable, worldwide, and fully paid-up licenses, for the entire unexpired term of the patents (or to the extent Lucent has the right to grant), to make, have made, use, offer to sell, sell and import, for Government Customers, any and all products of the Defense Businesses of the Business.

3.02 Lucent grants to GDATS, under Lucent's Patents, personal, nonexclusive, non-transferable, irrevocable, worldwide, and fully paid-up licenses, for the entire unexpired term of the patents (or to the extent Lucent has the right to grant), to make, have made, use, offer to sell, sell and import any and all products of the Commercial Businesses of the Business.

3.03 The have made rights granted hereunder shall not be exercised in a manner such that the exercise of the have made rights is a sham to sublicense Lucent's Patents to a third party and not for *bona fide* GDATS' business purposes.

3.04 Lucent further grants to GDATS a sublicense under those patent license rights granted to Lucent by any third party pursuant to any patent license agreement between such third party and Lucent existing as of the Closing Date which Lucent may sublicense, but only to the extent that Lucent has a right to grant such a sublicense and provided that Lucent shall not be obligated to pay any consideration for such sublicense.

## Article 4
## Know-How and Software Licenses

4.01 Lucent hereby grants to GDATS a personal, nonexclusive, non-transferable, irrevocable, worldwide, and fully paid-up license to use all Know How owned by Lucent which is used within the Business as of the Closing Date for (1) the manufacture, use and/or sale of any product of the Defense Businesses of the Business for Government Customers; and (2) the manufacture, use and/or sale of any product of the Commercial Businesses of the Business. If GDATS uses Know How in accordance with the license granted in this Section 4.01, and that use of the Know How necessarily infringes any claim of a patent owned by Lucent which issued from a patent application filed after the ninety day period specified in Section 1.09, Lucent and its successors will not assert such claim against GDATS in connection with the licensed use of the Know How.

4.02 Lucent hereby grants to GDATS a personal, nonexclusive, non-transferable, irrevocable, worldwide, and fully paid-up license to the Lucent Software under any and all of Lucent's copyrights and trade secrets in the Lucent Software, within the scope of the Business:

a. to make, use (including, without limitation, the right to modify and create Derivative Works) and reproduce the Code, Documentation and Derivative Works;

b. to sell, lease, distribute, sublicense or otherwise transfer copies of the Code, Documentation and Derivative Works, in whole or in part for use within the scope of the Business; and

c. to combine the Code, Documentation and Derivative Works with other software and equipment for use within the scope of the Business.

4.03 Lucent hereby grants to GDATS, with the right to grant a sublicense to General Dynamics and its Subsidiaries, a personal, nonexclusive, non-transferable, irrevocable, worldwide, and fully paid-up license to use all Know How (whether or not patented) and Lucent Software owned by Lucent which was developed prior to the Closing Date: (1) by the Business, or (2) by Lucent's Bell Laboratories at the request of the Business and funded pursuant to a contract from or of the Business, to make any products for Government Customers in the fields of use of: 1) land combat vehicles, surface and amphibious naval vessels, and submarines; 2) undersea surveillance systems and undersea military communications systems; 3) signal and information processing for combat military applications, and 4) tactical networking/decision support systems for military platforms. Lucent further grants to GDATS, with the right to grant a sublicense to General Dynamics and its Subsidiaries, a fully paid-up license under any claim of Lucent's Patents which claims such Know How and is necessarily infringed by the use of such Know How in accordance with this Section 4.03.

4.04 The license granted to GDATS under Sections 4.01, 4.02, and 4.03 above, includes the right to grant non-exclusive sublicenses to third parties, of the same scope as the license granted to GDATS under such sections, for all Know-How and Lucent Software which originated within the Business and which is used by the Business as of the Closing Date in the manufacture, use and/or sale of any product, to the extent reasonably necessary to carry out activities of supplying GDATS with products.

4.05 The right and licenses granted under Section 4.02 above shall include the right and license to display all pictorial, graphic, or audiovisual works created as a result of execution of the Object Code or contained in the Documentation.

4.06 The licenses granted in Sections 4.01, 4.02, and 4.03 above, are subject to all prior agreements and prior commitments of Lucent and/or its Subsidiaries to third parties entered into prior to the date of this Intellectual Property Agreement.

4.07 Except as provided in Section 4.04, GDATS shall in so far as practicable take all reasonable steps to ensure the confidentiality of the Know How of Lucent and Lucent Software licensed to GDATS pursuant to this Article 4.

