Electronically filed on August 2, 2005.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LUCENT TECHNOLOGIES INC.<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 04-1511C<br>(Judge Braden) |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56 of the Rules of the Court of Federal Claims, Plaintiff Lucent Technologies Inc. ("Lucent") submits the following proposed findings of uncontroverted fact.

**BACKGROUND**

1. Lucent is a corporation organized and existing under the laws of the State of Delaware. Declaration of Thomas R. Suher ("Suher Decl."), ¶ 3 (Plaintiff's Appendix in Support of Motion for Summary Judgment ("Pl. App."), Exhibit ("Ex.") 13, p. P286).

2. As of September 30, 1997, Government Solutions ("GS") was one of several business organizations within Lucent. Declaration of Michael J. Geller ("Geller Decl."), ¶¶ 3-4 (Pl. App., Ex. 12, pp. P279-80).

**The ATS Business Organization as of the Sale of Certain Assets on October 1, 1997**

3. As of September 30, 1997, Lucent maintained a business within the GS organization known as Advanced Technology Systems ("ATS"). Geller Decl., ¶ 4 (Pl. App., Ex. 12, p. P280). As of September 30, 1997, ATS was organized into several

different groups and disciplines, including, among others, Government Wireless Programs (Tactical Wireless), Utility Solutions, New Business Development and Advanced Projects (Land and Air Programs). Geller Decl., ¶ 7 (Pl. App., Ex. 12, pp. P280-81).

4. ATS was engaged in providing communications equipment and services, including research and development, for the government. ATS provided, among other things, products and services for advanced networking and communications including: remote signal detection; transmission; processing; analysis and display; command; control and communication and intelligence; ship systems automation; undersea surveillance; land and air systems; decision support systems; networking; advanced programs; structural vibration control; tactical wireless solutions; utility solutions and secure communications; and the research and development, systems engineering and software development and engineering technologies and competencies underlying such businesses. Geller Decl., ¶¶ 5-6 (Pl. App., Ex. 12, p. P280).

5. The business that ATS performed depended upon various types of critically important intellectual property, including extensive patent and technical information (*i.e.*, "know-how"), relating to, among other areas, optics, networking, software and mathematics. The intellectual property related to advanced communications and networking technologies applicable to the government's defense and national security needs in areas such as photonics, high-powered optical amplifiers, opto-mechanics, advanced multimedia, IP networking research and design and wireless engineering. Geller Decl., ¶ 6 (Pl. App., Ex. 12, p. P280).

6. As of September 30, 1997, ATS was working on approximately 360 government contracts ("active contracts"). Declaration of Debra B. Pfaff ("Pfaff Decl."), ¶ 9 (Pl. App., Ex. 14, p. P295). Approximately 140 of ATS' active contracts were subject to the Cost Accounting Standards ("CAS"). Pfaff Decl., ¶ 9 (Pl. App., Ex. 14, p. P295).

7. As of September 30, 1997, the active contracts included, among others, the cost-plus fixed fee ("CPFF") contracts listed in Table 1 below, under the heading "Contracts." Also listed in Table 1 below, under the heading "Proposals" is a proposal ATS was in the process of working on as of September 30, 1997, which resulted in the award of a contract shortly after that date. The information in Table 1 includes the contract number, contract type, execution date, the applicability of CAS to each of these contracts and the cost incurred by Lucent in connection with each contract in 1997 and 1998. Pfaff Decl., ¶ 9 (Pl. App., Ex. 14, pp. P295-96).

