**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LUCENT TECHNOLOGIES INC.<br>Plaintiff,<br>vs.<br>UNITED STATES,<br>Defendant. | Case No. 04-1511C<br>(Judge Braden) |

**AMENDED MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC") and the Court's Order filed September 26, 2006, Plaintiff Lucent Technologies Inc. ("Lucent") respectfully amends its previous motion for summary judgment and supporting brief, dated August 2, 2005, and moves for summary judgment on the grounds that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law with respect to Count I of Lucent's Complaint and Count I of Defendant United States' (the "government") Answer and Counterclaim.

Count I of Lucent's Complaint and Count I of the government's Counterclaim relate to the government's allegation that Lucent "closed a segment," pursuant to 48 C.F.R. § 9904.413-50(c)(12) (1996), when it sold some, but not all, of the assets of its Advanced Technology Systems business to General Dynamics Corporation ("GD") on October 1, 1997. As a result of its allegation that Lucent "closed a segment," the government claims it is entitled to recovery of $44,442,475, inclusive of interest, under 48 C.F.R. § 9904.413-50(c)(12) (1996).

The government's claim should be denied because Lucent's sale of certain assets to GD did not "close a segment" under the undisputed facts and the law. Accordingly, Lucent is entitled to summary judgment. In support of this Motion, Lucent relies on the pleadings and the supporting Memorandum of Points and Authorities, and the Stipulation of the Parties included in the Court's September 26, 2006 Order.

Respectfully submitted this 9th day of November, 2006.

s/Thomas A. Lemmer
Thomas A. Lemmer
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
(303) 634-4350
FAX: (303) 634-4400

ATTORNEY FOR PLAINTIFF
LUCENT TECHNOLOGIES INC.

OF COUNSEL:

Corey R. Sanchez
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202

Michael Garson
Lucent Technologies
8000 Towers Crescent Drive
Suite 400
Vienna, VA 22182

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LUCENT TECHNOLOGIES INC.<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES,<br><br>Defendant. | Case No. 04-1511C<br>(Judge Braden) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT**

Thomas A. Lemmer
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
(303) 634-4350
FAX: (303) 634-4400

ATTORNEY FOR PLAINTIFF
LUCENT TECHNOLOGIES INC.

OF COUNSEL:

Corey R. Sanchez
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202

Michael Garson
Lucent Technologies
8000 Towers Crescent Drive
Suite 400
Vienna, VA 22182

November 9, 2006

## TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 2

II. FACTS ........ 5

III. RELEVANT LEGAL STANDARDS FOR SUMMARY JUDGMENT ........ 6

IV. ARGUMENT ........ 7

A. A Sale of Assets Results in a Segment Closure Under Revised CAS 413 Only When All CAS-Covered Contracts Under Performance and Related Assets are Sold, Precluding the Future Adjustment of Previously Determined Pension Costs ........ 8

1. The Plain Meaning of Revised CAS 413 Requires the Sale of All CAS-Covered Contracts Under Performance and Related Assets for A Segment Closure to Occur ........ 8

a. The Plain Meaning of the Words Used in the Definition of Segment Closure is that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold ........ 9

b. The Plain Meaning of the Words Not Used in the Definition of Segment Closure is that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold ........ 12

2. The Policy Underlying Segment Closure Rules is Consistent with the Plain Meaning that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold ........ 16

B. Lucent's Sale Related to ATS Was Not a Segment Closure Because Lucent Did Not Sell All of the ATS CAS-Covered Contracts Under Performance and Related Assets ........ 21

V. CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Page**

## Cases

*Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003) .................. 4, 20

*Allis-Chalmers Mfg. Co. v. United States*, 79 Ct. Cl. 453 (1934) ...................................... 7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................... 7

*Arnold v. N. Am. Chem. Co.*, 122 N.E. 283 (Mass. 1919)................................................ 11

*ATK Thiokol, Inc. v. United States*, 68 Fed. Cl. 612 (2005).......................................passim

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) ........................................... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..................................................................... 6

*Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345 (1997) .................................. 16

*Curtis v. United States*, 168 F. Supp. 213 (Ct. Cl. 1958) ................................................... 7

*Gould, Inc.*, ASBCA No. 46759, 97-2 B.C.A. ¶ 29,254 ............................................. 8, 14

*Gould, Inc.*, ASBCA No. 46759, 98-1 B.C.A. ¶ 29,469 ..................................................... 8

*In Re Bicoastal Corp.*, 124 B.R. 593 (Bankr. M.D. Fla. 1991).................................... 8, 20

*In Re Bicoastal Corp.*, 125 B.R. 659 (M.D. Fla. 1991)....................................................... 8

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987)................................................................. 12

*Kearfott Guidance & Navigation Corp. v. Rumsfeld*, 320 F.3d 1369 (Fed. Cir. 2003)................................................................................................................. 11

*Lockheed Corp. v. Widnall*, 113 F.3d 1225 (Fed. Cir. 1997)....................................... 9, 13

*Lockheed Corp.*, ASBCA No. 27921, 86-1 B.C.A. ¶ 18,614........................................... 16

*Lorillard v. Pons*, 434 U.S. 575 (1978).............................................................................. 16

*Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed. Cir. 1987)..................... 6

