**Nos. 04-1511C & 04-1512C**
**(Judge Braden) (Consolidated)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**LUCENT TECHNOLOGIES, INC.,**

**Plaintiff,**
**v.**
**UNITED STATES OF AMERICA,**

**Defendant.**

**AT&T CORP.,**

**Plaintiff**

**v.**

**UNITED STATES OF AMERICA,**

**Defendant.**

---

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT (NO. 04-1511C)

---

**PETER D. KEISLER**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Deputy Director**

**C. COLEMAN BIRD**
**Senior Trial Counsel**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: 202.307.0453**
**Fax: 202.514.7965**

**Attorneys for Defendant**
**United States**

**OF COUNSEL:**

**KATHLEEN MALONE**
**Trial Attorney**
**Defense Contract Management Agency**
**495 Summer Street**
**Boston, MA 02210**

**Dated: December 19, 2006**

**TABLE OF CONTENTS**

PAGE

**TABLE OF CONTENTS** . . . . . . . . . . i

**TABLE OF AUTHORITIES** . . . . . . . . . . ii

**INDEX TO ATTACHMENTS** . . . . . . . . . . iv

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT (NO. 04-1511C)** . . . . . . . . . . 1

**STATEMENT OF FACTS** . . . . . . . . . . 2

**ARGUMENT** . . . . . . . . . . 3

- **I. Applicable Summary Judgment Standards** . . . . . . . . . . 3
- **II. The CAS Board Never Intended To Permit A Contractor To Defeat The Government's Right To A CAS 413 Segment-Closing Adjustment By The Simple Expedient Of Selling A Segment In Its Entirety Except For A Single Contract and Related Assets** . . . . . . . . . . 4
  - **A. The CAS Board's Intent Is Dispositive** . . . . . . . . . . 4
  - **B. The CAS Board Intended To Require A Contractor To Make A Segment-Closing Adjustment Where, As Here, The Contractor Sells Substantially All Of The Assets And Contracts Of A Segment** . . . . . . 5
    - **1. The CAS Provision's "Plain Meaning" Fails To Support Plaintiff's Interpretation** . . . . . . . . . . 6
    - **2. The Board's Intent And Purpose In Requiring A Segment-Closing Adjustment** . . . . . . . . . . 9

**CONCLUSION** . . . . . . . . . . 20

# TABLE OF AUTHORITIES

**CASES** **PAGE(s)**

*ATK Thiokol, Inc. v. United States*,
68 Fed. Cl. 612 (2005) . . . . . . . . . . 3, 4, 6

*Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (2001), *aff'd sub. nom.*
*Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir.),
*cert. denied sub nom. General Motors Corp. v. United States*,
540 U.S. 1068 (2003) . . . . . . . . . . *passim*

*Candle Corp. of America v. United States International Trade Commission*,
374 F.3d 1087 (Fed. Cir. 2004) . . . . . . . . . . 5

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986) . . . . . . . . . . 3

*Dana Corp. v. United States*,
174 F.3d 1344 (Fed. Cir. 1999) . . . . . . . . . . 4

*Golden Pac. Bancorp v. United States*,
15 F.3d 1066 (Fed. Cir. 1994) . . . . . . . . . . 3

*Holloway v. United States*,
526 U.S. 1 (1999) . . . . . . . . . . 5

*Mingus Constructors, Inc. v. United States*,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . 3

*Perry v. Martin Marietta Corp.*,
47 F.3d 1134 (Fed. Cir. 1995) . . . . . . . . . . 4

*Riley & Ephriam Constr. Co., Inc.*,
408 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . 3

*Roberto v. United States*,
440 F.3d 1341 (Fed. Cir. 2006) . . . . . . . . . . 5

*Viacom Inc. v. United States*,
70 Fed. Cl. 649 (2006) . . . . . . . . . . 4, 10

*Wassenaar v. Office of Personnel Management*,
21 F.3d 1090 (Fed. Cir. 1994) . . . . . . . . . . 5

**REGULATIONS** **PAGE(s)**

CAS 412, 4 C.F.R. § 412 (1992) . . . . . . . . . . 7

CAS 412.40(b)(2), 4 C.F.R. § 412.40(b)(2) (1986) . . . . . . . . . . 11

CAS 412, 48 C.F.R. §§ 9904.412 (1996) . . . . . . . . . . 6

CAS 413, 4 C.F.R. § 413 (1992) . . . . . . . . . . 15

CAS 413.30(a)(20), 48 C.F.R. § 9904.413-30(a)(20) (1996) . . . . . . . . . . 6

CAS 413.50(c)(12), 48 C.F.R. § 9904.413-50(c)(12) (1995) . . . . . . . . . . 1, 2, 6

