## PART 413—ADJUSTMENT AND ALLOCATION OF PENSION COST

Sec.
413.10 General applicability.
413.20 Purpose.
413.30 Definitions.
413.40 Fundamental requirement.
413.50 Techniques for application.
413.60 Illustrations.
413.70 Exemptions.
413.80 Effective date.
PREAMBLE A

AUTHORITY: 84 Stat. 796, Sec. 103, 50 U.S.C. App. 2168.

SOURCE: 42 FR 37196, July 20, 1977, unless otherwise noted.

EDITORIAL NOTE: A supplement, consisting of the preamble to these regulations as they appeared in the FEDERAL REGISTER, follows the text of this part. This preamble is intended to explain the regulations in non-technical language.

The preamble to the original publication of this part (42 FR 37196, July 20, 1977) is set forth in preamble A of the supplement.

For preambles to amendments and revisions which affect only certain sections, see the reference following those sections.

### § 413.10 General applicability.

General applicability of this Cost Accounting Standard is established by § 331.30 of the Board's regulations on applicability, exemption, and waiver of the requirement to include the Cost Accounting Standards contract clause in negotiated defense prime contracts and subcontracts (4 CFR 331.30).

### § 413.20 Purpose.

A purpose of this Standard is to provide guidance for adjusting pension cost by measuring actuarial gains and losses and assigning such gains and losses to cost accounting periods. The Standard also provides the bases on which pension cost shall be allocated to segments of an organization. The provisions of this Cost Accounting Standard should enhance uniformity and consistency in accounting for pension costs.

### § 413.30 Definitions.

(a) The following definitions of terms which are prominent in this Standard are reprinted from Part 400 of this chapter for convenience. Other terms which are used in this Standard and are defined in Part 400 of thi chapter have the meanings ascribed t them in that part unless the text de mands a different definition or th definition is modified in paragraph (b of this section:

(1) *Actuarial assumption.* A predic tion of future conditions affectin pension cost; for example, mortalit rate, employee turnover, compensatio levels, pension fund earnings, change in values of pension fund assets.

(2) *Actuarial cost method.* A tech nique which uses actuarial assump tions to measure the present value o future pension benefits and pensio fund administrative expenses, an which assigns the cost of such benefit and expenses to cost accounting peri ods.

(3) *Actuarial gain and loss.* Th effect on pension cost resulting fron differences between actuarial assump tions and actual experience.

(4) *Actuarial liability.* Pension cos attributable, under the actuarial cos method in use, to years prior to th date of a particular actuarial valu ation. As of such date, the actuarial li ability represents the excess of th present value of the future benefit and administrative expenses over th present value of future contribution for the normal cost for all plan partici pants and beneficiaries. The excess o the actuarial liability over the value o the assets of a pension plan is the Un funded Actuarial Liability.

(5) *Actuarial valuation.* The deter mination, as of a specified date, of th normal cost, actuarial liability, valu of the assets of a pension fund, and other relevant values for the pension plan.

(6) *Immediate-gain actuarial cost method.* Any of the several actuarial cost methods under which actuarial gains and losses are included as part of the unfunded actuarial liability of the pension plan, rather than as part of the normal cost of the plan.

(7) *Normal cost.* The annual cost attributable, under the actuarial cost method in use, to years subsequent to a particular valuation date.

(8) *Pension plan.* A deferred compensation plan established and maintained by one or more employers to provide systematically for the pay-

ment of benefits to plan participants after their retirement, provided that the benefits are paid for life or are payable for life at the option of the employees. Additional benefits such as permanent and total disability and death payments, and survivorship payments to beneficiaries of deceased employees may be an integral part of a pension plan.

(9) *Pension plan participant.* Any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit from a pension plan which covers employees of such employer or members of such organization who have satisfied the plan's participation requirements, or whose beneficiaries are receiving or may be eligible to receive any such benefit. A participant whose employment status with the employer has not been terminated is an active participant of the employer's pension plan.

(10) *Projected benefit cost method.* Any of the several actuarial cost methods which distribute the estimated total cost of all of the employees' prospective benefits over a period of years, usually their working careers.

