ity for the pension plan for that facility. The contractor first calculates the actuarial liability as of the date the contract expired. Because many of Contractor K's employees are terminated from the pension plan, the Internal Revenue Service considers it to be a partial plan termination, and thus requires that the terminated employees become fully vested in their accrued benefits to the extent such benefits are funded. Taking this factor into consideration, the actuary calculates the actuarial liability as amounting to $12.5 million. The contractor must then determine the market value of the pension fund assets allocable to the facility, pursuant to § 413.50(c)(5), as of the date agreed to by the contracting parties (§ 413.50(c)(12))—the date the contract expired. In making this determination the contractor establishes the ratio of the actuarial value of the assets allocable to the segment to the total actuarial value of the assets of the pension fund. The product of this ratio and the market value of all pension fund assets is the market value of the assets allocated to the segment. In this case, the market value of the segment's assets amounted to $13.8 million. Thus, for this facility the value of pension fund assets exceeded the actuarial liability by $1.3 million. This amount indicates the extent to which the Government overcontributed to the pension plan for the segment and, accordingly, indicates the extent to which prior years' pension costs are subject to adjustment.

**§ 413.70 Exemptions.**

None for this Standard.

**§ 413.80 Effective date.**

(a) The effective date of this Standard is March 10, 1978.

(b) This Standard shall be followed by each contractor on or after the start of his next cost accounting period beginning after the receipt of a contract to which this Cost Accounting Standard is applicable.

## PREAMBLE A

**Preamble to Original Publication, 6-2-76**

The following is the preamble to the original publication of Part 413, 42 FR 37191, July 20, 1977.

The cost Accounting Standard on Adjustment and Allocation of Pension Cost is one of a series being promulgated by the Cost Accounting Standards Board pursuant to section 719 of the Defense Production Act of 1950, as amended, Pub. L. 91-379, 50 U.S.C. app. 2168, which provides for the development of Cost Accounting Standards to be used in connection with negotiated national defense contracts.

This Standard is the second Standard dealing with pension costs. The first Standard, 4 CFR Part 412, establishes requirements covering the composition of pension cost and the bases to be used for measuring such cost. The Standard being promulgated today establishes the basis for assigning actuarial gains and losses to cost accounting periods and for allocating pension cost to segments of an organization.

As part of the Board's early research relating to the subject of pension cost, it submitted an issues paper to a large cross-section of companies, Government agencies, industry and professional associations, actuaries, and other interested individuals. On June 18, 1976, this staff draft Standard was sent to those interested parties who had expressed a desire to assist the Board in its research efforts. The responses to the staff draft Standard were considered in developing a proposed Standard which was published in the FEDERAL REGISTER of February 3, 1977, with an invitation to readers to submit written views and comments to the Board. The Board also supplemented the invitation in the FEDERAL REGISTER by sending copies of the proposed Standard to over 1,000 organizations and individuals.

The Board received 67 sets of written comments from companies, Government agencies, professional associations, industry associations, public accounting firms, actuaries, universities, and others in response to the FEDERAL

REGISTER proposal. All of these comments have been carefully considered by the Board. The Board's views on each of the major issues discussed by commentators are outlined below, together with explanations of the changes made to the proposed Cost Accounting Standard.

The Board wishes to take this opportunity to express its appreciation for the helpful suggestions and constructive criticisms it has received, and for the time devoted to assisting the Board in this endeavor by the many organizations and individuals involved.

(1) *Relationship to the Employee Retirement Income Security Act of 1974 and to the Financial Accounting Standards Board.* The Board received a number of comments relative to the relationship between the proposed Standard and the Employee Retirement Income Security Act of 1974 (ERISA). Many of the respondents stated that the proposed Standard contained requirements which are either inconsistent with, more restrictive than, or in conflict with the provisions of ERISA.

The purpose of the Board in promulgating its Standards on pension cost is to establish the criteria for measuring the proper amount of pension cost to be assigned to cost accounting periods for subsequent allocation to negotiated Government contracts. ERISA establishes, among other things, minimum funding Standards for pension plans and provisions affecting deductibility of pension cost for tax purposes. Although there is some commonality between the funding provisions of ERISA and the Standard being promulgated today, ERISA does not provide for the measurement of pension costs for assignment among cost accounting periods or for the subsequent allocation of such costs to contracts.

