| Description of change | Accounting treatment |
|---|---|
| 6. For a particular class of assets for which technological changes have rarely affected asset lives, a contractor uses a five year average of historical lives to estimate future lives. Last year the five year average resulted in an estimated future life of eight years for this class of assets. This year the five year average predicts a useful life of seven years for the assets acquired this year for this class of assets. | 6. The change in estimate is not a change in cost accounting practice. The contractor has not changed the method or technique used to determine the estimate. The result of the methodology applied to historical data has indicated a change in the estimated life, and this is not a change in cost accounting practice. |
| 7. A contractor has been operating for some time under Cost Accounting Standard 410. The contractor's mix of business changes substantially such that there are significant new projects which have substantially increased quantities of subcontracts and Government furnished material. | 7. The contractor has been allocating his general and administrative expense pool to final cost objectives on a total cost input base in compliance with the Standard. With the addition of the new work, it is agreed that a total cost input base would result in a significant distortion in the allocation of the G&A expense pool. To remain in compliance with the requirements of Standard 410, the contractor is required to change its G&A allocation base from a total cost input base to a value added base. Per the provisions of 331.20(l), this change to remain in compliance with the requirements of the Standard is not a change in cost accounting practice. |
| 8. The marketing department of a segment has reported directly to the general manager of the segment. The costs of the marketing department have been accounted for as part of the segment's G&A expense pool. The company reorganizes and requires the marketing department to report directly to a vice president at corporate headquarters. | 8. While the reporting framework of the organization has changed, the accounting for the cost of the marketing department has not changed. Thus, the organizational change has not resulted in a change in cost accounting practice. |
| 9. A contractor values the assets of a pension fund on the basis of acquisition cost. Pursuant to the provisions of the Employee Retirement Income Security Act of 1974, the value of the pension fund's assets must be determined on the basis of a valuation method which takes into account fair market values. | 9. The requirement to use the new valuation method is a requirement of the Act, but the Act does not spell out any requirement that the contractor reflect the new method (or any higher cost) in contract cost accounting. Nevertheless, applicable provisions of ASPR permit reimbursement to the contractor only of allocable pension costs actually paid into the pension fund. Additionally, Item 7.1.8 of the Disclosure Statement requires a description of the method used for valuing pension fund assets. In these circumstances, for all practical purposes the Act compels the contractor to alter his cost accounting practice. Accordingly, the alteration in accounting made by the contractor to conform to the law is not considered to be a change in cost accounting practice for purposes of paragraphs (a)(4) and (a)(5) of the Cost Accounting Standards clause (4 CFR Part 331.50). |

ARTHUR SCHOENHAUT,
*Executive Secretary.*

[FR Doc.77-3311 Filed 2-2-77;8:45 am]

[4 CFR Part 413]

## ADJUSTMENT AND ALLOCATION OF PENSION COST

### Proposed Cost Accounting Standard

Notice is hereby given of a Cost Accounting Standards on the Adjustment and Allocation of Pension Cost, being considered by the Cost Accounting Standards Board for promulgaton to implement further the requirement of section 719 of the Defense Production Act of 1950, as amended, Public Law 91-379, 50 USC App. 2168. When promulgated, the Standard will be used by all relevant Federal agencies and national defense contractors and subcontractors.

The proposed Standard, if adopted, would be one of a series of Cost Accounting Standards which the Board is promulgating "to achieve uniformity and consistency in the cost accounting principles followed by defense contractors and subcontractors under Federal contracts." (See Sec. 719(g) of the Defense Production Act of 1950, as amended.) It is anticipated that any contractor receiving an award of a contract subject to the rules, regulations, and Standards of the Cost Accounting Standards Board on or after the effective date of this Standard will be required to follow it in accordance with the provisions of § 413.80.

This Standard is the second Standard dealing with pension costs. The first Standard, 4 CFR Part 412, establishes the composition of pension cost and the bases to be used for measuring such cost. It provides also the criteria for determining the amount of pension cost to be assigned to cost accounting periods. Although Standard 412 includes actuarial gains and losses as a component of pension costs, it does not state how or when such gains and losses shall be assigned to periods or measured.

The proposed Standard being published today establishes the basis for assigning actuarial gains and losses to cost accounting periods. It establishes also the basis for valuing the assets of a pension fund. Such valuations affect significantly the components of pension cost, including actuarial gains and losses. Finally, the Standard establishes the basis for allocating pension costs to segments of an organization.