## Article 5
## Trademarks

5.01 No rights are granted to GDATS under any trademark or trade name owned by Lucent, except that GDATS shall have the right to use (to the extent that Lucent has the right to grant such right) the unregistered trade names "Advanced Technology Systems" and "ATS" in connection with the operation of the Business.

5.02 GDATS shall not use after the Closing Date in relation to the Business (1) the word Lucent as a trade name or as part of a corporate name, (2) the trade mark Lucent and/or the Lucent logo, nor will GDATS use any derivations or combination marks containing the name Lucent or the Lucent logo, except as provided in Section 5.4 of the Purchase Agreement.

## Article 6
## Limited Covenant By Lucent Not To License

6.01 For a period of three years after the Closing Date, Lucent agrees not to grant licenses under Lucent's Patents to the third parties listed in Exhibit B of this Intellectual Property Agreement for the manufacture or sale of military systems for the following fields of use: undersea surveillance systems, signal and information processing for anti-submarine warfare, active structural control, or secure (military) analog communications terminal products.

6.02 For a period of five years after the Closing Date and subject to existing Contracts (as defined in the Purchase Agreement), Lucent agrees not to grant licenses, under the Know How owned by Lucent which originated within the Business and which is used by the Business as of the Closing Date, to the third parties listed in Exhibit B of this Intellectual Property Agreement for the manufacture or sale of military systems for the following fields of use: undersea surveillance systems, undersea military communication networks where information flow is predominately in one direction, signal and information processing for anti-submarine warfare, active structural control, secure (military) analog communications terminal products, or tactical networking/decision support systems on military platforms.

## Article 7
## Miscellaneous

7.01 **Neither Party, or any of its Subsidiaries, makes any representations, extends any warranties of any kind, assumes any responsibility or obligations whatever, or confers any right by implication, estoppel or otherwise, other than the licenses, rights and warranties expressly granted in this Intellectual Property Agreement or the Purchase Agreement.**

7.02 Nothing contained in this Intellectual Property Agreement shall be deemed or construed to constitute or create between the Parties hereto a partnership, association, joint venture or other agency.

7.03 This Intellectual Property Agreement and the Purchase Agreement establish the rights, duties, and obligations of GDATS and Lucent with respect to the subject matter hereof. Except as otherwise agreed in this Intellectual Property Agreement or in the Purchase Agreement, Lucent and GDATS shall have no right or interest whatsoever in any product of the other party whether such product is conceived or developed by the other party, during, or after the course of performance of this Intellectual Property Agreement or the Purchase Agreement. Nothing in this Intellectual Property Agreement shall be construed to obligate GDATS or Lucent to a specified level of effort in its promotion and marketing of any product or enforcement of any intellectual property right.

7.04 This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York, irrespective of the choice of laws principles of the State of New York, as to all matters, including matters of validity, construction, effect, performance and remedies.

7.05 Any dispute resulting from this Intellectual Property Agreement will be settled in accordance with the procedures set forth in Section 9.6 of the Purchase Agreement.

7.06 This Intellectual Property Agreement sets forth the entire agreement and understanding between the Parties as to the subject matter hereof and merges all prior discussions

between them. A Party shall not be bound by any warranties, understandings or representations with respect to such subject matter other than as expressly provided herein, in the Purchase Agreement, or in a writing signed with or subsequent to execution hereof by an authorized representative of the Party to be bound thereby.

7.07 The Parties hereto agree that the invalidity or unenforceability of any of the provisions hereof shall not in anyway affect the validity or enforceability of any other provisions of this Intellectual Property Agreement except those of which the invalidated or unenforceable provisions comprise an integral part of or are otherwise clearly inseparable from such other provisions.

7.08 GDATS hereby assures Lucent that it will not without a license or license exception authorized by the Bureau of Export Administration of the U.S. Department of Commerce, Washington, D.C. 20230, United States of America, if required

(a) export or release the information or software (including source code) obtained pursuant to this Agreement to a national of Country Groups D:1 or E:2 (15 C.F.R. Part 740, Supp. 1), Iran, Iraq, Sudan, or Syria; or

(b) export to Country Groups D:1 or E:2, or to Iran, Iraq, Sudan, or Syria, the direct product (including processes and services) of the information or software; or

(c) if the direct product of the information is a complete plant or any major component of a plant, export to Country Groups D:1 or E:2, or to Iran, Iraq, Sudan, or Syria, the direct product of the plant or major component.