**Table 1: ATS Contracts and Proposals**

| Contract No. | Description | Type | Execution Date | CAS Covered | 1997 Incurred Costs | 1998 Incurred Costs |
|---|---|---|---|---|---|---|
| **Contracts** | | | | | | |
| DAAH0392C0054 | TAMP (including CLIN 0007) | CPFF | 4/1/92 | Yes | $1,107,700.87 | $1,017,726.53 |
| N0001992C0064 | Lithography Collimeter Dev. | CPFF | 7/23/92 | Yes | 194,058.77 | 168,484.01 |
| DAAB0797CS616 | Advanced Cellular | CPFF | 1/10/97 | Yes | 599,638.48 | 135,523.74 |
| 4358 | BTS-LL | CPFF | 2/18/97 | Yes | 996,537.57 | 1,209,400.02 |
| F3060297C0274 | Proactive Problem Avoidance | CPFF | 9/15/97 | Yes | 2,004.09 | 462,808.25 |
| CLASS0040 | Sapporo | CPFF | 7/14/97 | Yes | 31,682.41 | 554,371.55 |
| CLASS0310 | Flamingo | CPFF | 8/25/97 | Yes | 7,949.01 | 217,484.68 |
| 4369 | BTS-Reliability Study | CPFF | 9/19/97 | Yes | 9,912.90 | 3,495,962.41 |

| Contract No. | Description | Type | Execution Date | CAS Covered | 1997 Incurred Costs | 1998 Incurred Costs |
|---|---|---|---|---|---|---|
| N0001497C2064 | Robust RF Tags | CPFF | 9/30/97 | Yes | * | 988,955.70 |
| | | | **Proposals** | | | |
| 3338 | BTS-DC | CPFF | 5/29/98 | Yes | * | 470,471.54 |
| | | | | Total | **$2,949,484.10** | **$8,721,188.43** |

8. As of September 30, 1997, ATS was in the process of closing out approximately 250 government contracts that were completed as of that date, but close-out had not occurred (the "completed contracts"). Pfaff Decl., ¶ 9 (Pl. App., Ex. 14, pp. P295-96).

9. As of September 30, 1997, ATS had 1047 employees, including 759 management personnel and an additional 288 non-managerial employees, charging time to government contracts. Pfaff Decl., ¶ 6 (Pl. App., Ex. 14, p. P293).

10. As of September 30, 1997, ATS, including the Advanced Projects, Government Wireless Programs, Utility Solutions and New Business Development groups, had hundreds of employees with highly technical skills and competencies, including skills in research and development, engineering, manufacturing and operations, software design and additional support functions, such as contracting, finance and human resources. Geller Decl., ¶ 8 (Pl. App., Ex. 12, p. P281).

11. As of September 30, 1997, ATS operated its business out of several locations, including facilities in North Carolina, New Jersey and Maryland. Pfaff Decl., ¶ 8 (Pl. App., Ex. 14, p. P294).

12. As of September 30, 1997, the adjusted net book value of all the fixed assets relating to Lucent's government business, including the assets of the Government Wireless Programs, Utility Solutions and New Business Development, was approximately $18 million. Pfaff Decl., ¶ 7 (Pl. App., Ex. 14, pp. P293-94).

13. As of September 30, 1997, Lucent maintained for both active and inactive employees the "Lucent Management Pension Plan" ("LMPP") and the "Lucent Pension Plan" ("LPP"), both of which were defined benefit pension plans. Lucent employees in ATS participated in each of these plans. Answer, ¶ 27 (Pl. App., Ex. 11, p. P252); Counterclaim, ¶ 157 (Pl. App., Ex. 11, p. P271); Pfaff Decl., ¶ 11 (Pl. App., Ex. 14, p. P296).

14. Since 1996, the CAS has required that pension costs be measured annually considering, among other things, liabilities that accrued in the year, actuarial gains and losses and plan assets. 48 C.F.R. § 9904.412-40(a). The CAS has required pension costs be measured by segment on either a "composite" or segment-specific basis. 48 C.F.R. §§ 9904.413-40(c) and -50(c). The CAS further required that composite costs be allocated to segments. 48 C.F.R. §§ 9904.412-40(d) and -50(d). Finally, the CAS required that pension costs allocated to a segment be allocated to the segment's contract using a base. *See* 48 C.F.R. 9904.413-40(c). Since the formation of the LMPP and the LPP in 1996, and through September 30, 1997, Lucent had followed government contract cost accounting practices that measure pension costs using "composite" accounting, which measures a single, total cost for each of Lucent's pension plans, and then allocate each composite cost to segments participating in the respective plan based upon total

segment payroll dollars. Total payroll dollars equals total salaries, wages and bonuses. Under these practices, each segment then allocated any pension costs allocated to its contracts, which would include all CAS-covered contracts, such as those in Table 1, based upon segment payroll dollars through what is called the Security Accrual rate. The Security Accrual rate results from a cost pool that includes all fringe benefit costs, including pension costs, if any, and a cost base that includes total segment payroll dollars. Pfaff Decl., ¶ 12 (Pl. App., Ex. 12, p. P297).