*Perrin v. United States*, 444 U.S. 37 (1979)......................................................................... 9

**Page**

*Perry v. Martin Marietta Corp.*, 47 F.3d 1134 (Fed. Cir. 1995)........................................ 8

*Russello v. United States*, 464 U.S. 16 (1983)................................................................ 13

*Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560 (Fed. Cir. 1987)................. 7

*Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (2001)..........................................passim

*Tesoro Haw. Corp. v. United States*, 405 F.3d 1339 (Fed. Cir. 2005)............................. 12

*Thermalon Indus., Ltd. v. United States*, 51 Fed. Cl. 464 (2002)...................................... 7

*Unisys Corp.*, ASBCA No. 41135, 94-2 B.C.A. ¶ 26,894 ................................................. 7

*Whelan v. United States*, 529 F.2d 1000 (Ct. Cl. 1976) .................................................. 13

**Other Authorities**

40 Fed. Reg. 43,873 (Sept. 24, 1975)................................................................................ 19

60 Fed. Reg. 16,534 (March 30, 1995).............................................................................. 18

Accounting Principles Board No. 8 ............................................................................. 14, 20

Note to Board Members, May 14, 1976 ............................................................................ 14

Staff Draft CAS 413, June 18, 1976.................................................................................. 14

**Rules**

Rule 56 of the Rules of the Court of Federal Claims ..................................................... 1, 6

**Treatises**

*Black's Law Dictionary* (6th ed. 1990) ..................................................................... 10, 11

*Webster's II New College Dictionary* (3d ed. 2005) ...................................................... 10

**Regulations**

4 C.F.R. § 413.50(c)(12).................................................................................................passim

48 C.F.R. § 9904.403-40 ................................................................................................... 17

48 C.F.R. § 9904.412-30 ................................................................................................... 17

48 C.F.R. § 9904.412-40 ............................................................................................. 17, 18

**Page**

48 C.F.R. § 9904.412-50 .......... 17, 18

48 C.F.R. § 9904.413-30 .......... 2, 8, 10, 18

48 C.F.R. § 9904.413-50 .......... 13, 17, 18

48 C.F.R. § 9904.413-50(c)(12) .......... passim

48 C.F.R. § 9904.413-60 .......... 10, 11, 17

48 C.F.R. § 9904.413-63 .......... 1

48 C.F.R. Part 99 .......... 2

Pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC") and the Court's Order filed September 26, 2006, Plaintiff Lucent Technologies Inc. ("Lucent") respectfully submits this Memorandum of Points and Authorities in support of its Amended Motion for Summary Judgment.

## QUESTION PRESENTED

Whether, pursuant to Count I of Lucent's Complaint, and contrary to Count I of Defendant United States' (the "government") Answer and Counterclaim ("Counterclaim"), Lucent did not "close a segment" under "Revised CAS 413"[1] when

---

[1] "Revised CAS 413" refers to 48 C.F.R. § 9904.413-50(c)(12) and related definitions in CAS 413 that became effective March 30, 1995. *See* 48 C.F.R. § 9904.413-63(a). The CAS Board, authorized by 41 U.S.C. § 422, wrote this revision. Prior to that date, a predecessor provision existed, the "Original CAS 413." Original CAS 413 was found initially at 4 C.F.R. § 413.50(c)(12) in 1978 and then at 48 C.F.R. § 9904.413-50(c)(12) (1992), where it remained until it was superseded by Revised CAS 413 in March 1995. The CAS Board, authorized by 50 U.S.C. app. § 2168 (repealed 1988), wrote Original CAS 413. This brief distinguishes between these two CAS Boards by identifying the Board that drafted Revised CAS 413 as the "New CAS Board" and the Board that drafted Original CAS 413 as the "Former CAS Board."

Lucent's motion arises under Revised CAS 413 because the government bases its right of recovery on that provision due to the fact that the alleged segment closure occurred on October 1, 1997. *See* Counterclaim ¶¶ 169-73. Certain discussions later in this brief, however, will refer to Original CAS 413 to explain the meaning of Revised CAS 413. As discussed later, Revised CAS 413 and Original CAS 413 both require an "adjustment of previously determined pension costs" when a contractor "closes a segment." Revised CAS 413 does differ from Original CAS 413 in certain respects, including that Revised CAS 413 provides for a means to recover any adjustment amount, including amounts relating to firm, fixed priced contracts. These differences between Revised and Original CAS 413 are not relevant to this motion. *See Teledyne, Inc. v. United States*, 50 Fed. Cl. 155, 161-68 (2001), for a detailed discussion of the history of both Revised and Original CAS 413.

Lucent sold to General Dynamics Corporation ("GD") some, but not all, of the contracts subject to the Cost Accounting Standards ("CAS")[2] being performed by, and some, but not all, of the related assets being used to perform these contracts by, Lucent's Advanced Technology Systems ("ATS") business organization ("ATS Business Unit").[3]

## I. <u>INTRODUCTION</u>

Prior to October 1, 1997, Lucent performed contracts for the government subject to the CAS ("CAS-covered contracts") through its ATS Business Unit using certain tangible and intangible assets and employees (the "related assets") and maintained certain pension plans applicable to Lucent employees performing these contracts. On October 1, 1997, Lucent sold or transferred certain of these CAS-covered contracts and related assets, and transferred substantial pension assets, to GD. The government argues, however, that Lucent did not transfer all of the pension assets that Revised CAS 413 required be transferred. Thus, the government argues that Lucent "closed a segment" under Revised CAS 413, triggering: (a) a Lucent obligation to adjust, as of the date of

---

[2] 48 C.F.R. Part 99.