Cost Accounting Standards Board, Cost Accounting
Standards for Composition, Measurement, Adjustment,
and Allocation of Pension Costs; Final Rule (60 Fed. Reg.
16534) (March 30, 1995) . . . . . . . . . . 7, 9

Cost Accounting Standards Board, Notice of Proposed Cost
Accounting Standard on Adjustment and Allocation of Pension
Cost (42 Fed. Reg. 6595) (Feb. 3, 1977) . . . . . . . . . . 18

# INDEX TO ATTACHMENTS


| | | **Appendix Page** |
|---|---|---|
| Attachment No. 1 | Cost Accounting Standards Board, Cost Accounting Standards for Composition, Measurement, Adjustment, and Allocation of Pension Costs; Final Rule (60 Fed. Reg. 16534) (March 30, 1995) | 1 |
| Attachment No. 2 | CAS 412, *codified in* 4 C.F.R. § 412 (1992) (Text) | 26 |
| Attachment No. 3 | CAS 412, *codified in* 4 C.F.R. § 412 (1992) (Preamble) | 33 |
| Attachment No. 4 | CAS 413, *codified in* 4 C.F.R. § 413 (1992) (Text) | 42 |
| Attachment No. 5 | CAS 413, *codified in* 4 C.F.R. § 413 (1992) (Preamble, Part 1) | 50 |
| Attachment No. 6 | CAS 413, *codified in* 4 C.F.R. § 413 (1992) (Preamble, Part 2) | 57 |
| Attachment No. 7 | Cost Accounting Standards Board, Notice of Proposed Cost Accounting Standard on Adjustment and Allocation of Pension Cost (42 Fed. Reg. 6595) (Feb. 3, 1977) | 61 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **LUCENT TECHNOLOGIES INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 04-1511C**<br>**(Judge Braden)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |
| **AT & T CORP.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 04-1512C**<br>**(Judge Braden)**<br>**(Consolidated)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFF'S AMENDED MOTION**
**FOR SUMMARY JUDGMENT (NO. 04-1511C)**

Defendant, the United States, respectfully submits this opposition to Plaintiff Lucent Technologies Inc.'s Amended Motion for Summary Judgment ("Pl. Mot."), dated November 9, 2006. As we demonstrate below, plaintiff's motion is without support in the language of the Cost Accounting Standards provision at issue, its regulatory history, and most importantly, in the Cost Accounting Standards Board's purpose in promulgating this provision.

The provision in question (Cost Accounting Standard ("CAS") 413.50(c)(12), 48 C.F.R. § 9904.413-50(c)(12) (1995)) requires a contractor that closes a business segment performing Government contracts to make an adjustment of the segment's previously-determined pension

costs. The issue that plaintiff presents is whether a contractor can defeat the Government's right to a CAS 413 segment-closing adjustment by selling a segment, and transferring substantially all of the segment's CAS-covered contracts and assets to the buyer, but not every single CAS-covered contract and related asset. The parties agree that the intent of the Cost Accounting Standards Board (the "CAS Board") in promulgating CAS 413's segment closing requirement is dispositive on this issue. As we demonstrate below, there is no evidence that the CAS Board intended to create the massive loophole that plaintiff asks this Court to create. Plaintiff's motion should therefore be denied.

## **STATEMENT OF FACTS**

As the Court is aware, the parties have stipulated to the following limited set of facts for the sole purpose of allowing the Court to address the legal issue that plaintiff raises in its motion.

On October 1, 1997, Lucent and General Dynamics Corporation ("General Dynamics") closed an "Agreement for the Purchase and Sale of Assets" related to Lucent's Advanced Technology Systems Business Unit ("the ATS Business Unit"). Order dated September 26, 2006, ¶ 1. Pursuant to the October 1, 1997 Agreement, Lucent: (a) transferred substantially all of the ATS Business Unit's contracts under performance to General Dynamics; and (b) sold other substantial assets of the ATS Business Unit to General Dynamics. *Id.* ¶ 2. Pursuant to the October 1, 1997 Agreement, however, Lucent retained one or more CAS-covered contracts that the ATS Business Unit was performing, as of the October 1, 1997 closing date, and also retained certain of the tangible and intangible assets and employees of the ATS Business Unit. *Id.* ¶ 3.

## ARGUMENT

### I. Applicable Summary Judgment Standards

Summary judgment is appropriate where there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c); *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1071 (Fed. Cir. 1994); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). As this Court has recognized:

> The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986) (holding the moving party must meet its burden "by 'showing' – that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case"); *see also Riley & Ephriam Constr. Co., Inc.*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact") . . . Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the non-movant to establish the existence of a genuine issue that can only be resolved at trial.