(11) *Segment.* One of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service. The term includes Government-owned contractor-operated (GOCO) facilities, and joint ventures and subsidiaries (domestic and foreign) in which the organization has a majority ownership. The term also includes those joint ventures and subsidiaries (domestic and foreign) in which the organization has less than a majority of ownership, but over which it exercises control.

(12) *Spread-gain actuarial cost method.* Any of the several projected benefit actuarial cost methods under which actuarial gains and losses are included as part of the current and future normal costs of the pension plan.

(13) *Termination gain or loss.* An actuarial gain or loss resulting from the difference between the assumed and actual rates at which plan participants separate from employment for reasons other than retirement, disability, or death.

(b) The following modifications of definitions set forth in Part 400 of this chapter are applicable to this Standard: None.

### § 413.40 Fundamental requirement.

(a) *Assignment of actuarial gains and losses.* Actuarial gains and losses shall be calculated annually and shall be asssigned to the cost accounting period for which the actuarial valuation is made and subsequent periods.

(b) *Valuation of the assets of a pension fund.* The value of all pension fund assets shall be determined under an asset valuation method which takes into account unrealized appreciation and depreciation of pension fund assets, and shall be used in measuring the components of pension cost.

(c) *Allocation of pension cost to segments.* Contractors shall allocate pension cost to each segment having participants in a pension plan. A separate calculation of pension cost for a segment is required when the conditions set forth in § 413.50(c) (2) and (3) are present. When these conditions are not present, allocations may be made by calculating a composite pension cost for two or more segments and allocating this cost to these segments by means of an allocation base.

### § 413.50 Techniques for application.

(a) *Assignment of actuarial gains and losses.* (1) In accordance with the provisions of 4 CFR Part 412, actuarial gains and losses shall be identified separately from unfunded actuarial liabilities being amortized.

(2) Actuarial gains and losses determined under a pension plan whose costs are measured by an immediate-gain actuarial cost method shall be amortized over a 15-year period in equal annual installments, beginning with the date as of which the actuarial valuation is made. The installment for a cost accounting period shall consist of an element for amortization of the gain or less and an element for interest on the unamortized balance at the beginning of the period. If the actuar-

ial gain or loss determined for a cost accounting period is not material, the entire gain or loss may be included as a component of the current or ensuing year's pension cost.

(3) Actuarial gains and losses applicable to a pension plan whose costs are measured by a spread-gain actuarial cost method shall be included as part of current and future normal cost and spread over the remaining average working lives of the work force.

(b) *Valuation of the assets of a pension fund.* (1) The actuarial value of the assets of a pension fund shall be used (i) in measuring actuarial gains and losses, and (ii) for purposes of measuring other components of pension cost.

(2) The actuarial value of the assets of a pension fund may be determined by the use of any recognized asset valuation method which provides equivalent recognition of appreciation and depreciation of pension fund assets. However, the total asset value produced by the method used shall fall within a corridor from 80 to 120 percent of the market value of the assets, determined as of the valuation date. If the method produces a value that falls outside the corridor, the value of the assets shall be adjusted to equal the nearest boundary of the corridor.

(3) The method selected for valuing pension fund assets shall be consistently applied from year to year within each plan.

(4) The provisions of paragraphs (b) (1) through (3) of this section are not applicable to plans that are funded with insurance companies under contracts where the insurance company guarantees benefit payments.

(c) *Allocation of pension cost to segments.* (1) For contractors who compute a composite pension cost covering plan participants in two or more segments, the base to be used for allocating such costs shall be representative of the factors which the pension benefits are based. For example, a base consisting of salaries and wages shall be used for pension costs that are calculated as a percentage of salaries and wages; a base consisting of the number of employees shall be used for pension costs that are calculated as an amount per employee.

(2) Separate pension cost for a segment shall be calculated whenever any of the following conditions exist for that segment, provided that such condition(s) materially affect the amount of pension cost allocated to the segment:

(i) There is a material termination gain or loss attributable to the segment,

(ii) The level of benefits, eligibility for benefits, or age distribution is materially different for the segment than for the average of all segments, or

(iii) The appropriate assumptions relating to termination, retirement age, or salary scale are, in the aggregate, materially different for the segment than for the average of all segments. Calculations of termination gains or losses shall give consideration to factors such as unexpected early retirements, benefits becoming fully vested, and reinstatements or transfers without loss of benefits. An amount may be estimated for future reemployments.