Notwithstanding the differences in objectives between the proposed Standard and ERISA, the Board believes that compliance with the provisions of the Standard being promulgated today will not violate any provision of ERISA. The Internal Revenue Service confirmed the Board's view on this matter.

One commentator expressed concern over the issuance of a Cost Accounting Standard at this time in view of the active involvement by the Financial Accounting Standards Board in refining the accounting and reporting for both pension plans and employer pension costs. The Board is aware that the FASB may issue a Standard which could be different from the Standard being promulgated today. The Board maintains constant liaison with the FASB with regard to the two Boards' respective responsibilities for developing Standards. It also maintains liaison with the legislative and regulatory bodies responsible for developing and administering ERISA. The Board will review whatever pronouncements these bodies may issue and will consider whether revisions to this Standard are appropriate.

(2) *Definitions.* The Board has received a number of comments relative to the definitions used in the proposed Standard. Some commentators were concerned that the Board is developing still another glossary of actuarial terms. One of the problems in the field of pension accounting has been the words used to express concepts use. Different meanings have been ascribed to the same terms; different terms have been used to describe the same circumstances; and some terms have inferred meanings which have not been present and have not been intended. Thus, the Board's objective in developing the definitions in this Standard is to help provide a clear understanding of the concepts used therein.

With regard to the specific definitions used in the proposed Standard, the most common problem related to the term "segment." Some commentators construed the term to mean any group of employees performing work for the Government. The definition used in the proposed Standard is the same as that set forth in 4 CFR Part 400. As defined, a segment is an organizational unit which reports directly to a home office of that organization. The designation of organizational units as segments is the responsibility of the contractor; the proposed Standard does not change such designations.

(3) *Assignment of Actuarial Gains and Losses to Cost Accounting Periods.* Section 413.50(a)(2) of the proposed Standard required that for contractors using an immediate-gain actuarial cost method, actuarial gains and losses shall be amortized over a 15-year period. Several commentators stated that immediate recognition of actuarial gains and losses should be required when there are "abnormal forfeitures" (i.e., exceptionally large termination gains). Some commentators expressed a desire for a 10–15-year amortization period; some desired a 10–20-year period; others merely wanted sufficient flexibility to permit them to use whatever amorization period they deem appropriate.

The 15-year amortization period is the same as that set forth in the minimum funding provisions of ERISA. It is also consistent with Opinion No. 8 of the Accounting Principles Board (APB-8) covering the accounting for the cost of pension plans. The Board believes that the amortization period set forth in ERISA is a reasonable basis for adjusting past pension cost accruals without creating significant distortions to current year's accruals. The Board is opposed to the use of various amoritization periods because it would be contrary to the Board's objective of attaining greater consistency and uniformity in the measurement of pension cost and the assignment of such costs to cost accounting periods.

The Board believes also that there is no valid basis for immediate recognition of gains or losses simply because they are exceptionally large. Recognizing gains and losses in the current year generally is not appropriate because the gains or losses are often an adjustment of costs of a number of years. In this regard, the Board notes that APB-8 states also that gains and losses should be recognized immediately only if they arise from a single occurrence not directly related to the operation of the pension plan such as the closing of a plant. The Standard is consistent with this concept. Accordingly the 15-year amortization period has been retained in the Standard being promulgated today.

(4) *Annual calculation of actuarial gains and losses.* A number of commentators objected to the requirement in § 413.40(a) of the proposed Standard that actuarial gains and losses be developed annually. They pointed out that this provision, in effect, requires an annual actuarial valuation. They stated that such a requirement may impose a burden on small contractors, is contrary to ERISA which requires a valuation no less frequently than once every three years, and will result in increased administrative costs.

The Board's primary reason for requiring annual calculations of actuarial gains and losses is to assure that the proper cost is assigned to each cost accounting period. Postponing such calculations may well obscure large fluctuations in pension costs which should be recognized on a timely basis. Because many contracts begin and end within a two or three-year period, such postponements can result in incorrect costs being allocated to these contracts. The Board notes that the overwhelming majority of contractors perform annual actuarial valuations.

In addition, it should be noted that annual actuarial valuations need not be made for all pension plans. Section 412.40(a)(2) of 4 CFR Part 412 provides that for defined-contribution pension plans, the pension cost for a cost accounting period is the net contribution required to be paid for that period. Similarly, § 412.50(a) of 4 CFR Part 412 provides that multiemployer plans, certain insured plans, and certain plans applicable to colleges and universities shall be considered to be defined-contribution pension plans. Accordingly, the requirement to develop actuarial gains and losses annually is not applicable to these plans.