In its research leading to the development of this proposed Standard, the Board's staff circulated a staff draft Standard. The staff noted some confusion as to the meaning of the term "segment" in that draft. The definition used in the proposed Standard is the same as that set forth in 4 CFR Part 400. Some commentators construed the term to mean any group of employees performing work for the Government; others construed it to mean product line. It is neither. As defined, a segment is an organizational unit which reports directly to a home office of that organization. The designation of organizational units as segments is a responsibility of the contractor.

Other commentators expressed concern as to whether the provisions of the draft Standard requiring contractors, under certain circumstances, to separately calculate pension costs by segment is applicable to segments that perform commercial work only. The answer is in the negative. The provisions of the proposed Standard are applicable only to those segments having contracts that are subject to Cost Accounting Standards.

Several commentators asked whether the asset valuation criteria set forth in the proposed Standard are to be applied for all actuarial purposes or solely for determining actuarial gains and losses. The proposed Standard specifically provides that the value of a pension fund's assets, as derived pursuant to the proposed Standard, shall be used for purposes of calculating all components of pension cost. Other commentators asked whether the methods currently used for valuing pension fund assets can continue to be used in calculating pension cost. The proposed Standard does not prescribe the asset valuation method to be used. However, it requires that (1) the method be used consistently, and (2) the total asset value produced by the method be no less than 80% or more than 120% of the total market value of all of the assets of the pension fund. The proposed Standard contains an illustration covering the valuation of assets.

In developing the proposed Standard, the Board has researched the Employee Retirement Income Security Act of 1974 and regulations issued thereto. The Board believes that the provisions of this Standard are in consonance with both the provisions of the Act and with regulations issued to date.

The Board solicits comments on the proposed Cost Accounting Standard which will assist the Board in its consideration of the proposal. Interested persons should submit written data and views concerning the proposed Cost Accounting Standard to the Cost Accounting Standards Board, 441 G Street, N.W., Washington, D.C. 20548. To be given consideration by the Board in its determination relative to final promulgation of the Cost Accounting Standard covered by this Notice, written submissions must be made to arrive no later than April 25, 1977.

NOTE.—All written submissions made pursuant to this Notice will be made available for public inspection at the Board's Office during regular business hours.

The proposed Part 413 reads as follows:

## PART 413—ADJUSTMENT AND ALLOCATION OF PENSION COST

Sec.
413.10 General applicability.
413.20 Purpose.





HeinOnline -- 42 Fed. Reg. 6594 1977

Sec.
413.30 Definitions.
413.40 Fundamental requirement.
413.50 Techniques for application.
413.60 Illustrations.
413.70 Exemptions.
413.80 Effective date.

AUTHORITY: Sec. 719, Defense Production Act of 1950, as amended, Pub. L. 91-379 (50 USC App. 2168).

§ 413.10 General applicability.

General applicability of this Cost Accounting Standard is established by § 331.30 of the Board's regulations on applicability, exemption, and waiver of the requirement to include the Cost Accounting Standards contract clause in negotiated defense prime contracts and subcontracts (§ 331.30 of this Chapter).

§ 413.20 Purpose.

A purpose of this Standard is to provide guidance for adjusting pension cost by measuring actuarial gains and losses and assigning such gains and losses to cost accounting periods. In doing so, the Standard establishes the basis for valuing the assets of a pension fund. Another purpose of the Standard is to provide the bases on which pension cost shall be allocated to segments of an organization. The provisions of this Cost Accounting Standard should enhance uniformity and consistency in accounting for pension costs.

§ 413.30 Definitions.

(a) The following are definitions of terms prominent in this Standard.

(1) *Accrued benefit cost method.* An actuarial cost method under which units of benefit are assigned to each cost accounting period and are valued as they accrue—that is, based on the services performed by each employee in the period involved. The measure of normal cost under this method for each cost accounting period is the present value of the units of benefit deemed to be credited to employees for service in that period. The measure of the actuarial liability at a plan's inception date is the present value of the units of benefit credited to employees for service prior to that date. (This method is also known as the Unit Credit cost method.)

(2) *Actuarial assumption.* A prediction of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets.

(3) *Actuarial cost method.* A technique which uses actuarial assumptions to measure the present value of future pension benefits and pension fund administrative expenses, and which assigns the cost of such benefits and expenses to cost accounting periods.

(4) *Actuarial gain and loss.* The effect on pension cost resulting from differences between actuarial assumptions and actual experience.