7.09 GDATS shall not assign this Intellectual Property Agreement without Lucent's prior written consent, which consent shall not be unreasonably withheld if GDATS holds the Business as a discrete business unit and assigns to a third party substantially all of the capital stock or assets of that business unit. Lucent's consent shall not be required to assign the agreement if the purchaser of such stock or assets is a company listed on Exhibit B.

7.10 This Intellectual Property Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

## Article 8
## Notices

8.01 All notices, requests and other communications hereunder shall be in writing and shall be deemed to have been duly given if addressed, and delivered by hand, telex or facsimile, and confirmed by registered mail, with postage pre-paid, to the addresses set forth below (or to such other addresses as may be given by written notice).

If to Lucent, to:

Contract Administrator
Intellectual Property Division
Lucent Technologies Inc.
2333 Ponce de Leon Boulevard - Suite 511
Coral Gables, Florida 33134

With a copy (which shall not constitute notice) to:

Lucent Technologies Inc.
600-700 Mountain Avenue
Murray Hill, New Jersey 07974-0636
Attn: V.P. Corporate and Securities Law

If to GDATS, to:

General Dynamics Advanced Technology Systems, Inc.
3190 Fairview Park Drive
Falls Church, Virginia 22042-4523
Attn: General Counsel

With a copy (which shall not constitute notice) to:

Jenner & Block
One IBM Plaza
Chicago, Illinois 60611
Attn: David A. Savner, Esq.

**IN WITNESS WHEREOF**, each of the Parties has caused this Agreement to be executed in duplicate originals by its duly authorized representatives on the respective dates entered below.

**LUCENT TECHNOLOGIES INC.**

By: /s/ Michael R. Greene
Michael R. Greene

Title: Vice President - Intellectual Property

Date: ____________________

**GENERAL DYNAMICS ADVANCED TECHNOLOGY SYSTEMS, INC.**

By: ____________________

Name: ____________________

Title: ____________________

Date: ____________________

**THIS AGREEMENT DOES NOT BIND OR OBLIGATE ANY PARTY IN ANY MANNER UNLESS DULY EXECUTED BY AUTHORIZED REPRESENTATIVES OF ALL PARTIES.**

# EXHIBIT A
## LIST OF PATENTS TO BE ASSIGNED

| *U.S. Patent or Application* | *Inventor* | *Issued or Filed* | *Title* |
|---|---|---|---|
| 5,025,423 | Earp | 6/18/91 | Enhanced Bottom Sonar System |
| 5,033,028 | Browning | 7/16/91 | Reaction Mass Actuator |
| 5,175,989 | Messina | 1/5/93 | Apparatus For Avoiding Torque Build-ups in Deploying Ocean Cable |
| 5,493,165 | Smith et al. | 2/20/96 | Force Generator For Electrostrictive Actuators |
| 5,502,688 | Recchione et al. | 3/26/96 | Feedforward Neural Network System for the Detection And Characterization of Sonar Signals with Characteristic Spectrogram Textures |
| 5,512,856 | Doak | 4/30/96 | Method and Apparatus for Nonlinear Compensation |
| 5,558,477 | Browning et al. | 9/24/96 | Vibration Damping System Using Active Negative Capacitance Shunt Circuit with Piezoelectric Reaction Mass Actuator |
| 5,608,159 | Carcone et al. | 3/4/97 | Freeze Seal and Freeze Clamp for Cables, Wires, Optical Fibers and the Like |
| 08/640396 | Benning 8-4-11 | 4/30/96 | Apparatus and Method for Adaptive Suppression of Vibrations in Mechanical Systems |
| 08/841055 | Bitetto 1-13-7-1-1 | 4/29/97 | Underwater Plow Apparatus and Method |
| 08/810463 | Golioto 2 | 2/28/97 | Actively Controllable Support Device for a Cantilever Beam |
| 08/771554 | Mishkevich 1 | 12/13/96 | Unbalanced Force Generation in Motors |
| 08/682066 | Terpay 2 | 7/16/96 | Eddy current sensor |

**EXHIBIT B**

Lockheed Martin Corporation

Northrup Grumman Corporation

Litton Industries, Inc.

Newport News Shipbuilding, Inc.,

Raytheon Company

Hughes Aircraft Company

Boeing Corporation

Science Applications International Corporation (SAIC)

Avondale Industries

National Steel and Shipbuilding Company (NASSCO)

TRW, Inc.

Ball Aerospace (a company of Ball Corporation)

Oceaneering, Inc.

Tyco (including Tyco Submarine Systems)

Thomson Sinta (France)

Bae SEMA (UK)

Thomson Marconi Sonar (UK/France)

Ultra Electronics (UK)

Logica (UK)