15. As of September 30, 1997, Lucent allocated costs to its government contracts, including the CAS-covered contracts listed in Table 1, in accordance with its standard government contract cost accounting practices. Pfaff Decl., ¶ 10 (Pl. App., Ex. 14, p. P296).

**<u>Lucent's Sale of Certain Assets of ATS to GD</u>**

16. In April of 1997, Lucent began distributing a Confidential Offering Memorandum (the "Offering Memorandum") to solicit interest for the purchase of assets relating to the ATS business organization. Suher Decl., ¶ 4 (Pl. App., Ex. 13, p. P286).

17. On August 20, 1997, Lucent and General Dynamics Corporation ("GD") entered into an "Agreement for the Purchase and Sale of Assets by and between Lucent Technologies Inc. as Seller and General Dynamics Corporation as Buyer" (the "Asset Purchase Agreement"), effective October 1, 1997. Counterclaim, ¶ 160 (Pl. App., Ex. 11, p. P272); Suher Decl., ¶ 5 (Pl. App., Ex. 13, p. P286); Pl. App., Ex. 2, pp. P054-191.

18. Pursuant to the terms of the Asset Purchase Agreement, Lucent transferred some, but not all of the contracts, assets, and personnel of the ATS business organization

to GD. Answer, ¶ 45 (Pl. App., Ex. 11, p. P255); Asset Purchase Agreement, Section 2 (Pl. App., Ex. 2, pp. P071-77); Suher Decl., ¶ 6 (Pl. App., Ex. 13, pp. P286-87).

19. In connection with the sale of assets to GD, Lucent and GD also executed an Intellectual Property Agreement, dated October 1, 1997 (the "IP Agreement"). Suher Decl., ¶ 7 (Pl. App., Ex. 13, p. P287); Pl. App., Ex. 3, pp. P192-204. Pursuant to the terms of the IP Agreement, Lucent agreed to sell and GD agreed to buy "a part of the Advanced Technologies [sic] Systems Division of Lucent." IP Agreement, ¶ 2 (Pl. App., Ex. 3, p. P193); Suher Decl., ¶ 7 (Pl. App., Ex. 13, p. P287). Pursuant to the terms of the IP Agreement, Lucent assigned to GD only 13 out of its entire patent portfolio of several thousand patents. There was no sale or assignment of "know-how" or software associated with the ATS business. With regard to the unassigned patents, "know-how" and software, Lucent granted to GD a nonexclusive right to use such intellectual property and only for certain purposes. Pl. App., Ex. 3, pp. P195-98. Lucent retained the ownership of and right to use such intellectual property related to the ATS business. Lucent retained these rights, in part, because it intended to use such intellectual property in its ongoing and continuing business with customers, including specifically the government. Suher Decl., ¶ 7 (Pl. App., Ex. 13, pp. P287-88).

**<u>ATS Assets that Remained with Lucent after the Sale of Assets to GD</u>**

20. The assets of ATS that Lucent did not sell to GD included, among others, contracts (the "retained contracts), employees, pending proposals of ATS, fixed assets, real property and intellectual property (the "retained assets"). Pfaff Decl., ¶ 13 (Pl. App., Ex. 14, pp. P297-98). The retained contracts and assets did not include the programs and

product lines of ATS defined in the Asset Purchase Agreement as "Excluded Programs," which included Tactical Wireless (Government Wireless Programs), New Business Development and Land and Air Programs (Advanced Projects). Answer, ¶ 45 (Pl. App., Ex. 11, p. P255); Asset Purchase Agreement, p. 5, ¶ 2.2 and Schedule 2.2(i) (Pl. App., Ex. 2, pp. P065, P072-74, P146); Suher Decl., ¶ 6 (Pl. App., Ex. 13, pp. P286-87). The sale also did not include other activities of ATS such as Utility Solutions and significant elements of the Research & Development group dedicated to ATS, along with the supporting organizations for such business activities. Suher Decl., ¶ 6 (Pl. App., Ex. 13, pp. P286-87).