[3] For purposes of this motion only, Lucent does not contest the government's assertion that ATS was a "segment" under CAS at all relevant times. This motion establishes that even if the government's assertion were correct, Lucent is entitled to judgment as a matter of fact and law based upon the meaning of when a segment is "closed." Should the Court deny Lucent's motion and hold that a "material" or "significant" transfer of contracts and assets may be a segment closing, Lucent reserves the right to argue that: (a) even if ATS were a segment, Lucent still did not close a segment based on facts outside of this motion; and (b) the government's assertion that ATS was a segment under 48 C.F.R. § 9904.413-30(a)(20) for purposes relevant to segment closing issues arising under Revised CAS 413 is incorrect.

the alleged segment closure, previously determined pension costs for the ATS Business Unit; and (b) government entitlement to recover from Lucent an amount based upon this cost adjustment. *See* Counterclaim ¶¶ 167-73.

Specifically, Revised CAS 413 provides that:

> If a segment is closed, if there is a pension plan termination, or if there is a curtailment of benefits, the contractor shall determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The difference between the market value of the assets and the actuarial accrued liability for the segment represents an adjustment of previously determined pension costs.

48 C.F.R. § 9904.413-50(c)(12) (emphasis added).

The government alleges that Lucent closed the ATS segment. As of this alleged segment closing date, the government believes that Lucent pension plan assets exceeded Lucent pension plan liabilities allocable to the ATS Business Unit and that this difference equals the appropriate adjustment of previously determined pension costs for the ATS Business Unit. The government further believes that it is entitled to recover an amount equaling "the product of the adjustment amount and a fraction," where this fraction would equal the government's participation in pension costs for the ATS Business Unit over a representative period of time. 48 C.F.R. § 9904.413-50(c)(12)(vi). *See* Counterclaim ¶¶ 163-65, 170-73. Thus, the threshold requirement to any government recovery from Lucent is that Lucent "closed" the ATS segment. *See* Counterclaim ¶¶ 168-69.

Even assuming that, as of October 1, 1997, ATS were a "segment," as CAS defines that term,[4] Lucent's sale of certain ATS contracts and related assets did not "close" this segment because Lucent did not sell all of ATS' CAS-covered contracts and related assets. As established below, Revised CAS 413 provides that a segment is closed only when all of a segment's CAS-covered contracts in performance at the time of the sale and related assets are sold.

As also established below, sound policy underlies the requirement that all CAS-covered contracts and related assets be sold in order for a segment closing to have occurred. In short, it is only in such a circumstance that "normal" pension accounting rules applicable to CAS-covered contracts, that require adjusting previously determined (*i.e.*, estimated) pension costs over future accounting periods, become ineffective. This occurs because the absence of CAS-covered contracts means that there is no future accounting period(s) to accomplish the adjustment of previously determined pension costs, requiring an immediate adjustment of previously determined pension costs. *See Teledyne,* 50 Fed. Cl. at 163, *aff'd Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003).

For example, when prior estimated pension costs allocated to a segment have exceeded actual costs, the pension plan likely will have surplus assets that, under normal practices, would be eliminated over the future through future reductions in pension costs and the allocation of these reduced pension costs to ongoing and future CAS-covered

---

4 *See* n.3, *supra*.

contracts. When all CAS-covered contracts and related assets have been sold, however, this future adjustment will not occur, necessitating an immediate adjustment pursuant to the provisions of Revised CAS 413.

Here, there was no complete sale of the relevant CAS-covered contracts and related assets. Accordingly, as explained further below, pursuant to Revised CAS 413's plain meaning and underlying policy, Lucent is entitled to summary judgment because no segment was closed.

## II. FACTS

In 1997, Lucent maintained the ATS Business Unit, which performed contracts, including CAS-covered contracts. *See* Counterclaim ¶ 156; Lucent's Answer ¶ 156.[5]

Lucent maintained two defined benefit pension plans for its employees. *See* Counterclaim ¶ 157; Lucent's Answer ¶ 157.

---

[5] The Counterclaim and Plaintiff's Reply to Defendant's Counterclaim ("Lucent's Answer") establish the type of contracts that ATS performed. Counterclaim ¶ 156 states "Lucent's ATS segment was engaged principally in producing underwater detection and communications equipment for the Government under CAS-covered contracts." Lucent's Answer to ¶ 156 states:

> Lucent admits that, among other things, it produced underwater detection and communications equipment for the government under CAS-covered contracts. The government's use of the term "principally" in paragraph 156 constitutes the government's characterization, to which no response is required. The remaining allegations in paragraph 156 are conclusions of law, to which no response is required; to the extent the allegations may be deemed to include allegations of fact, they are denied.