*ATK Thiokol, Inc. v. United States*, 68 Fed. Cl. 612, 627 (2005) (citations omitted). This Court also has recognized that, in considering motions for summary judgment, the "trial court is required to resolve all doubt over factual issues in favor of the non-moving party, . . . [and] all reasonable inferences and presumptions must be resolved in favor of the non-moving party." *Id.* at 627-28. Therefore, all inferences and presumptions related to the facts to which the parties have stipulated for purposes of plaintiff's amended summary judgment motion must be drawn in favor of the Government, the non-moving party.

## II. The CAS Board Never Intended To Permit A Contractor To Defeat The Government's Right To A CAS 413 Segment-Closing Adjustment By The Simple Expedient Of Selling A Segment In Its Entirety Except For A Single Contract and Related Assets

### A. The CAS Board's Intent Is Dispositive

The issue presented is the CAS Board's intent when it promulgated CAS 413. In its decision in *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir. 2003), the court of appeals set forth the definitive "interpretive lens" to be used in interpreting the CAS, and reaffirmed that the Court must determine the intent of the CAS Board when it promulgated the CAS provisions in question:

> When interpreting provisions of the CAS our task is "to ascertain the [Board's] intended meaning when it promulgated the CAS." We accomplish this first by looking at the text of the relevant provisions and "any guidance that the [Board] has published to aid in interpretation." We examine the issues that follow through this interpretive lens.

*Allegheny Teledyne*, 316 F.3d at 1373, *quoting from Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed. Cir. 1995); *see also ATK Thiokol, Inc. v. United States*, 68 Fed. Cl. 612, 630 (2005) (Court must "ascertain the [CAS Board's] intended meaning when it promulgated the CAS").

The interpretation of CAS provisions in general, and of the segment closing provisions of CAS 413.50(c)(12) in particular, is "purely a legal question," one that is "particularly appropriate" for resolution on summary judgment. *Viacom Inc. v. United States*, 70 Fed. Cl. 649, 655 (2006), *citing, inter alia, Perry v. Martin Marietta Corp.*, 47 F.3d at 1137 (interpretation of CAS "is purely a legal question"), and *Dana Corp. v. United States*, 174 F.3d 1344, 1347 (Fed. Cir. 1999) (summary judgment "particularly appropriate" for resolving a

question of law).

In construing the CAS Board's intent, it is important to bear in mind the well-settled canon of statutory and regulatory construction that statutes and regulations should be interpreted reasonably in light of the congressional or agency purpose, and not in a way that would plainly frustrate or impede the accomplishment of that purpose. *See Roberto v. United States*, 440 F.3d 1341, 1350 (Fed. Cir. 2006) ("[t]he rules of statutory construction apply when interpreting an agency regulation"). When the language of a statute does not unambiguously resolve an issue, the court "must look beyond the statutory language to the statute's purpose to determine its meaning." *Candle Corp. of America v. United States International Trade Commission*, 374 F.3d 1087, 1093 (Fed. Cir. 2004), *citing, inter alia*, *Holloway v. United States*, 526 U.S. 1, 9 (1999) ("statutory language should be interpreted consonant with the 'provisions of the whole law, and its object and policy'") (other citations omitted). In construing regulations, courts should reject any interpretation, such as the interpretation that plaintiff proffers in this case, that would wholly frustrate the agency's manifest purpose, or lead to absurd results. *See Wassenaar v. Office of Personnel Management*, 21 F.3d 1090, 1092 (Fed. Cir. 1994) (an interpretation of a statute that "'would lead to absurd results is to be avoided when [the statute] can be given a reasonable application consistent with [its] words and legislative purpose'") (citations omitted).

### B. The CAS Board Intended To Require A Contractor To Make A Segment-Closing Adjustment Where, As Here, The Contractor Sells Substantially All Of The Assets And Contracts Of A Segment

According to plaintiff, a sale of assets does not constitute a segment closing under CAS 413 unless the contractor sells and transfers "all CAS-covered contracts under performance and related assets." Pl. Mot. at 8. Plaintiff asks this Court to determine, as a matter of law, that a

contractor that sells substantially all of a segment, with the exception of a single CAS-covered contract and related assets, has not closed the segment for purposes of CAS 413.

There is simply no basis, however, for plaintiff's contention that the CAS Board intended to require a CAS 413 segment-closing adjustment only when a contractor chooses to sell a segment in its entirety – lock, stock, and barrel – and to allow the contractor to escape this mandatory adjustment requirement merely by retaining a single CAS-covered contract and related assets.