(3) Pension cost shall also be separately calculated for a segment under circumstances where—

(i) The pension plan for that segment becomes merged with that of another segment, and

(ii) The ratios of assets to actuarial liabilities for each of the merged plans are materially different from one another after applying the benefits in effect after the merger.

(4) Whenever the pension cost of a segment is required to be calculated separately pursuant to paragraphs (c) (2) and (3) of this section, such calculations shall be prospective only; pension costs need not be redetermined for prior years.

(5) For a segment whose pension costs are required to be calculated separately pursuant to paragraph (c)(2) of this section, there shall be an initial allocation of a share in the undivided pension fund assets to that segment, as follows:

(i) If the necessary data are readily determinable, the amount of assets to be allocated to the segment shall be the amount of funds contributed by, or on behalf of, the segment, increased

by income received on such funds, and decreased by benefits and expenses paid from such funds; (ii) if the data specified in paragraph (i) of this paragraph (c)(5), are not readily determinable the actuarial value of the pension fund's assets shall be allocated to the segment in a manner consistent with the actuarial cost method or methods used to compute pension cost. For a segment whose pension costs are required to be calculated separately pursuant to paragraph (c)(3) of this section the initial allocation of assets to the segment shall be the market value of the segment's assets as of the date of the merger.

(6) If prior to the time a contractor is required to use this Standard, it has been calculating pension cost separately for individual segments, the amount of assets previously allocated to those segments need not be changed.

(7) After the initial allocation of assets, the contractor shall maintain a record of the portion of subsequent contributions, income, benefit payments, and expenses attributable to the segment and paid from the pension fund; income and expenses shall include a portion of any investment gains and losses attributable to the assets of the pension fund. Fund income and expenses shall be allocated to the segment in the same proportion that the assets allocated to the segment bears to total fund assets as of the beginning of the period for which fund income and expenses are being allocated.

(8) If plan participants transfer among segments, contractors need not transfer assets or liabilities unless a transfer is sufficiently large to distort the segments' ratio of fund assets to actuarial liabilities.

(9) Contractors who separately calculate the pension cost of one or more segments may calculate such cost either for all pension plan participants assignable to the segment(s) or for only the active participants of the segment(s). If costs are calculated only for active participants, a separate segment shall be created for all of the inactive participants of the pension plan and the cost thereof shall be calculated. When a contractor makes such an election, assets shall be allocated to the segment for inactive participants in accordance with paragraphs (c) (5), (6), and (7) of this section. When an employee of a segment becomes inactive, assets shall be transferred from that segment to the segment established to accumulate the assets and actuarial liabilities for the inactive plan participants. The amount of funds transferred shall be that portion of the actuarial liabilities for these inactive participants that have been funded. If inactive participants become active, funds and liabilities shall similarly be transferred to the segments to which the participants are assigned. Such transfers need be made only as of the last day of a cost accounting period. The total annual pension cost for a segment having active lives shall be the amount calculated for the segment plus an allocated portion of the pension cost calculated for the inactive participants. Such an allocation shall be on the same basis as that set forth in paragraph (c)(1) of this section.

(10) Where pension cost is separately calculated for one or more segments, the acturaial cost method used for a plan shall be the same for all segments, as required by 4 CFR 412.50(b). Unless a separate calculation of pension cost for a segment is made because of a condition set forth in paragraph (c)(2)(iii) of this section, the same actuarial assumptions may be used for all segments covered by a plan.

(11) If a pension plan has participants in the home office of a company, the home office shall be treated as a segment for purposes of allocating the cost of the pension plan. Pension cost allocated to a home office shall be a part of the costs to be allocated in accordance with the appropriate requirements of 4 CFR Part 403.