With regard to small contractors, the Board notes that it has not received a single comment from a small contractor stating that the requirement for an annual actuarial valuation for certain pension plans will result in a financial hardship to the contractor. Every comment it has received on this point has come from a major contractor. As for increased actuarial fees, the Board was informed by several actuaries that the difference between the cost of three annual valuations and the cost of a single, three-year valuation is relatively small.

In view of these considerations, the Board has retained the requirement for annual development of actuarial gains and losses.

(5) *Valuation of pension fund assets.* A substantial number of commentators objected to the provision of § 413.50(b)(2) of the proposed Standard which required that the value of pension fund assets be within 80 to 120 percent of the market value of such assets. Some commentators stated that such an approach could have a significant impact on pension cost in a year in which there is a large market fluctuation. Many of these seemed particularly concerned that a substantial drop in the market value of fund assets would cause an increase in pension costs. Other commentators stated that such a requirement is inconsistent with the fundamental requirement of the proposed Standard which stated that the method in use should minimize the effect of short-term market fluctuations. Some suggested various modifications to the proposed Standard to minimize the possible impact of this provision. For example, it was suggested that the average market value of the fund on several dates be used to determine whether an adjustment is required, or that no adjustment should be required unless the value of the fund is outside of the corridor for a period of several years. Some commentators were of the opinion that the corridor approach was reasonable and should be used except in cases where certain asset valuation methods are used; the most common method cited was the 5-year moving average. Several commentators noted that ERISA requires that, for minimum funding purposes, assets shall be valued on a basis which gives consideration to fair market values. They suggested that this provision obviates a need for a corridor.

The Board notes that there is no opposition to the concept that the actuarial value of pension fund assets should take into account the market value of such assets. It recognizes that there are numerous asset valuation methods which take into account market value in varying degrees. In order to achieve an acceptable relationship between the actuarial value of pension fund assets and thei market values, the Board could hav restricted the use of any of thes market valuation methods. In the ab sence of such restrictions, however the Board believes some limits must b provided to assure that the actuaria value of fund assets on a given dat gives adequate recognition to thei market value. The Board reiterates it often stated concept that assignmen of costs to the proper period is of para mount importance in determining con tract costs. Total reliance on valuatio methods which fail to produce actuar ial values within the specified corrido is not acceptable for contract costin purposes. For the same reasons, th Board does not accept the suggeste modifications to the use of a singl asset valuation date because thes modifications could defeat the objec tive of assuring that the value of th fund bears an appropriate relationship to current market values.

The Board notes that the requirement to adjust pension fund assets to within a certain range of market value is not a new concept with this Standard. The Armed Services Procurement Regulations (ASPR) has for many years required that appreciation in equity securities be recognized to the extent that 80 percent of their market value exceeds their adjusted book value. The requirement for upward adjustments of pension fund assets in the Standard being promulgated today is thus similar to the existing ASPR provision. No known problems with this provision for upward adjustments have come to the attention of the Board. Early research in connection with the pension cost Standards did, however, indicate widespread dissatisfaction with the existing ASPR provisions because they did not permit adjustment of pension fund assets below cost. The Standard being promulgated today will correct this apparent inequity.

The Board notes also that many of the commentators apparently did not realize that the adjustment to pension fund assets required pursuant to § 413.50(b) would result in an actuarial gain or loss subject to the 15-year amortization period specified in § 413.50 (a)(2). It should be recognized that the

15-year amortization period minimizes the effect of short-term market fluctuations in two ways. First, the cost impact of the actuarial gain or loss for any year is spread over 15 years. Secondly, in computing a single year's pension cost, there could be adjustments resulting from market fluctuations in as many as 15 prior years. If, as can be expected, some of these adjustments will be increases to the year's pension costs while others will be decreases, the effect of market fluctuations on a year's pension cost will be further minimized. Accordingly, § 413.50(b)(2), in conjunction with § 413.50(a)(2), is considered to assure adequate recognition of the market value of pension fund assets while at the same time assuring that the effect of short-term market fluctuations is minimized.