(5) *Actuarial liability.* Pension cost attributable, under the actuarial cost method in use, to years prior to the date of a particular actuarial valuation. As of such date, the actuarial liability represents the excess of the present value of the future benefits and administrative expenses over the present value of future contributions for the normal cost for all plan participants and beneficiaries. The excess of the actuarial liability over the value of the assets of a pension plan is the Unfunded Actuarial Liability.

(6) *Actuarial valuation.* The determination, as of a specified date, of the normal cost, actuarial liability, value of the assets of a pension fund, and other relevant values for the pension plan.

(7) *Immediate-gain actuarial cost method.* Any of the several actuarial cost methods under which actuarial gains and losses are separately determined at a valuation date as a consequence of the actuarial cost method.

(8) *Normal cost.* The annual cost attributable, under the actuarial cost method in use, to years subsequent to a particular valuation date.

(9) *Pension plan.* A deferred compensation plan established and maintained by one or more employers to provide systematically for the payment of benefits to plan participants after their retirement, provided that the benefits are paid for life or are payable for life at the option of the employees. Additional benefits such as permanent and total disability and death payments, and survivorship payments to beneficiaries of decreased employees may be an integral part of a pension plan.

(10) *Pension plan participant.* Any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit from a pension plan which covers employees of such employer or members of such organization, or whose beneficiaries are receiving or may be eligible to receive any such benefit. A participant currently in the employ of an employer is an active participant of the employer's pension plan.

(11) *Projected benefit cost method.* Any of the several actuarial cost methods which distribute the estimated total cost of all of the employees' prospective benefits over a period of years, usually their working careers.

(12) *Segment.* One of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service. The term includes Government-owned contractor-operated (GOCO) facilities, and joint ventures and subsidiaries (domestic and foreign) in which the organization has a majority ownership. The term also includes those joint ventures and subsidiaries (domestic and foreign) in which the organization has less than a majority of ownership, but over which it exercises control.

(13) *Spread-gain actuarial cost method.* Any of the several projected benefit cost methods which includes actuarial gains and losses as part of normal cost as a consequence of the actuarial cost method.

(14) *Termination gain or loss.* An actuarial gain or loss resulting from the difference between the assumed and actual duration of employment of plan participants in a contractor's work force. Termination assumptions do not give consideration to retirement, disability, or death. Assumptions are sometimes made separately for voluntary and for involuntary terminations.

(b) The following modifications of definitions set forth in Part 400 of this chapter are applicable to this Standard: None.

§ 413.40 Fundamental requirement.

(a) *Assignment of actuarial gains and losses.* Actuarial gains and losses shall be calculated annually and shall be assigned to future cost accounting periods.

(b) *Valuation of the assets of a pension fund.* The value of all pension fund assets shall be used in measuring the components of pension cost, and shall be determined under a method which takes into account fair market values and which minimizes the effect of short-term market fluctuation.

(c) *Allocation of pension cost.* Contractors shall allocate pension cost to each segment having participants in a pension plan. The cost of each pension plan shall be separately allocated. Such allocations may always be made by separately computing pension cost for one or more segments. Unless distortions are created, such allocations may instead be made by computing a composite pension cost for two or more segments and allocating the cost to these segments by means of an allocation base. The base shall be representative of the factors on which the pension cost was based.

§ 413.50 Techniques for application.

(a) *Assignment of actuarial gains and losses.* (1) In accordance with the provisions of 4 CFR Part 412, actuarial gains and losses shall be identified separately from unfunded actuarial liabilities being amortized.

(2) Actuarial gains and losses determined under a pension plan whose costs are measured by an immediate-gain actuarial cost method shall be amortized over a 15-year period, beginning with the date as of which the actuarial valuation is made. The gain or loss assignable to each cost accounting period shall be set forth in equal annual installments which shall consist of an amortized portion of the gain or loss plus an interest equivalent on the unamortized portion of such gain or loss. If the actuarial gain or loss determined for a cost accounting period is not material in amount, it may be assigned to a single period.

(3) Actuarial gains and losses applicable to a pension plan whose costs are measured by a spread-gain actuarial cost method are included as part of normal cost and are spread over the remaining average working lives of the work force. Accordingly, no specific amortization period is specified in this Standard for such gains and losses.

(b) *Valuation of the assets of a pension fund.* (1) The value of a pension





HeinOnline -- 42 Fed. Reg. 6595 1977

fund's assets shall be used (i) in determining actuarial gains and losses, and (ii) for purposes of calculating other components of pension cost.