21. Included within the retained assets that Lucent did not transfer to GD were employees who were working for the ATS business organization. These employees included research and development technical managers and employees and other support personnel. The retention of these employees enabled Lucent to continue to be responsible for the performance of the contracts in Table 1 and to pursue and be awarded additional CAS-covered contracts in 1998 and thereafter, including work relating to the government's defense and national security needs in the photonics, high-power optical amplifiers, opto-mechanics, advanced multimedia, free-space wireless, IP networking research and design and wireless engineering areas. Geller Decl., ¶ 12 (Pl. App., Ex. 12, p. P283).

22. The retained contracts included, among others, the nine active government CAS-covered contracts being performed by ATS that are shown in Table 1 above. Pfaff Decl., ¶ 14 (Pl. App., Ex. 14, p. P298).

23. Pursuant to the terms of the Asset Purchase Agreement, none of the "completed contracts" were sold to GD. Counterclaim, ¶ 161 (Pl. App., Ex. 11, p. P272); Asset Purchase Agreement, ¶ 2.2. (Pl. App., Ex. 2, p. P074); Pfaff Decl., ¶ 14 (Pl. App., Ex. 14, p. P298). This included approximately 250 contracts. Pfaff Decl., ¶ 9 (Pl. App., Ex. 14, p. P295).

24. Lucent, GD and the government did not enter into a novation agreement relating to the active contracts Lucent transferred to GD. Answer, ¶ 49 (Pl. App., Ex. 11, p. P255); Suher Decl., ¶ 9 (Pl. App., Ex. 13, p. P289).

25. The retained assets included approximately 230 employees who were working in the ATS business organization as of the sale, including over 160 managers and nearly 70 non-managerial employees. Pfaff Decl., ¶ 15 (Pl. App., Ex. 14, p. P298). Included in the retained employees were several members of the ATS leadership team, including, among others, Mike Geller and Mike Conrad. Pfaff Decl., ¶ 16 (Pl. App., Ex. 14, p. P298).

26. The asset sale to GD did not include the transfer of any inactive or retired personnel. Answer, ¶ 51 (Pl. App., Ex. 11, p. P255); Asset Purchase Agreement, ¶ 5.5 (Pl. App., Ex. 2, p. P097-103).

27. The retained assets included portions of ATS' facilities. Pfaff Decl., ¶ 18 (Pl. App., Ex. 14, p. P298).

28. The retained assets included various fixed assets, including over $1,370,000 of assets relating to Government Wireless Programs, Utility Solutions, and the New

Business Development groups, along with fixed assets from human resources, public relations and other groups. Pfaff Decl., ¶ 17 (Pl. App., Ex. 14, p. P298).

29. The retained assets form the core of Lucent's existing post September 30, 1997, CAS-covered, government business that has continued to produce annual revenues, which currently are estimated to equal or exceed $77 million. Geller Decl., ¶ 13 (Pl. App., Ex. 12, p. P283). Table 2 below shows an accurate representation of some of the additional CAS-covered contracts, including Time and Material ("T&M") contracts, Lucent performed using the retained assets after the sale to GD. Table 2 shows the same type of information shown in Table 1. Pfaff Decl., ¶ 19 (Pl. App., Ex. 14, p. P299).