On October 1, 1997, Lucent and GD closed an "Agreement for the Purchase and Sale of Assets" related to Lucent's ATS Business Unit (the "Agreement"). *See* Stipulation 1, September 26, 2006 Order. Pursuant to the Agreement, Lucent: (a) transferred substantially all of the ATS Business Unit's contracts under performance to GD; and (b) sold other substantial assets of the ATS Business Unit to GD. *See* Stipulation 2, September 26, 2006 Order. Pursuant to the Agreement, however, Lucent retained one or more CAS-covered contracts that the ATS Business Unit was performing, as of the October 1, 1997 closing date, and also retained certain of the tangible and intangible assets and employees of the ATS Business Unit. *See* Stipulation 3, September 26, 2006 Order.

## III. RELEVANT LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. RCFC 56; *Celotex Corp. v. Catrett*; 477 U.S. 317 (1986); *ATK Thiokol, Inc. v. United States*, 68 Fed. Cl. 612, 627-28 (2005). Although this Court must examine the factual issues in a light most favorable to the nonmoving party, in *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987), the Federal Circuit has explained:

> Where a movant has supported its motion with affidavits and other evidence which, unopposed, would establish its right to judgment, the non-movant may not rest upon general denials in its pleadings or otherwise, but must proffer countering evidence sufficient to create a genuine factual dispute. A dispute is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant.

*Sweats Fashions, Inc. v. Pannill Knitting Co*., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (emphasis in original), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those that are outcome determinative to the results of the case. *See id.; Curtis v. United States*, 168 F. Supp. 213, 216 (Ct. Cl. 1958).

## IV. ARGUMENT

Count I of Lucent's Complaint and Count I of the government's Counterclaim relate to a government claim of entitlement under Revised CAS 413 because Lucent allegedly closed a segment when Lucent sold certain ATS CAS-covered contracts and related assets to GD. *See* Counterclaim ¶ 169. As explained below, no segment closure occurred under Revised CAS 413 because of that sale. Accordingly, Lucent requests this Court to hold that: (a) the sale to GD did not result in a segment closure under Revised CAS 413; (b) the government has no entitlement to an immediate adjustment of pension costs under Revised CAS 413; and (c) Lucent is entitled to summary judgment, as a matter of fact and law, under Count I of its Complaint and on Count I of the government's Counterclaim.[6]

[6] While Lucent bears the burden that it is entitled to summary judgment, this Court should consider when assessing Lucent's right to summary judgment that the government bears the ultimate burden in this case. *See Unisys Corp.*, ASBCA No. 41135, 94-2 B.C.A. ¶ 26,894, at 133,900 ("[i]n any appeal that involves alleged noncompliance with cost accounting standards, the burden is on the Government to establish the noncompliance"); *see also Thermalon Indus., Ltd. v. United States*, 51 Fed. Cl. 464, 472 (2002) (the burden is on the defendant to establish its counterclaim), *citing Allis-Chalmers Mfg. Co. v. United States*, 79 Ct. Cl. 453, 462-63 (1934).

### A. A Sale of Assets Results in a Segment Closure Under Revised CAS 413 Only When All CAS-Covered Contracts Under Performance and Related Assets are Sold, Precluding the Future Adjustment of Previously Determined Pension Costs

Whether a sale of less than all of a segment's CAS-covered contracts and related assets means that no segment is closed under Revised CAS 413 (as well as under Original CAS 413) is an issue of first impression. No previous decision addressing Revised or Original CAS 413 that considered when a segment closing occurs involved circumstances of a sale of less than all of a segment's assets. *See In Re Bicoastal Corp.,* 124 B.R. 593 (Bankr. M.D. Fla. 1991), *aff'd* 125 B.R. 659 (M.D. Fla. 1991); *Gould, Inc.,* ASBCA No. 46759, 97-2 B.C.A. ¶ 29,254, *aff'd* 98-1 B.C.A. ¶ 29,469; *Teledyne, supra*.

Without previous precedent on this issue, the Court should look to the plain meaning of Revised CAS 413 and its underlying policy. *Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed. Cir. 1995) (the court's responsibility "is ultimately to ascertain the [CAS Board]'s intended meaning when it promulgated the CAS"); *ATK Thiokol*, 68 Fed. Cl. at 630 (same). The plain meaning of Revised CAS 413 and its policy establish that when a sale of contracts and assets occurs, a segment is closed only when all CAS-covered contracts and related assets are sold.

#### 1. The Plain Meaning of Revised CAS 413 Requires the Sale of All CAS-Covered Contracts Under Performance and Related Assets for A Segment Closure to Occur

Revised CAS 413 defines a "segment closing" because of a sale as occurring when "a segment has . . . been sold or ownership has been otherwise transferred . . . ." *See* 48 C.F.R. § 9904.413-30(a)(20). The plain meaning of these words is that the sale must

include all the segment's CAS-covered contracts under performance and related assets to result in a segment closure. This meaning comes from the words used in the definition of segment closure, as well as the words not used in this definition. Indeed, as discussed in Section b. below, the definition of segment closing contains no words that support concluding that a closing occurs when less than all CAS-covered contracts and related assets have been sold because the CAS Board expressly decided not to use any such words.