As we demonstrate below, plaintiff's interpretation is at odds with business and commercial reality, the plain meaning of the definition of the term "segment closing," and the CAS Board's contemporaneous explanation of the term in context with other terms. More important, plaintiff's interpretation would wholly frustrate and flout the Board's plainly expressed intent to require the CAS 413 "settling up" cost adjustment whenever a contractor, as in this case, sells a business unit and, as part of the sale, transfers to the buyer substantially all the assets (contracts, tangible and intangible assets, and employees).

### 1. The CAS Provision's "Plain Meaning" Fails To Support Plaintiff's Interpretation

As the court of appeals directed in *Allegheny Teledyne*, we turn first to the text of the relevant provisions. The relevant provisions are found in the definition of "segment closing" in CAS 413.30(a)(20), 48 C.F.R. § 9904.413-30(a)(20) (1996), and the segment closing provision itself, CAS 413.50(c)(12), 48 C.F.R. § 9904.413-50(c)(12) (1996).[1] A "segment closing" is

[1] The provisions of CAS 413 as originally promulgated in 1977 do not govern this case. The segment closing in this case is governed by the 1995 Amendments to CAS 412 and 413, which were promulgated by the new CAS Board and are codified at 48 C.F.R. §§ 9904.412 and 9904.413 (1996). As the Court is aware, the CAS Board that promulgated the original version of CAS 413 ("Original CAS 413") went out of existence in 1980, when its funding expired and was not renewed. *See ATK Thiokol*, 68 Fed. Cl. at 628. In 1995, a new CAS Board promulgated the

defined as follows:

> (20) *Segment closing* means that a segment has (i) been sold or ownership has otherwise been transferred, (ii) discontinued operations, or (iii) discontinued doing or actively seeking Government business under contracts subject to this Standard.

CAS 413.30(a)(20) (Def. App. at 18). In the original version of CAS 413 as promulgated by the original CAS Board, there was no definition of a "segment closing." *See* Original CAS 413 (Def. App. at 18). The term "segment closing" was defined for the first time in Revised CAS 413. CAS 413.30(a)(20) (Def. App. at 42-43). Nothing in the definition of "segment closing" in Revised CAS 413 suggests that, in order for the sale of a segment to constitute a segment closing, the sale must include each and every CAS-covered contract and all related assets. If that had been the CAS Board's intent, it would have been a simple matter for the Board so to state. The Board never did so, however.

Plaintiff's lengthy argument allegedly based upon the "plain meaning" of the definition of segment closing is unavailing. Pl. Mot. at 8-16. There can be no doubt that a sale of virtually all of the contracts and related assets, *etc.* of a segment constitutes a segment closing under the plain meaning of the terms in this definition. Both as defined in the CAS, and in business and economic reality, a "segment" is the operational unit, and more than the sum of its physical assets.

The CAS Board defined the term "segment" in CAS 413 as follows:

---

1995 Amendments that are applicable to this case ("Revised CAS 413"). For the Court's convenient reference, we have set forth in the Appendix attached to this memorandum the 1995 Amendments to CAS 412 and 413 as promulgated in the Federal Register, 60 Fed. Reg. 16533 *et seq*. (Mar. 30, 1995) (Attachment No. 1), and the original versions of CAS 412 and 413 as codified at 4 C.F.R. §§ 412, 413 (1992) (which contains the original Board's explanatory preambles) (Attachments Nos. 2-3 (CAS 412) and Nos. 4-6 (CAS 413)).

> (19) *Segment* means one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a service. The term includes Government-owned, contractor-operated GOCO) facilities, and joint ventures and subsidiaries (domestic and foreign) in which the organization has a majority ownership . . . .

CAS 413.30(a)(19) (Def. App. at 18). Where, as here, a contractor sells and transfers virtually all of a segment's contracts, assets (tangible and intangible), and employees, it could not be clearer that, as in this case, that segment has ceased to exist as an operating unit and has been closed, both from the seller's and the buyer's perspective. This is compelled by the plain meaning and common understanding of the terms used in the definition of "segment closing." If a car owner were to agree to sell his or her car, except for the car's radio, no one would doubt that the car had been sold. If a car dealer were to sell its business (tangible and intangible assets, contracts, and employees) in its entirety but retained only a single vehicle to be sold under an executory contract that the dealer had also retained, no one would seriously suggest that the dealer had not sold and closed its dealership. More generally, if a company sells all of the contracts, assets, and employees of a division (retaining only a single contract, computer, and employee), no one would doubt that that division had been sold and closed. As a matter of business and economic reality, that is precisely what happened in this case. This segment was sold and closed, and ceased to exist, and it would confound the plain meaning of the term "segment closing" to suggest otherwise.