(12) If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The determination of the actuarial liability shall give consideration to any requirements imposed by agencies of the United States Government. In computing the

market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraph (c)(5) (i) and (ii) of this section. The market value of the assets allocated to the segment shall be the segment's proportionate share of the total market value of the assets of the pension fund. The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment. If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date. The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.

**§ 413.60 Illustrations.**

(a) *Assignment of actuarial gains and losses.* Contractor A has a defined-benefit pension plan whose costs are measured under an immediate-gain actuarial cost method. The contractor makes actuarial valuations every other year. In the past, at each valuation date, the contractor has calculated the actuarial gains and losses that have occurred since the previous valuation date and has merged such gains and losses with the unfunded actuarial liabilities that are being amortized. Pursuant to § 413.40(a), the contractor must make an actuarial valuation annually. Any actuarial gains or losses measured must be separately amortized over a 15-year period beginning with the period for which the actuarial valuation is made (§ 413.50(a) (1) and (2)).

(b) *Valuation of the assets of a pension fund.* Contractor B has a defined benefit pension plan, the assets of which are invested in equity securities, debt securities, and real property. The contractor, whose cost accounting period is the calendar year, has an annual actuarial valuation of the pension fund in June of each year; the effective date of the valuation is the beginning of that year. The contractor's method for valuing the assets of the pension fund is as follows: debt securities expected to be held to maturity are valued on an amortized basis running from initial cost at purchase to par value at maturity; land and buildings are valued at cost less depreciation taken to date; all equity securities and debt securities not expected to be held to maturity are valued on the basis of a 5-year moving average of market values. In making an actuarial valuation, the contractor must compare the values reached under the asset valuation method used with the market values of all of the assets (§ 413.40(b)). In this case, the assets are valued as of January 1 of that year. The contractor established the following values as of the valuation date.

| | Asset valuation method | Market |
|---|---|---|
| Cash | $100,000 | $100,000 |
| Equity securities | 6,000,000 | 7,800,000 |
| Debt securities expected to be held to maturity | 550,000 | 600,000 |
| Other debt securities | 600,000 | 750,000 |
| Land and buildings, net of depreciation | 400,000 | 750,000 |
| Total | $7,650,000 | $10,000,000 |

Section 413.50(b)(2) requires that the total value of the assets of the pension fund fall within a corridor from 80 to 120 percent of market. The corridor for the plan's assets as of January 1 is from $12 million to $8 million. Because the asset value reached by the contractor—$7,650,000—falls outside the corridor, the value reached must be adjusted to equal the nearest boundary of the corridor: $8 million. In subsequent years the contractor must continue to use the same method for valuing assets (§ 413.50(b)(3)). If the value produced falls inside the corridor, such value shall be used in measuring pension cost.

(c) *Allocation of pension cost to segments.* (1) Contractor C has a defined-benefit pension plan covering employees at five segments. Pension cost is computed by use of an immediate-gain actuarial cost method. One segment (X) is devoted primarily to performing work for the Government. During the

46

current cost accounting period, Segment X had a large and unforeseeable reduction of employees because of a contract termination at the convenience of the Government and because the contractor did not receive an anticipated follow-on contract to one that was completed during the period. As a result, the plan has a large net termination gain. As a consequence of this gain a separate calculation of the pension cost for Segment X would result in a materially different allocation of costs to that segment than would a composite calculation and allocation by means of a base. Accordingly, pursuant to § 413.50(c)(2), the contractor must calculate a separate pension cost for Segment X. In doing so, the entire termination gain must be assigned to Segment X and amortized over 15 years. If the actuarial assumptions for Segment X continue to be substantially the same as for the other segments, the termination gain may be separately amortized and allocated only to Segment X; all other Segment X computations may be included as part of the composite calculation. After the gain is amortized, the contractor is no longer required to separately calculate the costs for Segment X unless subsequent events require such separate calculation.