In summary, the Board continues of the view that wide latitude should be provided for selecting an asset valuation method, but that such latitude should be coupled with the requirement that the assets valued under the method selected fall within a range of the market value of such assets. The requirement that assets be valued at least at 80 percent of market value is consistent with the present provision of ASPR. The requirement that assets be valued at no more than 120 percent of market value is a needed and equitable change to the ASPR concept. These requirements are not expected to result in severe pension cost fluctuations which concerned some of the commentators. Under the circumstances the Board has not adopted those recommendations aimed at deleting or revising the requirement that pension fund assets be valued within 80 to 120 percent of market value.

(6) *Valuation of bonds in a pension fund.* Several commentators expressed their disagreement with the provision of § 413.60(b) of the proposed Standard which required that, in establishing the corridor, market values must be used for all assets, including bonds. They stated that the use of amortized amounts will, over time, produce values less susceptible to short/term market fluctuations than will be produced by the use of market values. They noted also that, for minimum funding purposes, ERISA permits bonds to be valued at cost less amortization. The Board's research shows that assets of a pension fund are acquired for investment purposes and may be liquidated whenever pension fund managers believe that the proceeds therefrom can generate more income elsewhere. The Board's research shows also that the frequent turnover of pension fund assets is the rule rather than the exception. Therefore, the Board continues of the view, that in establishing the corridor, all assets should be valued on the basis of market and no change has been made to § 413.60(b) to provide otherwise. However, the Standard permits a contractor to use amortized values for bonds as a part of the asset valuation method.

(7) *Allocation of pension cost to segments of an organization.* Section 413.40(c) of the proposed Standard provided that pension costs for a segment may always be developed by separate computation. It further provided that composite pension costs for two or more segments may be computed and allocated by means of an allocation base "unless distortions are created." Section 433.50(c)(2) provided that "unless an equitable allocation of pension costs to segments can be made by means of an allocation base." Separate pension costs for the segment shall be calculated under certain specified conditions.

Some commentators were opposed to a requirement to calculate separate pension costs for a segment under any conditions. Others thought that the proposed Standard was unclear as to when separate segment pension cost calculations were required. A number of commentators concluded that separate calculations would have to be made in any event in order to prove that the use of an allocation base is acceptable. A number of these stated that such separate calculations would be costly.

Normally, pension costs are "central payments or accruals" as that term is used in 4 CFR Part 403. Therefore, where pension costs can be computed for an individual segment, 4 CFR Part 403 would ordinarily require that the amount so computed be the amount

allocated to such segment. The calculation of individual segment costs is, in effect, a direct allocation which is not only consistent with CAS 403 but is also consistent with the Board's cost allocation concepts as set forth in the Board's Restatement of Objections, Policies and Concepts (May 1977). Under the circumstances, the Board does not agree with those commentators who are of the view that computation of separate segments pension costs should never be required. Nevertheless, the Board recognizes that the calculation of separate segments pension costs cannot be made without some additional cost and effort. Consistent with its long-standing concepts on materiality, the Board believes that the calculation of separate segment pension cost should be mandatory only when such separate calculations produce materially different results than would result from the use of an allocation base. Therefore the Board sought to provide, in the proposed Standard, criteria to determine when separate calculations would be required.

It is evident that many reviewers of the proposed Standard were uncertain as to when separate segment pension cost calculations would required and when an allocation base could be used. Accordingly, § 413.40(c) has been revised to clearly state that a separate calculation of pension cost for a segment is required only when the conditions set forth in § 413.50(c) (2) and (3) are present. Appropriate changes have also been made in these paragraphs.

The Board recognizes whether separate segment pension cost calculations are required depends in the final analysis on what is considered to be "material" for the purposes of § 413.50(c) (2) and (3). The proposed Standard provided that separate segment costs are to be computed for a segment which had "significant" termination gains; "significantly" different than average benefits, eligibility criteria, or age distribution; or "significantly" different actuarial assumptions.

The concern of many commentators that they would have to make separate segment pension cost calculations in order to prove that the use of a base is acceptable apparently stemmed in part from uncertainty as to what wa[s] meant by "significant." The Board i[s on] record as stating that Cost Ac[counting] Standards should be reasona[ble] and not seek to deal with insignifi[cant] amounts of costs. The Board ha[s] previously published in its Statemen[t] of Operating Policies, Procedures an[d] Objectives certain criteria to be considered in determining whether [a] transaction or a decision about an ac[counting] practice is material. Such cri[teria] have also been proposed for in[clusion] in the Board's regulations. It i[s] intended that these criteria be consid[ered] in determining whether separat[e] segment pension cost calculations ar[e] required.