(2) Any recognized method may be used for valuing the assets of a pension fund. However, the total asset value produced by the method used shall fall within a corridor from 80 to 120 percent of the market value of the assets, determined as of the valuation date. If the method produces a value that falls outside the corridor, the value of the assets, as computed under the method in use, shall be adjusted to equal the nearest boundary of the corridor.

(3) The method selected for valuing pension fund assets shall be consistently applied from year to year within each plan and shall recognize appreciation and depreciation of assets in the same manner.

(4) The provisions of paragraphs (b) (1) through (3) of this section are not applicable to insured plans whose funds are co-mingled with the general funds of the insurance company.

(c) *Allocation of pension cost.* (1) For contractors who compute a composite pension cost covering plan participants in two or more segments, the allocation of pension cost to such segments shall be made on the following bases. For a plan whose benefits are based on salaries and wages, the pension cost shall be allocated to each segment on the basis of the salaries and wages for the participants of the segments. For a plan whose benefits are not based on salaries and wages, the pension cost shall be allocated to each segment on the basis of the number of participants in the segments. However, the contracting parties may agree to the use of any other allocation base if such other base establishes a beneficial or casual relationship between the segments and the pension cost.

(2) Unless an equitable allocation of pension cost to segments can be made by means of an allocation base used pursuant to paragraph (c)(1) of this section, separate pension cost for a segment shall be calculated whenever any of the following conditions exist for that segment: (i) there is a significant termination gain or loss attributable to the segment, (ii) the level of benefits, eligibility for benefits, or age distribution is significantly different for the segment than for the average of all segments included in the composite calculation, or (iii) the proper assumptions relating to termination, retirement age, or salary scale are significantly different for the segment than for the average of all segments included in the composite calculation. Pension cost shall also be separately calculated for a segment under circumstances where (A) the pension plan for that segment was, or becomes, merged with that of another segment, and (B) the ratios of assets to actuarial liabilities for each of the merged plans are significantly different from one another after applying the benefits in effect after the merger.

(3) Whenever the pension cost of a segment is required to be calculated separately pursuant to paragraph (c)(2) of this section, such calculations shall be prospective only; prior years' pension costs need not be re-determined.

(4) Calculations of termination gains or losses shall give consideration to factors such as unexpected early retirements, benefits becoming fully vested, and reinstatements or transfers without loss of benefits. An amount may be estimated for future reemployments.

(5) For a segment whose pension costs are required to be calculated separately pursuant to paragraph (c)(2) of this section, there shall be an initial memorandum allocation of pension fund assets to that segment, as follows: (i) If the necessary data are readily determinable the amount of assets to be allocated to the segment shall be the amount of funds contributed by, or on behalf of, the segment, increased by income received on such funds, and decreased by benefits and expenses paid from such funds; (ii) if the data specified in paragraph (c)(5)(i) of this section, are not readily determinable, assets shall be allocated to the segment in a manner consistent with the actuarial cost method used to determine annual pension cost; (iii) if the costs were determined under differing actuarial cost methods, assets shall be allocated to the segment in the same proportion as the actuarial liability of the segment bears to the actuarial liability of the plan, computed on the accrued benefit cost method. If after the effective date of this Standard a segment's pension plan becomes part of another pension plan, the amount of assets to be allocated to the segment shall be the market value of the segment's assets as of the effective date of the merger.

(6) If prior to the effective date of this Standard a contractor has been calculating pension cost separately for individual segments, the amount of assets previously allocated to those segments need not be changed.

(7) An initial allocation of assets to a segment pursuant to paragraph (c)(5) of this section shall be made only for the active pension plan participants of the segment. The inactive pension plan participants shall be considered as constituting a separate segment; assets shall likewise be allocated to this segment.

(8) After the initial allocation of assets, the contractor shall maintain a record of the portion of subsequent contributions, income, and expenses attributable to the segment; such income and expenses shall include a portion of any actuarial gains and losses attributable to the assets of the pension fund. Fund income and expenses shall be allocated to the segment in the same proportion that the assets allocated to the segment bears to total fund assets.

(9) If plan participants transfer among segments, contractors need not transfer funds unless a transfer is sufficiently large as to distort the segments' ratio of fund assets to actuarial liabilities. However, when an employee of the segment becomes inactive, assets shall be transferred from that segment to the segment established to accumulate the assets and actuarial liabilities for the inactive plan participants. The amount of funds transferred shall be that portion of the actuarial liabilities of the inactive participants that have been funded.