**Table 2: New CAS-Covered Contracts**

| Contract No. | Description | Type | Execution Date | CAS Covered | 1998 Incurred Costs |
|---|---|---|---|---|---|
| 9810348YXG | ELB Phase 1B | CPFF | 5/13/98 | Yes | 556,528.24 |
| MDA 90498CB266 | Flexible Routing System | T&M | 6/2/98 | Yes | 154,048.39 |
| MDA 90498CB641 | 672-1 | CPFF | 8/1/98 | Yes | 65,546.36 |
| 98A810600000 | Woodland | CPFF | 9/17/98 | Yes | 49,286.78 |
| | | | | Total | **825,409.77** |

30. On September 22, 2003, the Defense Contract Audit Agency ("DCAA") completed an audit regarding Lucent's compliance with 48 C.F.R. § 9904.413-50(c)(12) (the "Audit Report"). Audit Report, p. 1 (Pl. App., Ex. 15, p. P303); Answer, ¶¶ 45 and 76 (Pl. App., Ex. 11, pp. P255 and 259). The Audit Report concluded that Lucent did not transfer to GD all assets, including ATS' CAS-covered contracts. Audit Report p. 30 (Pl. App., Ex. 15, p. P308); Answer, ¶¶ 45 and 76 (Pl. App., Ex. 11, pp. P255 and 259).

31. The government has admitted that "Lucent agreed to sell to GD the vast majority of the active Government contracts being performed by [ATS]." Counterclaim, ¶ 161 (Pl. App., Ex. 11, p. P272).

**The Continued Allocation of the LMPP and LPP Pension Plan Costs to CAS-Covered Contracts after the Sale of Assets to GD**

32. Since October 1, 1997, Lucent has accounted for costs of the LMPP and the LPP for government contract purposes in accordance with its established government contract accounting practices, which, for relevant purposes, have been the same as those in effect prior to October 1, 1997. That is, Lucent's government contract cost accounting practices after September 30, 1997, have continued to compute composite pension costs for each plan and to allocate these composite pension costs to segments based upon payroll dollars. These practices also have continued to require that any pension costs allocated to a segment be allocated to the segment's contracts, including the CAS-covered contracts in Tables 1 and 2, based upon the Security Accrual rate. Pfaff Decl., ¶ 21 (Pl. App., Ex. 14, pp. P299-300).

33. The LMPP and the LPP pension plans have been fully-funded since their formation in 1996 which means that the plans have not generated any costs. This has occurred because the assets of each plan have been sufficiently large to absorb the liabilities that have accrued each year under each plan for each plan participant because the participant was an employee of Lucent. Prior to October 1, 1997, plan participants included Lucent employees working on ATS CAS-covered contracts, including those in Table 1. Subsequent to September 30, 1997, plan participants of Lucent included

employees within the retained assets, and other Lucent employees, working on the CAS-covered contracts in Tables 1 and 2, among other CAS-covered contracts. Thus, pursuant to the consistent application of the pension cost accounting practices, previously described, CAS-covered contracts performed up through September 30, 1997, and those performed after that date, including the contracts in Table 1, have had no pension costs allocated to them, and, thus, have benefited from the consumption of pension plan assets to fund pension plan liabilities. Pfaff Decl., ¶ 22 (Pl. App., Ex. 14, p. P300).

34. Many of the ATS employees that remained with Lucent continued to charge payroll costs to the contracts in Tables 1 and 2, after the sale of assets to GD. The total amount of direct labor dollars charged by employees to the contracts in Tables 1 and 2 during 1998 was approximately $1 million. Absent the fully-funded condition of Lucent's pension plan, these direct labor dollars charged to contracts would have resulted in the allocation of pension costs to these contracts. Thus, these contracts benefited in 1998 from the fully-funded condition of Lucent's pension plans. Pfaff Decl., ¶ 23 (Pl. App., Ex. 14, pp. P300-01).

Respectfully submitted this 2nd day of August, 2005.

s/Thomas A. Lemmer
Thomas A. Lemmer
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
(303) 634-4000
FAX: (303) 634-4400

ATTORNEY FOR PLAINTIFF
LUCENT TECHNOLOGIES INC.

OF COUNSEL:

Corey R. Sanchez
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202

Michael Garson
Corporate Counsel
Lucent Technologies Inc.
450 Spring Park Place
Herndon, VA 20170-5243
(703) 394-1450

DN:32106368.2