**a. The Plain Meaning of the Words Used in the Definition of Segment Closure is that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold**

To interpret a regulation, the Court should look at the plain language and interpret its terms in accordance with their common meaning. *Lockheed Corp. v. Widnall,* 113 F.3d 1225, 1227 (Fed. Cir. 1997) (look at regulation's plain language and consider terms in accordance with their common meaning), *citing Perrin v. United States*, 444 U.S. 37, 42 (1979); *see also Teledyne*, 50 Fed. Cl at 161-62 (look to the plain meaning of a CAS regulation to interpret it). When CAS does not define a term, the intended meaning should be assessed by consulting "dictionaries or definitions in related regulations . . . ." *ATK Thiokol*, 68 Fed. Cl. at 630.

The key words with substantive meaning regarding the definition of "segment closing" due to a sale are "segment," "closing" and "sold." These words together show that a segment is closed only when all of the segment's CAS-covered contracts under

performance are transferred to the buyer and no assets remain to permit the continued performance of CAS-covered contracts.

CAS states that a "segment" is "one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service." 48 C.F.R. § 9904.413-30(a)(19). Accordingly, a segment is defined by the operations necessary to produce the products and services it sells under its contracts. *See, e.g.,* 48 C.F.R. § 9904.413-60(c)(8) (segment closed when facility lost five-year contract to operate government-owned facility).

CAS does not define "closing." According to the dictionary, to "close" something means to bring it to an end or to cease operations. *See Webster's II New College Dictionary* 216 (3d ed. 2005); *see also Teledyne*, 50 Fed. Cl. at 170. In other words, no part of the object that closes continues. Accordingly, and conversely, when a segment's operations to produce goods or services sold under its contracts do not end or cease, there is no segment closing.

This meaning is consistent with the other terms used in CAS § 413.30(a)(20) to define a segment closing when a sale is not involved; *i.e.*, the discontinuance of operations or a discontinuance of performing or seeking government contracts. 48 C.F.R. § 9904.413-30(a)(20). The discontinuance of something means that it ends or ceases, which further supports that the products and services are no longer provided. *Black's Law Dictionary* 464-65 (6th ed. 1990). In terms of the CAS, this means that the

contractor no longer continues to provide, or has the capability or desire to provide, goods and services under CAS-covered contracts.

CAS does not define "sold." Consistent with the plain meaning of "segment" and "closing" is the plain meaning of "sold." As discussed in *Black's Law Dictionary*, a "sale" is achieved when something is "sold," and something is "sold" when a "contract [exists] whereby property is transferred from one person to another for a consideration of value, implying the passing of the general and absolute title, as distinguished from a special interest falling short of complete ownership." *Black's Law Dictionary* at 1337; *see also Arnold v. N. Am. Chem. Co.*, 122 N.E. 283, 284 (Mass. 1919). Accordingly, when something is sold, there is a complete transfer of ownership. The seller does not retain any rights. In the case of the sale of a segment in the context of Revised CAS 413, this means that the contractor must retain no ownership in the CAS-covered contracts under which it has been providing products and services through the segment allegedly closed and no ownership of the assets it has been using to perform these contracts. Anything less means that the "segment" has not been sold.

Revised CAS 413 contains several illustrations that support the interpretation that the entire segment must be sold to be a segment closure. *See Kearfott Guidance & Navigation Corp. v. Rumsfeld*, 320 F.3d 1369, 1377 (Fed. Cir. 2003) (regulations are to be read in harmony). Specifically, under Illustrations 8, 12 and 14 to Revised CAS 413, when the contractor no longer has <u>any</u> CAS-covered contracts under which pension assets could be adjusted, a segment closure has occurred. *See* 48 C.F.R. §§ 9904.413-60(c)(8) (loss of a contract results in the cessation of operations); (12) (sale of a segment and

novation of all contracts); and (14) (no government contracts). From the plain meaning of the terms "segment," "closing" and "sold," a segment closing occurs when a segment performing government contracts is sold in its entirety such that the owner of the segment allegedly sold no longer provides, or is able to provide, to the government under CAS-covered contracts the services and products that it had been providing through this segment. It is only in this circumstance that no future period(s) exists to continue the adjustment of previously determined pension costs. *See Teledyne*, 50 Fed. Cl. at 170-71.

Accordingly, the plain meaning of Revised CAS 413 is that a segment is not closed by a sale unless all of the segment's CAS-covered contracts and related assets are sold.

**b. The Plain Meaning of the Words Not Used in the Definition of Segment Closure is that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold**

Words not used in Revised CAS 413 also support the meaning that a segment closure does not occur when less than all of a segment's CAS-covered contracts and related assets are sold. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987); s*ee also Teledyne*, 50 Fed. Cl. at 165. Regulations are to be interpreted in the same manner as statutes. *See Tesoro Haw. Corp. v. United States*, 405 F.3d 1339, 1346-47 (Fed. Cir. 2005), *citing Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414-15 (1945) (focus on "plain words of the regulation" to ascertain the

meaning of the regulation); *Lockheed Corp.*, 113 F.3d at 1227 ("[t]o interpret a regulation we must look at its plain language and consider the terms in accordance with their common meaning"); *Whelan v. United States*, 529 F.2d 1000, 1002-03 (Ct. Cl. 1976) (rules of statutory construction apply to the interpretation of administrative regulations). Accordingly, when language is not used in a regulation that could have been used, significance should be given to that fact when interpreting the regulation.