In order to determine whether the sale of substantially all of a segment constitutes a segment closing for purposes of CAS 413, the Court must necessarily conduct a fact-based inquiry that would consider what was sold and what was retained, the business and economic

significance of what was sold and what was retained, and the intent of the parties to the transaction. Plaintiff's proposed short-cut (under which the transfer of anything less than 100% of the assets, contracts, *etc*. could never constitute a segment closing) is erroneous as a matter of law, and cannot substitute for the reasoned inquiry that the law requires.

### 2. The Board's Intent And Purpose In Requiring A Segment-Closing Adjustment

In the comments that accompanied the promulgation of Revised CAS 413, the new CAS Board provided only a limited explanation for the definition of "segment closing" that it included in Revised CAS 413:

> *Comment*. Four commenters suggested that the definition of a segment closing should be clarified. Concerns were raised that an internal reorganization would require a current period adjustment for a segment closing, even though neither the segment's nor the contractor's relationship to the Government had changed.
>
> *Response*. The definition has been revised to delineate three conditions requiring a current period adjustment. The first condition occurs when there is a change in ownership of the segment, not just a simple reorganization within the contractor's internal structure. The second event is the one addressed in the NPRM [Notice of Proposed Rulemaking]; that is, when the contractual relationship ends because the segment operationally ceases to exist. The third case addresses the end of the contractual relationship with the Government, whether the segment continues in operation or not.

60 Fed. Reg. 16534, at 16539 (Def. App. at 7). The Board's intended meaning for the term "segment closing" cannot be understood without reference to what the Board intended to accomplish in requiring an adjustment of previously-determined pension costs when a contractor closes a segment.

This Court has found that the Board's purpose in requiring the CAS 413 segment-closing

adjustment was "to correct for the government's past over or under contribution to the closed segment's pension costs." *Viacom Inc. v. United States*, 70 Fed. Cl. at 659; *see also Teledyne, Inc. v. United States*, 50 Fed. Cl. 155, 181 ("the purpose of the CAS 413 segment closing provision is to look back and determine whether the government over contributed or under contributed to the segment's pension plan"), *aff'd sub. nom. Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366 (Fed. Cir.), *cert. denied sub nom. General Motors Corp. v. United States*, 540 U.S. 1068 (2003).

To accomplish this purpose, CAS 413.50(c)(12) requires a contractor that closes a segment to make an adjustment of previously-determined pension costs equal to the difference between the segment's actuarial liability and the market value of the assets allocated to the segment. CAS 413.50(c)(12) (Def. App. at 20). The contractor first must calculate the amount of the closed segment's pension surplus or deficit (the difference between the market value of segment's pension assets and its actuarial liability) (*see id*.), and then compute the Government's share of that adjustment based upon a fraction equal to the portion of the pension costs allocated to the segment during a representative period that were allocated to Government, CAS-covered contracts and subcontracts (*see* CAS 413.50(c)(12)(vi) (Def. App. at 20)). CAS 413.50(c)(12)(vii) then provides that the Government's share is allocable as a credit or charge during the cost accounting period within which the segment closing event occurred. CAS 413.50(c)(12)(vii) (Def. App. at 20). The Board provided the following explanation of its intent in requiring a segment-closing adjustment:

> The Board believes that a current period adjustment [*i.e.*, a segment closing adjustment] is appropriate when there is a disruption of the contracting relationship, a discontinuance of the operational segment, or a discontinuance of the pension plan.

> When such events occur, pension costs can no longer be computed and adjusted on an on-going basis since there are either no future accounting periods in which credits or charges can be allocated to contracts or no future periods in which benefits will be earned.

Comments, 60 Fed. Reg. 16539 (Def. App. at 7).

*The Importance Of The Amortization Process For "Actuarial Gains And Losses" In The Board's Regulatory Scheme*. In order to understand the Board's intent, it is necessary to understand how pension costs are required to be determined for segments that are continuing in business, and specifically the required amortization of "actuarial gains and losses" that we describe below. As the court of appeals recognized in *Allegheny Teledyne*, CAS 412, the other, companion CAS provision dealing with pension cost, "governs how a contractor determines its pension costs for each period – by the contractor's best actuarial estimate of the plan's anticipated earnings and benefit payments, taking into account the plan's past experience and reasonable expectations." *Allegheny Teledyne*, 316 F.3d at 1371, citing CAS 412.40(b)(2), 4 C.F.R. § 412.40(b)(2) (1986) (Def. App. at 27). In order to estimate a plan's actuarial liability (the actuarial present value of a stream of promised future benefit payments to plan participants), it is necessary to make a number of assumptions, which are called "actuarial assumptions," about various aspects of the plan's future experience.