(2) Contractor D has a defined-benefit pension plan covering employees at ten segments, all of which have some contracts subject to Cost Accounting Standards. The contractor uses a spread-gain actuarial cost method and calculates pension cost by developing a pension cost rate and applying that rate to the salaries and wages of the work force. One of the segments (Segment Y) is entirely devoted to Government work. The contractor's policy is to place junior employees in this segment. The age distribution of the employees of the segment is so different from that of the other segments that the pension cost for Segment Y would be materially different if computed separately than if computed as part of a computation which averages the ages of all employees covered by the plan. Pursuant to § 413.50(c)(2), the contractor must compute the pension cost for Segment Y as if it were a separate pension plan. Accordingly, the contractor must allocate a portion of the pension fund's assets to Segment Y. Memorandum records may be used in making the allocation. However, because this portion cannot be readily determined, § 413.50(c)(5)(ii) permits the allocation to be made on the basis of the actuarial cost method or methods used to calculate prior years' pension cost for the plan. Once the assets have been allocated, in future cost accounting periods the contractor shall make separate pension cost calculations for Segment Y based on the actual age distribution for the segment. Because the factors comprising pension cost for the other nine segments are relatively equal, the contractor may compute pension cost for these nine segments by using composite factors and developing a percentage of payroll for the nine segments. The pension cost allocated to each of the nine segments shall be the product of the percentages developed and the payroll of each segment (§ 413.50 (c)(1)).

(3) Contractor E has a defined-benefit pension plan which covers employees at 12 segments. The contractor uses composite actuarial assumptions to develop a pension cost for all segments. Three of these segments primarily perform Government work; the work at the other nine segments is primarily commercial. Employee turnover at the segments performing commercial work is relatively stable. However, employment experience at the Government segments has been very volatile; there have been large fluctuations in employment levels and the contractor assumes that this pattern of employment will continue to occur. It is evident that separate termination assumptions for the Government segments and the commercial segments will result in materially different pension costs for the Government segments. Therefore, the cost for these segments must be separately calculated, using the appropriate termination assumptions for these segments (§ 413.50(c)(2)(iii)).

(4) Contractor F has a defined-benefit pension plan covering employees at 25 segments. Twelve of these segments primarily perform Government work; the remaining segments perform pri-

marily commercial work. The contractor's records show that the termination experience and projections for the 12 segments are so different from that of the average of all of the segments that separate pension cost calculations are required for these segments pursuant to § 413.50(c)(2). However, because the termination experience and projections are about the same for all 12 segments, contractor F may calculate a composite pension cost for the 12 segments and allocate the cost to these segments by use of an appropriate allocation base.

(5) After this Standard becomes applicabale to Contractor G, it acquires Contractor H and makes it Segment H. Prior to the merger, each contractor had its own defined-benefit pension plan. Under the terms of the merger, Contractor H's pension plan and plan assets were merged with those of Contractor G. The actuarial assumptions, current salary scale, and other plan characteristics and about the same for Segment H and Contractor G's other segments. However, based on the same benefits at the time of the merger, the plan of Contractor H had a disproportionately larger unfunded actuarial liability than did Contractor G's plan. Any combining of the assets and actuarial liabilities of both plans would result in materially different pension cost allocation to Contractor G's segments than if pension cost were computed for Segment H on the basis that it had a separate pension plan. Accordingly, pursuant to § 413.50(c)(5), Contractor G must allocate to Segment H a portion of the assets of the combined plan. The amount to be allocated shall be the market value of Segment H's pension plan assets at the date of the merger, adjusted for subsequent receipts and expenditures applicable to the segment (§ 413.50(c)(7)). Contractor G must use these amounts of assets as a basis for calculating the annual pension cost applicable to Segment H.

(6) Contractor I has a defined-benefit pension plan covering employees at seven segments. The contractor has been making a composite pension cost calculation for all of the segments. However, the contractor determines that, pursuant to this Standard, separate pension costs must be calculated for one of the segments. In accordance with § 413.50(c)(9), the contractor elects to allocate fund assets only for the active participants of that segment. The contractor must then create a segment to accumulate the assets and actuarial liabilities for the plan's inactive participants. When active participants of a segment become inactive, the contractor must transfer assets to the segment for inactive participants to cover the actuarial liabilities for the participants that become inactive. However, the amount to be transferred shall be proportionate to the percentage of such liabilities that are funded.