To clarify that the Board's existin[g] materiality criteria apply in this instance, § 413.50(c) (2) and (3) in th[e] Standard being promulgated today us[e] the words "material" or "materially" in lieu of the words "significant" o[r] "significantly" contained in the proposed Standard. More importantly, a statement has been added t[o] § 413.50(c)(2) to state that separat[e] pension cost calculations are required when the listed conditions are present only if "such conditions materially affect the amount of pension costs allocated to the segment." The Board believes that, in most cases, it will be obvious to the contracting parties whether the presence of one or more of these conditions for a segment will materially affect the pension cost for that segment. In cases where the impact is not obviously known, the Board contemplates that the contracting parties will rely on summary estimates as a basis for determining whether separate calculations are required. The Board believes that over time, the need for such summary estimates will diminish. The Board emphasizes that separate calculations are not routinely required, even though no two segments are likely to be identical with respect to the actuarial factors set forth in the Standard. The Board intends that separate segment calculations will be required only in those instances where they would result in a materially different pension cost allocation to a segment.

Several commentators noted that there are pension plans covering sever-

al segments that are almost completely devoted to performing work for the Government. Others noted that they had segments which perform a relatively negligible amount of Government work. In either case, according to these commentators, even significant differences in pension cost factors among segments covered by the plan would not materially affect the amount of pension costs allocated to Government contracts. Accordingly, they recommended that the provisions of the Standard relative to separate computations for a segment not be applicable to such segments.

One of the Board's primary objectives in the Standard being promulgated today is to allocate the proper amount of pension costs to each segment. This objective is appropriate, irrespective of the mix of Government and commercial work of a segment or among all segments covered by a pension plan. Even if several segments are entirely devoted to performing work for the Government, the allocation of pension costs among such segment could materially affect the amount of pension costs that are allocated to particular types of contracts in a cost accounting period. The Board recognizes, however, that if a relatively immaterial amount of a segment's work is performed for the Government, any revised allocation of pension cost for that segment would probably have little or no effect on the costs allocated to Government contracts. In such a case, the Board urges the contracting parties give due consideration to the Board's views on materiality.

(8) *Allocation bases.* The proposed Standard required in § 413.50(c)(1) that contractors who compute a composite pension cost for two or more segments must allocate such costs on a base consisting either of the salary and wages of the participants or the number of participants, except where the contracting parties agree to the use of a different base. A number of commentators stated that in certain cases a better beneficial or causal relationship can be obtained by the use of other than the specified bases. The most commonly listed practice was the use of one base to allocate normal cost and another base to allocate unfunded actuarial liabilities. The Board recognizes that in many cases the use of other bases or a combination of bases would provide an equitable means for allocating pension costs to segments. The Board believes that it should not preclude the use of any appropriate base. Therefore, § 413.50(c)(1) of the Standard being promulgated today has been revised to provide that the base to be used for allocating composite pension costs shall be representative of the factors on which the pension benefits are based.

The Board still believes, however, that under certain circumstances, a specific base provides the best means for allocating pension cost. Accordingly, § 413.50(c)(1) still requires the use of salaries and wages as an allocation base where costs are calculated as a percentage of salaries and wages, and the use of a base consisting of the number of employees where costs are calculated as an amount per employee.

(9) *Allocation of pension fund assets to segments.* When pension cost must be separately calculated for a segment, it will generally be necessary to allocate pension fund assets to such segments. Section 413.50(c)(5)(iii) of the proposed Standard provided that if contractors used different actuarial cost methods in prior years, the allocation of assets must be based on actuarial liabilities developed under the Accrued Benefit actuarial cost method. Several commentators noted that this provision could result in an allocation of assets to segments which is inconsistent with the bases used to accumulate the assets. The Board agrees with this observation. Accordingly, § 413.50(c)(5) of the Standard being promulgated today provides that the allocation of assets shall be made in a manner consistent with the actuarial cost method or methods used to give rise to such assets. It should be noted, however, that such an allocation is permitted only when contributions, disbursements, income, and expenditures made by, or in behalf, of a segment are not readily determinable.

Several commentators suggested that the Standard should be clarified with regard to whether the value of the assets to be allocated shall be the cost of the assets, the actuarial value