(10) Where pension cost is separately calculated for a segment, the total annual pension cost for the segment shall be the amount calculated for the segment, plus an allocated portion of the pension cost calculated for the inactive participants. Such an allocation shall be made on the basis of total pension costs calculated for the segments having active participants.

(11) Where pension cost is separately calculated for one or more segments, the actuarial cost method used for a plan shall be the same for all segments, as required by 4 CFR 412.50(b). Unless a separate calculation of pension cost for a segment is made because of a condition set forth in paragraph (c)(2)(iii) of this section, the same actuarial assumptions may be used for all segments covered by a plan.

(12) Nothing in this section shall preclude contracting parties from agreeing to the establishment of a separate fund for an individual segment.

(13) The requirements of paragraphs (c) (1) and (2) of this section are appropriate only for segments whose productive operations are continuing. However, if a segment is closed and a significant number of employees are thereby terminated from the plan, the contractor shall compute a net gain or loss from the plan applicable to that segment, irrespective of whether or not the pension plan is terminated. In computing such net gain or loss, the contractor shall determine the amount of any termination gain pursuant to paragraph (c)(4) of this section. The computation shall also establish gains or losses on pension fund assets, as follows: (i) A portion of the assets of the pension fund shall be allocated to the segment in accordance with the requirements of paragraph (c)(5) (i) through (iii) of this section; (ii) all of the assets shall be valued at market as of the date of the event (e.g., contract termination) that caused the closing of the segment. If such a date cannot be readily determined, the contracting parties shall agree on an appropriate date. The net gain or loss from the plan for the segment shall be used as a basis for negotiating any appropriate adjustments.

§ 413.60 Illustrations.

(a) *Assignment of actuarial gains and losses.* Contractor A has a defined-benefit pension plan whose costs are measured under an immediate-gain actuarial cost method. The contractor makes actuarial valuations every other year. At each valuation date, the contractor calculates the actuarial gains and losses that occurred since the previous valuation date and merges such gains and losses with the unfunded actuarial liabilities that are being amortized. Pursuant to § 413.40(a)(1), the contractor must make an actuarial valuation annually. Any actuarial gains or





HeinOnline -- 42 Fed. Reg. 6596 1977

Case 1:04-cv-01511-SGB Document 52-8 Filed 12/19/2006 Page 4 of 5



losses measured must be separately amortized over a 15-year period beginning with the date as of which the actuarial valuation is made. (Section 413.-50(a)(1) and (2).)

(b) *Valuation of the assets of a pension fund.* Contractor B has a pension plan, the assets of which are invested in equity securities, debt securities, and real property. The contractor, whose cost accounting period is the calendar year, has an annual actuarial valuation of the pension fund in June of each year; the effective date of the valuation is the beginning of that year. The contractor's method for valuing the assets of the pension fund is a follows: debt securities expected to be held to maturity are valued on an amortized basis running from initial cost at purchase to par value at maturity; land and buildings are valued at cost less depreciation taken to date; all equity securities and debt securities not expected to be held to maturity are valued on the basis of a 5-year moving average of market values. In making an actuarial valuation, the contractor must compare the values reached under the asset valuation method used with the market values of all of the assets (§ 413.40(b)). In this case, the assets are valued as of January 1 of that year. The contractor establishes the following values as of that date.

| | Asset valuation method | Market |
|---|---|---|
| Cash | $100,000 | $100,000 |
| Equity securities | 6,000,000 | 7,800,000 |
| Debt securities expected to be held to maturity | 550,000 | 600,000 |
| Other debt securities | 600,000 | 750,000 |
| Land and buildings, net of depreciation | 400,000 | 750,000 |
| Total | 7,650,000 | 10,000,000 |

Section 413.50(c)(2) requires that the total value of the assets of the pension fund fall within a corridor from 80 to 120 percent of market. The corridor for the plan's assets as of January 1 is from $12 million to $8 million. Because the asset value reached by the contractor—$7,650,000—falls outside the corridor, the value reached must be adjusted to equal the nearest boundary of the corridor: $8 million. In subsequent years the contractor must continue to use the same method for valuing assets § 413.-50(b)(3)). If the value produced falls inside the corridor, such value shall be used in measuring pension cost.