First, the language in 48 C.F.R. § 9904.413-50(c)(12) (*i.e.,* Revised CAS 413) "[i]f a segment is closed," quoted previously on page 3, and the language of the definition of "segment closing" at 48 C.F.R. § 9904.413-30(a)(20), quoted previously on page 8, do not contemplate anything less than the whole closure of the segment. This language does not include <u>any</u> words that qualify the finality that the words "close," "end," or "cease" plainly mean, such as "partially," "in part," "material," "materially," "significant" or any other similar words meaning something less than the whole. This is in contrast, for example, to other sections of CAS 413 that require contractors to calculate separate segment pension costs under CAS 413 when certain conditions exist that have a "material" impact on pension costs allocated to a segment. *See* 48 C.F.R. § 9904.413-50(c)(2). Thus, the CAS Board understands words of qualification, and the CAS Board's decision not to qualify in Revised CAS 413 the amount of the segment that must be sold to result in a segment closure reinforces that the closure must be the complete end of the segment. *See, e.g., Russello v. United States*, 464 U.S. 16, 23 (1983) (where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally

and purposefully in the disparate inclusion or exclusion"); *Teledyne*, 50 Fed. Cl. at 178, n. 27 (CAS Board elected not to incorporate recovery under firm, fixed-price contracts into Original CAS 413, meaning that CAS 413 should not be read to permit implicitly recovery under such contracts).

Second, the text of Original CAS 413 supports the importance of the lack of any words of qualification in Revised CAS 413.[7] During the writing of Original CAS 413 in 1977, the Former CAS Board dropped several words that would have qualified the need for a complete segment closing. The Former CAS Board initially drafted Original CAS 413 to read "[i]f all, or substantially all, of a segment is closed, and a significant number of employees are thereby separated from the plan, the contractor shall compute a net gain or loss from the plan applicable to that segment . . . ." *Teledyne*, 50 Fed. Cl. at 164, *quoting* Note to Board Members, May 14, 1976, Staff Draft CAS 413, June 18, 1976, (emphasis added); *see also, Gould*, *Inc.*, ASBCA No. 46759, 97-2 B.C.A. ¶ 29,254 (Accounting Principles Board ("APB") No. 8 required "substantially all" of a business unit be disposed of in order for that business unit to be closed for financial reporting purposes).

The final version of Original CAS 413 did not include the text "all, or substantially all, of," and did not include the text "and a significant number of employees are thereby separated from the plan." *Teledyne*, 50 Fed. Cl. at 165. When the Former CAS Board deliberately discarded the "substantially all" language that it initially

---

7 *See* n.1, *supra.*

contemplated including in Original CAS 413, the Former CAS Board made a statement that a segment should not be considered closed if the contractor sold or transferred something less than the entire segment. That intent was reinforced by the Former CAS Board also discarding the language "a significant number of employees are thereby separated from the plan."

This evolution of the text of Original CAS 413 is directly relevant to Revised CAS 413. When the New CAS Board drafted Revised CAS 413, the New CAS Board examined in detail how Original CAS 413 needed to change in order to address certain issues that had arisen under Original CAS 413, including when previously determined pension costs must be adjusted currently rather than over the future. *See Teledyne*, 50 Fed. Cl. at 165-68. Thus, the history of what the Former CAS Board intended when it removed language of qualification from the definition of segment closure was available to the New CAS Board when drafting Revised CAS 413.

Moreover, the statute that created the New CAS Board provided that the existing standards, including Original CAS 413, would remain in effect until "amended, superseded or rescinded" by the New CAS Board and that the existing standards would be subject to the statute "as if promulgated by the Board" under this statute. 41 U.S.C. § 422(j). In accordance with this statute, the New CAS Board reissued all CAS, including CAS 413, effective 1992.[8] Thus, the New CAS Board is deemed to have had knowledge of the history and intent of Original CAS 413 and the wording of Original

---

8 *See also* discussion at n.1, *supra.*

CAS 413 when it drafted Revised CAS 413. *See ATK Thiokol*, 68 Fed. Cl. at 637 (CAS Board found to have been aware of the meaning of certain language when it drafted CAS 420 and this awareness is relevant to interpreting the CAS Board's intent regarding CAS 420); *Lockheed Corp.*, ASBCA No. 27921, 86-1 B.C.A. ¶ 18,614, at 93,540 (CAS Board presumed to have had the requisite understanding of the regulations). *Accord Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (it is presumed that Congress is aware of interpretation of a statute and adopts that interpretation when it reenacts a statute without change); *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 354 (1997) (presumed that Congress drafts statutes with full knowledge of existing law and great care for language used to achieve intended result). Nevertheless, when it drafted Revised CAS 413, the New CAS Board did not include any language of qualification in the definition of segment closure that might allow for closure when something less than all is sold. Thus, the absence of any words of qualification relating to the definition of segment closing supports the plain meaning of Revised CAS 413 that all of a segment's CAS-covered contracts and related assets must be sold for a segment closing to occur.