CAS 413 defines an "actuarial assumption" as an "estimate of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, earnings on plan assets, changes in values of pension fund assets." CAS 413.30(a)(3) (Def. App. at 17). Because actuarial assumptions are projections of what will happen in the future (regarding such matters as expected earnings on plan assets, when plan participants will retire and become eligible to receive pension benefits, how long they will live, *etc.*), there will almost always be a

difference between the projected experience and the plan's actual experience in these respects. In the language of CAS 412, such differences constitute an "actuarial gain" or an "actuarial loss," which is defined as the "effect on pension cost resulting from differences between actuarial assumptions and actual experience." CAS 413.30(a)(5) (Def. App. at 17).

If these actuarial gains and losses (the difference between projected future experience and actual experience) were to be recognized immediately, *i.e.*, in the year after they occurred, there would be a risk of large swings in the amount of pension cost charged to Government contracts from year to year. CAS 413 prohibits the contractor from recognizing the entire amount of an actuarial gain or loss immediately. Instead, it requires the contractor to amortize the actuarial gain or loss on a straight-line basis over a 15-year period. CAS 413.50(a)(2) (Def. App. at 18-19). For example, if a plan experiences an actuarial gain of $15 million in a year, it would be required to amortize that gain at the rate of $1 million per year for the next 15 years, meaning that each year the amount of pension cost otherwise calculated for that year would be reduced by the amortized amount ($1 million). If the plan experiences an actuarial loss the next year, that loss would similarly have to be amortized over the next 15 years. As a result, for a segment that is continuing in operation and not being closed, there will be added to (or subtracted from) the amount of pension cost otherwise calculated for the year in question the sum of all the amortizations for previous years' actuarial gains and losses that have not yet been fully amortized. In this way, the amount of pension cost charged to the segment's contracts can be corrected over time to reflect the over- or under-estimates of cost.

*The Problem That Occurs When A Segment Is Closed*. As long as the segment is continuing in operation, the CAS Board's corrective regulatory mechanism (the required

amortization of actuarial gains and losses) will work. It will insure that an adjustment will be made to account for past over- or under-estimates of pension costs charged to the segment and correct for the difference between the plan's projected and actual experience.

This corrective mechanism breaks down, however, when the segment is closed. At that point (because the segment's contracts are terminated or transferred to the buyer), it is no longer possible to use CAS 413's amortization process to adjust pension costs in future cost accounting periods to correct for the pension costs previously charged to the segment's contracts because of what later turned out to be over- or under-estimates.

An example will help illustrate the problem. Assume that a year before a contractor closed its segment, the plan's pension assets earned $15 million more than had been projected in the actuarial assumptions upon which the pension cost charged to the segment's contracts had been calculated. This means that – with perfect 20/20 hindsight – the contractor charged too much pension cost to the segment's contracts in that year. As previously noted, CAS 413 requires that this actuarial gain ($15 million) be amortized over the next 15 years ($1 million per year), so that the amount of the segment's total pension cost each year will be reduced by $1 million until the entire actuarial gain is amortized. As a result, in each year in which the $15 million actuarial gain is being amortized, the pension cost charged to each of the segment's contracts will be reduced by the portion of the $1 million amortization (the reduction in the segment's pension cost) that is allocated to each contract. In this way, through this amortization process, an adjustment is made to pension cost charged in the following years to account for the

excess pension cost previously charged in the year in question.[2]

The segment closing completely disrupts this process, and prevents the adjustment of previously-determined pension costs for actuarial gains. When a segment is closed (either by its cessation of operations or by its sale to a buyer, with accompanying transfer of contracts), it is no longer possible through the CAS 413 amortization process to make adjustments to correct for past over- and under-estimates of pension costs that were charged to the segment's contracts. After the segment closing, the segment cost charged to the segment's transferred contracts in the future will be the cost that the buyer calculates based upon its own pension plan, without regard to any actuarial gains or losses that the seller's pension plan may have experienced before the segment closing. In the example discussed above, if the segment were to be sold a year after the $15 million actuarial gain had been experienced, so that, by the time of segment closing, only $1 million of the $15 million gain had been recognized by amortization, unless there were a segment closing adjustment, the remaining $14 million actuarial gain would never be recognized, and the "overcharge" to the segment's contracts in the year of the gain (to both Government and commercial contracts) would never be corrected.