(7) Contractor J has a defined-benefit pension plan covering employees at ten segments. The contractor makes a composite pension cost calculation for all segments. The contractor's records show that the termination experience for one segment—primarily performing Government work—has been significantly different from the average turnover experience of the other segments. Moreover, the contractor assumes that such different experience will continue. Because of this fact, and because the application of a different termination assumption would result in significantly different costs being charged to the Government, the contractor must develop separate pension cost for that segment. In accordance with § 413.50(c)(2), the amount of pension cost must be based on an acceptable termination assumption for that segment; however, as provided in § 413.50(c)(10), all other assumptions for that segment may be the same as those for the remaining segments.

(8) Contractor K has a five-year contract to operate a Government-owned facility. The employees of that facility are covered by the contractor's overall defined-benefit pension plan which covers salaried and hourly employees at other locations. At the conclusion of the five-year period, the Government decides not to renew the contract. Although some employees are hired by the successor contractor, as far as Contractor K is concerned, the facility is closed. Pursuant to § 413.50(c)(12), Contractor K must compute an unfunded actuarial liabil-

ity for the pension plan for that facility. The contractor first calculates the actuarial liability as of the date the contract expired. Because many of Contractor K's employees are terminated from the pension plan, the Internal Revenue Service considers it to be a partial plan termination, and thus requires that the terminated employees become fully vested in their accrued benefits to the extent such benefits are funded. Taking this factor into consideration, the actuary calculates the actuarial liability as amounting to $12.5 million. The contractor must then determine the market value of the pension fund assets allocable to the facility, pursuant to § 413.50(c)(5), as of the date agreed to by the contracting parties (§ 413.50(c)(12))—the date the contract expired. In making this determination the contractor establishes the ratio of the actuarial value of the assets allocable to the segment to the total actuarial value of the assets of the pension fund. The product of this ratio and the market value of all pension fund assets is the market value of the assets allocated to the segment. In this case, the market value of the segment's assets amounted to $13.8 million. Thus, for this facility the value of pension fund assets exceeded the actuarial liability by $1.3 million. This amount indicates the extent to which the Government overcontributed to the pension plan for the segment and, accordingly, indicates the extent to which prior years' pension costs are subject to adjustment.

**§ 413.70 Exemptions.**

None for this Standard.

**§ 413.80 Effective date.**

(a) The effective date of this Standard is March 10, 1978.

(b) This Standard shall be followed by each contractor on or after the start of his next cost accounting period beginning after the receipt of a contract to which this Cost Accounting Standard is applicable.

## PREAMBLE A

### Preamble to Original Publication, 6-2-76

The following is the preamble to the original publication of Part 413, 42 FR 37191, July 20, 1977.

The cost Accounting Standard on Adjustment and Allocation of Pension Cost is one of a series being promulgated by the Cost Accounting Standards Board pursuant to section 719 of the Defense Production Act of 1950, as amended, Pub. L. 91-379, 50 U.S.C. app. 2168, which provides for the development of Cost Accounting Standards to be used in connection with negotiated national defense contracts.

This Standard is the second Standard dealing with pension costs. The first Standard, 4 CFR Part 412, establishes requirements covering the composition of pension cost and the bases to be used for measuring such cost. The Standard being promulgated today establishes the basis for assigning actuarial gains and losses to cost accounting periods and for allocating pension cost to segments of an organization.

As part of the Board's early research relating to the subject of pension cost, it submitted an issues paper to a large cross-section of companies, Government agencies, industry and professional associations, actuaries, and other interested individuals. On June 18, 1976, this staff draft Standard was sent to those interested parties who had expressed a desire to assist the Board in its research efforts. The responses to the staff draft Standard were considered in developing a proposed Standard which was published in the FEDERAL REGISTER of February 3, 1977, with an invitation to readers to submit written views and comments to the Board. The Board also supplemented the invitation in the FEDERAL REGISTER by sending copies of the proposed Standard to over 1,000 organizations and individuals.

The Board received 67 sets of written comments from companies, Government agencies, professional associations, industry associations, public accounting firms, actuaries, universities, and others in response to the FEDERAL