(c) *Allocation of pension cost.* (1) Contractor C has a defined-benefit pension plan covering employees at five segments. Pension cost is computed by use of an immediate-gain actuarial cost method. One segment (X) is devoted primarily to performing work for the Government. During the current cost accounting period, Segment X had a large and unforseeable reduction of employees because of a contract termination at the convenience of the Government and because the contractor did not receive an anticipated follow-on contract to one that was completed during the period. As a result, the plan has a large net termination gain. As a consequence of this gain a separate calculation of the pension cost for Segment X would result in a significantly different allocation of costs to that segment than would a composite calculation and allocation by means of a base. Accordingly, pursuant to § 413.-50(c)(2), the contractor must calculate the pension cost for Segment X as if it had its own pension plan. In doing so, the entire termination gain must be assigned to Segment X and amortized over 15 years. After the gain is amortized, the contractor is no longer required to separately calculate the costs for Segment X unless subsequent events require such separate calculation.

(2) Contractor D has a defined-benefit pension plan covering employees at ten segments, all of which have some contracts subject to Cost Accounting Standards. The pension plan's benefits are based on final five-year pay. The cost of the plan is calculated by use of a spread-gain actuarial cost method; the contractor computes normal cost as a percentage of payroll of all the segments and adds an amount representing amortization of a frozen initial unfunded actuarial liability. One of the segments (Segment Y) is entirely devoted to Government work. The contractor's policy is to place junior employees in this segment. The age distribution of the employees of the segment is significantly different from that of the other segments so that its pension cost would be significantly different if computed separately than if computed as a part of a computation which averages the ages of all employees covered by the plan. Pursuant to § 413.50(c)(2), the contractor must compute the pension cost for Segment Y as if it were a separate pension plan. Accordingly, the contractor must allocate a portion of the pension fund's assets to Segment Y. However, because this portion connot be readily determined, § 413.50(c)(5)(ii) permits the allocation to be made on the basis of the actuarial cost method that was used to determine the pension cost for the plan. Once the assets have been allocated, in future cost accounting periods the contractor shall make separate pension cost calculations for Segment Y based on the actual age distribution for the segment. Because the factors comprising pension cost for the other nine segments are relatively equal, the contractor may compute pension cost for these nine segments by using composite factors and developing a percentage of payroll for the nine segments. Unless the contracting parties agree to the use of another allocation base, the pension cost allocated to each of the nine segments shall be the product of the percentage developed and the payroll of each segment (§ 413.50(c)(1)).

(3) In July 1974, Contractor E acquired Contractor F and made it Segment F. Prior to the merger, each contractor had its own pension plan. Under the terms of the merger, contractor F's pension plan was merged with that of Contractor E. The actuarial assumptions, currently salary scale, and other plan characteristics are about the same for Segment F and Contractor E's other segments. However, based on the same benefits at the time of the merger, the plan of Contractor F had a disproportionately larger unfunded actuarial liability than did Contractor E's plan. Any grouping of the assets and actuarial liabilities of both plans would result in significantly different pension cost allocation to Contractor E's segments than if pension cost were computed for Segment F on the basis that it had a separate pension plan. Accordingly, pursuant to § 413.50(c)(5)(i), Contractor E must allocate to Segment F a portion of the assets of combined plan. The amount to be allocated shall be the value of F's pension plan assets at the date of the merger, adjusted for subsequent contributions and expenditures applicable to the segment (Section 413.50(c)(8)). Contractor E must use these amounts of assets as a basis for calculating the annual pension cost applicable to Segment F.

(4) Contractor G has a pension plan covering employees at seven segments. The contractor has been making a composite pension cost calculation for all of the segments. However, the contractor determines that, pursuant to this Standard, separate pension costs must be calculated for one of the segments. In accordance with § 413.50(c)(7), the contractor must allocate fund assets for the active participants of that segment. The contractor must also create a segment to accummulate the assets and actuarial liabilities for the plan's inactive participants. Pursuant to § 413.50(c)(9), when participants become inactive, the contractor must transfer assets to the segment for inactive participants to cover the actuarial liabilities for the participants that become inactive. However, the amount to be transferred shall be proportionate to the percentage of such liabilities that are funded.