#### 2. The Policy Underlying Segment Closure Rules is Consistent with the Plain Meaning that a Sale Results in a Segment Closure Only When All of the Segment's CAS-Covered Contracts Under Performance and Related Assets are Sold

The policy underlying the requirement in Revised CAS 413 for an immediate adjustment of previously determined pension costs when a segment is closed is consistent with and, therefore, supportive of, the plain meaning of Revised CAS 413. *See Teledyne*, 50 Fed. Cl. at 161 (it is important to interpret CAS to accomplish the policy of the

regulation); *ATK Thiokol*, 68 Fed. Cl. at 630. The policy underlying Revised CAS 413 is to require an immediate adjustment when it is no longer possible to allocate adjustments of previously determined pension costs relating to a segment to any CAS-covered contract of the segment, a circumstance that will exist only when there are no CAS-covered contracts and related assets remaining after a sale.

Specifically, CAS pension accounting measures pension costs for a given fiscal year based on estimates regarding the future because of the long term nature of pension plans. *See* 48 C.F.R. §§ 9904.412-30(a)(3), -40(a)(1) and -50(a)(1)(iv); and .413-40(a) and -50(a). It is these estimated pension costs that CAS 413 requires be allocated to segments for further allocation to contracts, including CAS-covered contracts. *See* 48 C.F.R. §§ 9904.413-40(c) and -50(c).[9]

---

[9] More specifically regarding the measurement and allocation of pension costs, CAS 412 requires that yearly pension costs be measured based upon the terms of the relevant plan and various estimates regarding the future called "actuarial assumptions," the actuarial cost methodology that measures the costs of plan benefits and various adjustments, such as for actuarial gains and losses. 48 C.F.R. § 9904.412-40(a) and -50(a) and (b). CAS 413 requires that yearly pension costs be allocated to segments based upon the factor(s) that determine the costs incurred, such as salaries or headcount. *Id.* at .413-50(c)(1) - (4). Yearly pension costs allocated to segments are allocated to contracts based upon the factor(s) that resulted in the allocation of pension costs to the segment, such as salaries or headcount. *Id.* at .403-40(b)(4) and -60(c). Neither CAS 412 nor CAS 413 requires, and, indeed CAS prohibits, that cost accounting practices be based upon or change as the contractor's volume of government business or mix of contracts (government versus nongovernment or firm, fixed price versus redeterminable) changes year to year because volume and mix are not cost accounting practices. CAS, therefore, imposes equally on the government and contractors the risks associated with the cost impacts that result from changes in volume and contract mix from year to year.

Pension accounting recognizes that estimates regarding the future most often will not equal what actually occurs in the future. *See* 48 C.F.R. § 9904.413-30(a)(5) ("[a]ctuarial gain or loss means the effect on pension cost resulting from differences between actuarial assumptions and actual experience"). Thus, CAS pension accounting requires that contractors assess routinely the differences between past estimates and actual experience and adjust previously determined pension costs by amortizing these differences over current and future years and including the yearly amortization in yearly pension costs. *See* 48 C.F.R. §§ 9904.412-40(a)(1) and -50(a)(1)(v); .413-40(a) and -50(a). Because current and future year pension costs, including adjustments to previously determined costs, are allocated to current and future year CAS-covered contracts, this process effectively adjusts previously determined estimated pension costs allocated to CAS-covered contracts over the future. *See* 48 C.F.R. §§ 9904.412-40(d) and -50(d); .413-40(c) and -50(c).

In contrast:

> The Board believes a current period adjustment is appropriate when there is a disruption of the contracting relationship . . . . When such events occur, pension costs can no longer be computed and adjusted on an on-going basis since there are . . . no future accounting periods in which credits or charges can be allocated to contracts . . . .

60 Fed. Reg. 16,534 (March 30, 1995).

In the circumstance of only a partial sale of a segment's CAS-covered contracts and the continued ability to perform these retained contracts, or to secure and perform future CAS-covered contracts, current and/or future periods will exist in which

adjustments of previously determined pension costs will be allocated to CAS-covered contracts. That circumstance, therefore, eliminates the need for a current period adjustment of previously determined pension costs.

The policy underlying Revised CAS 413 is reinforced by the policy underlying Original CAS 413. Like Revised CAS 413, Original CAS 413 required "an adjustment of previously determined pension costs" upon a segment closure. 4 C.F.R. § 413.50(c)(12); 48 C.F.R. § 9904.413-50(c)(12). This requirement existed because the Former CAS Board recognized that pension costs resulted from "long-range projections." *See Teledyne*, 50 Fed. Cl. at 163, *quoting* 40 Fed. Reg. 43,873-74 (Sept. 24, 1975). The Former CAS Board further recognized that these projections required annual adjustments through actuarial gains and losses spread over future years. *See Teledyne* , 50 Fed. Cl. at 163-64. Therefore, as stated in *Teledyne*:

> Important to this case, CAS 413 also addresses how actuarial gains and losses relating to pension costs should be treated when there is a "segment closing." *Id.* § 413.50(c)(12). The CASB recognized that a "segment closing" presents a unique situation that requires a separate accounting treatment because the contractor no longer has the ability to amortize ongoing actuarial gains or losses over future periods. As the CASB noted in the preamble accompanying the final rule published in the Federal Register:
>
> > As a general rule, [CAS 413] . . . is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost accounting periods in determining the costs for the segment. <u>However, a problem arises in cases where a segment is closed. Because there are no future periods in which to adjust previously-determined pension costs applicable to that</u>

> segment, a means must be developed to provide a basis for adjusting such costs. This adjustment is not an actuarial gain or loss as defined in the Standard.