The original CAS Board recognized this problem, and required the segment closing adjustment provided in CAS 413.50(c)(12) to address it. In the contemporaneous explanatory Preamble that accompanied the original promulgation of CAS 413 in 1977, the Board explained:

> As a general rule, the Standard being promulgated today is based on the concept that material actuarial gains and losses

---

[2] We are not suggesting that the "overcharge" that the actuarial gain represents resulted from any improper conduct upon the contractor's part, only that, because for this year actual experience ultimately turned out to be more favorable than the contractor had projected, the contractor charged more pension cost than in retrospect was needed for that year.

> applicable to a segment will be taken into account in future cost accounting periods in determining the costs for a segment. However, a problem arises in cases where a segment is closed. *Because there are no future periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs*. This adjustment is not an actuarial gain or loss as defined in the Standard. To clarify its intent, the Board has revised § 413.50(c)(12) of the Standard and the related illustration in § 413.60(c)(8). The Standard now states that when a segment is closed, the contractor shall determine the difference between the actuarial liability of the segment and the market value of the assets allocated to the segment.

Preamble, § 12, CAS 413, 4 C.F.R. § 413 (1992) (Def. App. at 58) (emphasis added). In the same portion of the Preamble, just two paragraphs later, the Board reiterated this same point: "The [B]oard emphasizes that the purpose of this provision is to serve as a basis for recognizing and adjusting pension costs previously allocated to the segment being terminated." *Id*. (Def. App. at 59).

*Plaintiff's Proffered Interpretation Is Fundamentally Flawed*. This regulatory history and background makes plain the fundamental flaws in plaintiff's proffered interpretation. Plaintiff contends that the Board intended that, as long as the contractor retains a *single* CAS-covered contract of the segment, no segment-closing adjustment would be required. Pl. Mot. at 8 *et seq*. This is so, according to plaintiff, because as long as the selling contractor retains such a contract, the self-regulating, corrective mechanism of adjusting pension cost in future years for actuarial gains and losses experienced in previous years can continue to operate – with respect to the pension cost on that one single contract. *Id*. The fundamental flaw in plaintiff's argument is that, if plaintiff's interpretation were to be adopted, the Government would be deprived of the segment-closing adjustment to which it is entitled under CAS 413.50(c)(12) with respect to the

segment's pension surplus that was allocable to the segment's transferred contracts.

Simply put, the Board could not possibly have intended such a result. Wholly apart from the absence of any indication of such an intent, such a result would allow a contractor to deny the Government the benefits of a segment closing adjustment and effectively frustrate the Board's intent. Contrary to plaintiff's suggestion, this is not simply "a timing determination, and not any denial of right." Pl. Mot. at 20. A large Government segment could have hundreds or even thousands of CAS-covered contracts. If, as plaintiff suggests, the contractor could retain a single, small CAS-covered contract, and thereby deny the Government a segment-closing adjustment upon the pension surplus allocated to every other contract of the segment, and in this way force the Government to attempt to recover for its past over-contributions to the segment's pension costs by reducing pension cost on the single remaining CAS-covered contract that the contractor retained, the contractor could almost completely defeat the Government's recovery.

Depending upon the size of the single CAS-covered contract that was retained in relation to the contracts that were transferred in the segment closing, it could take decades or even centuries for the Government to recover – through reduced pension costs on the single contract that the contractor retained – the amount of the CAS 413 segment closing adjustment to which it is entitled. In the meanwhile, the excess pension assets in the seller's pension fund at the time of segment closing that resulted from the Government's past over-contribution to the segment's pension costs would remain in the seller's pension plan, and would help lower the seller's future pension cost for the benefit of the seller's remaining customers. This would utterly frustrate the CAS Board's intent – that the adjustment be made with respect to segment's pension surplus or deficit allocable to the segment's contracts. Otherwise, there would never be the adjustment of

"previously-determined pension costs" that the CAS Board intended and required.

Plaintiff's argument would also make the mandatory segment-closing adjustment optional for the contractor, but not the Government. If the segment had a pension deficit, the contractor could insure that the Government paid the required CAS 413 segment-closing adjustment merely by making sure that it transferred or disposed of all of the CAS-covered contracts and related assets. But, if the segment had a pension surplus, the contractor could defeat the Government's right to a CAS 413 segment-closing adjustment merely by retaining a single CAS-covered contract and related assets. The CAS Board could never have intended to make its regulations such a "one way street" for the benefit of contractors, by imposing a requirement that the contractor, but not the Government, could evade merely by a minimal restructuring of the sale transaction.

*Plaintiff's Reliance Upon Original CAS 413's Regulatory History Is Misplaced.* Plaintiff suggests that the Original CAS Board must have intended to frustrate the operation of the segment closing provisions that it promulgated, based upon changes that the Original Board made in the language of what became CAS 413.50(c)(12) before the Board adopted Original CAS 413 in final form. Pl. Mot. at 14-15 (*citing Teledyne*, 50 Fed. Cl. at 164).