(5) Contractor H has a pension plan covering employees at ten segments. The contractor makes a composite pension cost calculation for all segments. The contractor's records show that the termination experience for one segment—primarily performing Government work—has been significantly different from the average turnover experience of the other segments. Moreover, the contractor assumes that such different experience will continue. Because of this fact, and because the application of a different termination assumption would result in significantly different costs being charged to the Government, the contractor must develop separate pension cost for that segment. In accordance with § 413.50(c)(2), the amount of pension cost must be based on the proper termination assumption for that segment; however, as provided in § 413.50(c)(11), all other assumptions for that segment may be the same as those for the remaining segments.

(6) Contractor I has a five-year contract to operate a Government-owned facility. The pension plan for the employees of that facility is a part of the con-





HeinOnline -- 42 Fed. Reg. 6597 1977

Case 1:04-cv-01511-SGB Document 52-8 Filed 12/19/2006 Page 5 of 5



tractor's single pension plan which covers salaried and hourly employees at other locations. At the conclusion of the five-year period, the Government decides not to renew the contract. Although some employees are hired by the successor contractor, Contractor I must still terminate many employees. Pursuant to § 413.50(c)(12), Contractor I must compute a gain or loss on the pension plan for that facility. The contractor first calculates the termination gain or loss. Because of the size of the termination, the Internal Revenue Service considers it to be a partial plan termination. As such, the terminated employees become fully vested in their accrued benefits. As a result, there is a termination loss of $2.5 million. The contractor must then determine the market value of the pension fund assets allocated to the facility. The difference between the market value of the assets and the expected value of the assets represents the gain or loss on the assets. In this case, there was a gain of $1.5 million. Thus, for this facility, there was a net loss of $1 million for the plan. However, there may be other factor to be considered in arriving at the net cost of a plan (such as transfer of pension funds for employees transferring to the successor contractor, or, in case of a whole or partial plan termination, requirements imposed by other Federal agencies). The net gain or loss from all factors shall be used as a basis for negotiating any appropriate adjustments.

§ 413.70 **Exemptions.**

None for this Standard.

§ 413.80 **Effective date.**

(a) The effective date of this Standard is [effective date of final rulemaking].

(b) This Standard shall be followed by each contractor on or after the start of his next cost accounting period beginning after the receipt of a contract to which this Cost Accounting Standard is applicable.

ARTHUR SCHOENHAUT,
*Executive Secretary.*

[FR Doc.77-3312 Filed 2-2-77;8:45 am]

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

[14 CFR Part 39]

[Docket No. 77-GL-2]

### McCAULEY MODEL D2AF34C65 AND D2AF34C81 SERIES PROPELLERS

### Proposed Airworthiness Directives

The Federal Aviation Administration is considering amending Part 39 of the Federal Aviation Regulations by adding an airworthiness directive applicable to McCauley Model D2AF34C65 and D2AF34C81 series propellers. There have been cracks and failures of the hubs that could result in blade separation. Since this condition is likely to exist or develop in other propellers of the same design, the proposed airworthiness directive would require periodic inspection of the hubs for fatigue cracks until replaced by McCauley oil-filled hubs containing a dyed oil crack detection system.

Interested persons are invited to participate in the making of the proposed rule by submitting such written data, views or arguments as they may desire. Communications should identify the docket number and be submitted in duplicate to the Federal Aviation Administration, Office of the Regional Counsel, Attention: Rules Docket, 2300 East Devon Avenue, Des Plaines, Illinois 60018. All communications received on or before March 23, 1977 will be considered by the Administrator before taking action upon the proposed rule. The proposals contained in this notice may be changed in light of comments received. All comments will be available, both before and after the closing date for comments, in the Rules Dockets for examination by interested persons.

This amendment is proposed under the authority of sections 313(a), 601 and 603 of the Federal Aviation Act of 1958 (49 U.S.C. 1354(a), 1421, 1423) and section 6(c) of the Department of Transportation Act (49 U.S.C. 1655(c)).

In accordance with Departmental Regulatory Reform dated March 23, 1976, we have determined that the expected impact of this proposed regulation is so minimal that it does not warrant an evaluation.

In consideration of the foregoing, it is proposed to amend § 39.13 of Part 39 of the Federal Aviation Regulations by adding the following new airworthiness directive:

McCAULEY PROPELLERS. Applies to the following Model D2AF34C65 and D2AF34C81 series propellers installed on but not limited to Cessna Model 310J, E310J, 310K, 310L, and 310N aircraft.