> *Id.* Pt. 413, Preamble A (emphasis added). Thus, the CASB included the segment closing provision "to serve as a basis for recognizing and adjusting pension costs previously allocated to the segment being terminated." *Id.*

*Teledyne*, 50 Fed. Cl. at 164.[10] Thus, like Revised CAS 413, Original CAS 413 applied when adjustments to previously determined pension costs could not occur because of the absence of CAS-covered contracts and the ability to perform CAS-covered contracts. *See Allegheny Teledyne*, 316 F.3d at 1374; *Bicoastal Corp.*, *supra*; *see also, Gould*, *supra*.

It is important to note that concluding that a partial sale is not a segment closure is, effectively, a timing determination and not any denial of right. That is, a determination that a partial sale is not a segment closure means that no closure occurs at the point of the partial sale. Should a subsequent sale occur that disposes of all remaining CAS-covered

---

10 The Former CAS Board stated:

> Recognizing gains and losses in the current year generally is not appropriate because gains or losses are often an adjustment of costs for a number of years. In this regard, the Board noted that APB No. 8, Accounting for the Costs of Pension Plans, issued November 1966 by the Financial Accounting Standards Board, stated that gains and losses should be recognized immediately only if they arise from a single occurrence not directly related to the operation of the pension plan such as the closing of a plant.

Preamble A to 48 C.F.R. § 9904.413, ¶ 3 (emphasis added).

contracts and related liabilities, however, a segment closure would occur at that point in time. During the interim, CAS pension accounting requirements would have required continuing adjustments of previously determined costs and the recognition of these adjustments in current and future years. Thus, there is no prejudice or harm that accrues from a partial sale.[11] This further supports why Revised CAS 413, and Original CAS 413, define a segment closing to require a complete sale of the segment. Accordingly, the policy underlying Revised CAS 413 is that when less than 100% of a segment's CAS-covered contracts are sold and the ability to perform these contracts is retained, one or more future accounting periods will exist that will permit the continued adjustment of previously determined pension costs, precluding the harm that arises when no such future period exists. That policy is consistent with the plain meaning of Revised CAS 413.

### B. Lucent's Sale Related to ATS Was Not a Segment Closure Because Lucent Did Not Sell All of the ATS CAS-Covered Contracts Under Performance and Related Assets

Even assuming that ATS were a segment on October 1, 1997,[12] Lucent's sale or transfer of certain contracts, and related assets, to GD did not close ATS. As established above, the plain meaning of, and policy behind, Revised CAS 413 requires that <u>all</u> of a

---

11 Any impact on cost allocations of a change in contract volume or contract mix because of a partial sale is not conceptually different from the impact of other changes in contract volume and contract mix that impact the allocation of pension costs in any particular year. As explained in note 9, *supra*, such impacts are routine elements of CAS cost accounting. This further supports that a partial sale of a segment does not merit the extraordinary treatment required when no future allocations will occur because a segment has been closed.

12 *See* n.3, *supra*.

segment's CAS-covered contracts in performance and related assets be sold in order to have a segment closure. This simply did not occur here.

The parties' Stipulations establish that, under the Agreement, Lucent retained one or more CAS-covered contracts that the ATS Business Unit was performing as of October 1, 1997. *See* Stipulation 3, September 26, 2006 Order. In addition, as part of the Agreement, Lucent retained certain of the tangible and intangible assets and employees of the ATS Business Unit. *See id*. Accordingly, even though Lucent sold a substantial portion of the ATS Business Unit, because Lucent retained CAS-covered contracts and related assets, Lucent did not sell all of the ATS Business Unit under the Agreement. Thus, the undisputed facts establish that Lucent's sale to GD did not close ATS under Revised CAS 413.

## V. CONCLUSION

The government might wish that Revised CAS 413 had been written to find a segment closure when something less than the entire segment is sold, but that is not what Revised CAS 413 provides. Revised CAS 413 requires the entire segment be sold because this is the only circumstance that terminates the relationship between previously determined pension costs and the contracts that have a relationship to such costs, making it impossible to adjust these previously determined pension costs in future years.

As a result, even if ATS were to have been a segment of Lucent on October 1, 1997, Lucent's sale of only some of ATS' CAS-covered contracts and related assets to GD did not dispose of ATS in its entirety. Accordingly, Lucent respectfully requests that this Court grant Lucent's motion for summary judgment that under Count I of Lucent's

Complaint the government has no entitlement against Lucent because of the sale of some of the ATS CAS-covered contracts and related assets and that the government's Counterclaim fails as a matter of law based on the undisputed facts.

Respectfully submitted this 9th day of November, 2006.

s/Thomas A. Lemmer
Thomas A. Lemmer
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202
(303) 634-4350
FAX: (303) 634-4400

ATTORNEY FOR PLAINTIFF
LUCENT TECHNOLOGIES INC.

OF COUNSEL:

Corey R. Sanchez
McKenna Long & Aldridge LLP
1875 Lawrence Street, Suite 200
Denver, CO 80202

Michael Garson
Lucent Technologies
8000 Towers Crescent Drive
Suite 400
Vienna, VA 22182

DN:32119311.4