Plaintiff's argument is based upon language that is found, not in any promulgation of the CAS Board itself, but in a staff paper. The original CAS Board rejected the staff language to which plaintiff refers (under which a segment closing adjustment would be required "if all, or substantially all, of a segment is closed") when the Board published its proposed CAS 413 for comment in February 1977. In its proposed CAS 413, the Board required a form of segment-

closing adjustment[3] "if *a segment is closed* and a significant number of employees are thereby terminated from the plan." Notice of Proposed Cost Accounting Standard, 42 Fed. Reg. 6594, 6596 (Feb. 3, 1977) (Def. App. at 63) (emphasis added). In its final version of CAS 413, the Original CAS Board deleted the language that it had previously proposed regarding the termination of a "significant number of employees," and simply provided that a segment-closing adjustment was required "[i]f a segment is closed." CAS 413.50(c)(12) (Def. App. at 45).

There is no suggestion, either in the Board's explanation that accompanied the proposed CAS 413 in February 1977 or in the Board's contemporaneous Preamble that accompanied the promulgation of Original CAS 413 in July 1977, or otherwise, that, by not using the terms "all" or "substantially all," the CAS Board intended to relieve contractors that did close "substantially all" of a segment from the burden of making a segment-closing adjustment, or that the Board ever intended that only the closing of "all" of a segment would trigger that obligation. Indeed, it is hard to imagine how the CAS Board could reasonably have drawn the distinction that plaintiff suggests, given that, as we have demonstrated above, such a distinction would wholly frustrate the Board's stated purpose in requiring contractors to make segment-closing adjustments. This ambiguous sliver of regulatory history is too slender a reed, therefore, upon which to base the interpretation that plaintiff suggests. A more likely reading of this portion of the regulatory history of Original CAS 413 is that the earlier CAS Board felt it was unnecessary to expressly include the closing of "substantially all" of a segment in the definition, because it was so clear

---

[3] The Board proposed, instead of the mandatory "segment-closing adjustment" that it ultimately required, to require the contractor, instead, to calculate the "net gain or loss from the plan applicable to the segment," which the parties were then to "us[e] as a basis for negotiating any appropriate adjustments." Proposed CAS 413.50(c)(13) (Def. App. at 63).

that such a transaction would have to trigger the required CAS 413.50(c)(12) segment-closing adjustment in order to accomplish the Board's stated purpose.

*Plaintiff's Arguments Based Upon The CAS Board's Illustrations Are Without Merit*. Finally, plaintiff suggests that certain Illustrations (Illustrations Nos. 8, 12, and 14) in Revised CAS 413 itself as adopted in the 1995 Amendments to CAS 413 support its argument that no segment closing has occurred unless all CAS-covered contracts are transferred to the buyer. Pl. Mot. at 11-12, *citing* CAS 413.60(c)(8), 413.60(c)(12), and 413.60(c)(14). Contrary to plaintiff's contentions, however, these three Illustrations (which can be found at Def. App. at 22-23) provide no support whatsoever for plaintiff's argument. None of them involves a transaction like the transaction at issue in this case, one in which all but one or a few CAS-covered contracts and related assets are transferred to the buyer. Illustration No. 8 involves the termination of a single GOCO contract, Illustration No. 12 the sale of a contractor's "only government segment," and Illustration No. 14 a contractor's decision not to renew a segment's only Government contract and not to seek additional Government contracts for the segment. *Id*. In none of these cases does the contractor sell all the contracts and assets of a segment except for a single contract and related assets. These illustrations are intended merely to demonstrate how other portions of CAS 413 are supposed to operate, not to illustrate what would or would not constitute a segment closing that requires a segment closing adjustment.

**CONCLUSION**

For the foregoing reasons, defendant respectfully requests that the Court enter an order denying plaintiff's amended motion for summary judgment in its entirety.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ Jeanne E. Davidson
JEANNE E. DAVIDSON
Deputy Director

s/ C. Coleman Bird
C. COLEMAN BIRD
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: 202.307.0453
Facsimile: 202.514.7965

Attorney for Defendant United States

OF COUNSEL

KATHLEEN MALONE
Trial Attorney
Defense Contract Management Agency
495 Summer Street
Boston, MA 02210

Dated: December 19, 2006

**CERTIFICATE OF FILING**

I hereby certify that on the 19th day of December, 2006, a copy of the foregoing Defendant's Opposition to Plaintiff's Amended Motion for Summary Judgment (No. 04-1511C) was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ C. Coleman Bird