D2AF34C65 or -XM
D2AF34C65-A or -AM
D2AF34C65-F or -FM
D2AF34C65-J or -JM
D2AF34C65-K or -KM
D2AF34C65-L or -LM
D2AF34C65-N or -NKM
D2AF34C81 or -XM
D2AF34C81-A or -AM
D2AF34C81-F or -FM
D2AF34C81-J or -KM
D2AF34C81-K or -KM
D2AF34C81-L or -LM
D2AF34C81-M
D2AF34C81-N

Compliance required as indicated, unless already accomplished. To detect propeller hub cracks and prevent possible failure, accomplish the following:

(a) Model D2AF34C65, -A, -F, -J, -K, or -L, and D2AF34C81, -A, -F, -J, -K, or -L propellers.

(1) Propeller hubs with less than 500 hours time in service, inspect in accordance with paragraph (c)(1) within 525 hours total time and reinspect in accordance with paragraph (c)(1) every 100 hours time in service from last inspection.

(2) Propeller hubs with 500 or more but less than 1200 hours time in service, inspect in accordance with paragraph (c)(1) within the next 25 hours time in service after the effective date of this AD and reinspect in accordance with paragraph (c)(1) every 100 hours time in service from last inspection.

(3) Propeller hubs with 1200 or more hours time in service, or whose total time in service is unknown, inspect in accordance with paragraph (c)(2) within the next 25 hours time in service after the effective date of this AD, unless already accomplished within the last 300 hours time in service and reinspect in accordance with paragraph (c)(2) every 300 hours time in service from the last inspection.

(b) Model D2AF34C65-XM, -AM, -FM, -JM, -KM, -LM, -M, -N, or -NKM, and D2AF34C81-XM, -AM, -FM, -JM, -KM, -LM, -M, or -N propellers.

(1) Propeller hubs with less than 1200 hours time in service, inspect in accordance with paragraph (c)(2) within 1250 hours total time in service and reinspect in accordance with paragraph (c)(1) every 100 hours time in service from last inspection.

(2) Propeller hubs with 1200 or more but less than 1800 hours time in service, inspect in accordance with paragraph (c)(2) within the next 50 hours time in service after the effective date of this AD unless already accomplished within the last 300 hours, and reinspect in accordance with paragraph (c)(1) every 100 hours time in service from last inspection.

(3) Propeller hubs with 1800 hours or more time in service or whose total hours in service are unknown inspect in accordance with paragraph (c)(2) within the next 50 hours time in service after the effective date of this AD, unless already accomplished within the last 300 hours time in service and reinspect in accordance with paragraph (c)(2) every 300 hours time in service from the last inspection.

(c) Required action.

(1) Inspect all external surfaces of propeller hub for cracks by dye penetrant method. Replace before further flight any cracked hub with an oil-filled Model D2AF34C65-XMO, -AMO, -FMO, -JMO, -KMO, -LMO, -MO, -NO, -NKMO, -O; or D2AF34C81-XMO, -AMO, -FMO, -JMO, -KMO, -LMO, -MO, -NO, or -O oil-filled hub as applicable in accordance with McCauley Service Bulletin No. 125 dated February 15, 1977.

(2) Remove propeller from aircraft and disassemble to allow complete inspection of hub. Inspect all external and internal hub surfaces including retention threads for cracks using dye penetrant method in accordance with McCauley Service Letter 1974-3 dated March 29, 1974. Replace before further flight any cracked hub with a Model D2AF34C65 or D2AF34C81 series oil-filled hub as in paragraph (c)(1).

(d) The foregoing inspections may be discontinued after replacement of Model D2AF34C65 or D2AF34C81 series hubs with McCauley oil-filled hubs as in paragraph (c)(1).

The manufacturer's specifications and procedures identified and described in this directive are incorporated herein and made part hereof pursuant to 5 U.S.C. 522(a)(1). All persons affected by the directive who have not already received these documents from the manufacturer, may obtain copies upon request to McCauley Accessory Division, Cessna Aircraft Company, Box 7, Roosevelt Station, Dayton, Ohio 45417. These documents may also be examined at the Great Lakes Regional Office, 2300 East Devon Avenue, Des Plaines, Illinois 60018, and at FAA Headquarters, 800 Independence Avenue, S.W., Washington, D.C. 20591. A historical file on this AD which includes incorporated material is maintained by the FAA, at its headquarters in Washington, D.C. and at the Great Lakes Region.

NOTE.—The Federal Aviation Administration has determined that this document does not contain a major proposal requiring preparation of an Inflation Impact Statement





HeinOnline -- 42 Fed. Reg. 6598 1977