# In the United States Court of Federal Claims

No. 04-1511C
(Consolidated with Case No. 04-1512C)
Filed April 26, 2007
**TO BE PUBLISHED**

| | | |
|---|---|---|
| AT&T CORP., Plaintiff, and LUCENT TECHNOLOGIES, INC., Plaintiff, v. THE UNITED STATES, Defendant. | * | Amended Cost Accounting Standard 413, 48 C.F.R. §§ 9904.413-30(a)(19), (20) 9904.413-50(c)(12); Contract Disputes Act, 41 U.S.C. §§ 601, *et seq.*; Counterclaim, 28 U.S.C. §§ 1503, 2508; Summary Judgment, RCFC 56(c); Segment Closing; Segment Closing Adjustment. |

**Thomas A. Lemmer**, McKenna, Long & Aldridge, L.L.P., Denver, Colorado, counsel for plaintiff, Lucent Technologies Incorporated.

**Howard Stanislawski**, Sidley, Austin, L.L.P., Washington, D.C., counsel for plaintiff, AT&T Corporation.

**C. Coleman Bird**, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., counsel for defendant.

## MEMORANDUM OPINION AND ORDER REGARDING AMENDED MOTION FOR SUMMARY JUDGMENT AS TO COUNT I OF THE COMPLAINT AND COUNT I OF THE COUNTERCLAIM

**BRADEN, *Judge*.**

Lucent Technologies Incorporated ("Lucent")'s Amended Motion for Summary Judgment requests that the United States Court of Federal Claims interpret whether a "segment closing," based on a segment sale or transfer, requires the sale or transfer of *all* of a segment's contracts and related assets. *See* 48 C.F.R. §§ 9904.413-30(a)(20)(i), 9904.413-50(c)(12). This is an issue of first impression.

## I. RELEVANT FACTS.[1]

In 1997, Lucent owned an Advanced Technology Systems Business Unit ("ATS Business Unit") that principally was engaged in producing underwater detection and communications equipment for the United States Department of Defense ("DOD"), under contracts governed by the Cost Accounting Standards ("CAS-covered contracts"). *See* Counterclaim ¶ 156, Answer ¶ 156. Lucent maintained two defined employee benefit pension plans.[2] *See* Counterclaim ¶ 157, Answer ¶ 157.

For the purpose of resolving Lucent's November 9, 2006 Amended Motion for Summary Judgment, the parties have stipulated to the following facts. On October 1, 1997, Lucent and General Dynamics Corporation ("General Dynamics") signed an "Agreement for the Purchase and Sale of Assets" for Lucent's ATS Business Unit ("October 1, 1997 Agreement"). *See* J. Stip. Order ¶ 1. Pursuant to the October 1, 1997 Agreement, Lucent transferred substantially all of the ATS Business Unit contracts to General Dynamics and sold certain ATS Business Unit assets to General Dynamics. *Id.* ¶ 2. The October 1, 1997 Agreement, however, allowed Lucent to retain one or more ongoing CAS-covered contracts that the ATS Business Unit was performing, as of October 1, 1997. *Id.* ¶ 3. In addition, Lucent retained other ATS Business Unit assets and employees. *Id.*

On September 30, 2003, a Divisional Administrative Contracting Officer ("DACO"), employed by the Defense Contract Management Agency ("DCMA or the Government"), issued a final decision that the DCMA was entitled to $28,260,630, plus $16,181,845 in interest, pursuant to 48 C.F.R. § 9904.413-50(c)(12), because Lucent's sale of certain assets to General Dynamics was a "segment closing." *See* Compl. ¶¶ 2-4; *see also* Counterclaim ¶ 166.

---

[1] The relevant facts recited herein were derived from: Lucent's September 29, 2004 Complaint ("Compl."); the United States ("Government")'s January 28, 2005 Answer and Counterclaim ("Counterclaim"); Lucent's March 10, 2005 Answer to the Government's Counterclaim ("Answer"); the court's September 26, 2006 Order ("J. Stip. Order"); Lucent's November 9, 2006 Amended Motion for Summary Judgment and Memorandum in support ("Pl. Mot."); the Government's December 19, 2006 Response ("Gov't Resp."); Lucent's January 19, 2007 Reply ("Pl. Reply"); the Government's February 20, 2007 Surreply ("Gov't Surreply"); and the March 28, 2007 Oral Argument ("TR 1-92").

[2] "[A] [d]efined-benefit pension plan means a pension plan in which the benefits to be paid or the basis for determining such benefits are established in advance and the contributions are intended to provide the stated benefits." 48 C.F.R. § 9904.412-30(a)(10).

## II. PROCEDURAL HISTORY.

On September 29, 2004, Lucent filed a Complaint in the United States Court of Federal Claims appealing the DACO's September 30, 2003 final decision and seeking a declaratory judgment that: 1) Lucent did not close a segment, as defined in 48 C.F.R. § 9904.413-30(a)(20), and therefore did not trigger an adjustment, pursuant to 48 C.F.R. § 9904.413-50(c)(12); 2) assuming a segment closing occurred, the DCMA can only recover surplus pension assets on contracts that it has participated in, pursuant to 48 C.F.R. § 9904.413-50(c)(12); 3) the DACO used incorrect figures in calculating the asserted segment closing adjustment; 4) assuming a segment closing occurred, the DCMA is not entitled to recover surplus pension assets attributable to inactive personnel, pursuant to 48 C.F.R. § 9904.413-50(c)(12); and 5) assuming a segment closing occurred, the DACO utilized an inflated and incorrect interest factor in making the September 30, 2003 final decision. *See* Compl. ¶¶ 73-117. The Complaint also alleges that, assuming a segment closing occurred, the DCMA is liable for breach of contract in the amount of $18,708,562 for failure to pay its share of Lucent's post-retirement benefit ("PRB") liabilities. *Id.* ¶¶ 118-27.

On January 28, 2005, the Government filed an Answer and Counterclaim, alleging that Lucent's sale of the ATS Business Unit to General Dynamics was a "segment closing," thereby rendering Lucent liable for the Government's share of any surplus pension assets, with interest for non-compliance with the applicable regulations. *See* Counterclaim ¶¶ 167-73.

On March 10, 2005, Lucent filed an Answer to the Government's Counterclaim. On May 2, 2005, the parties filed a Joint Preliminary Status Report.[3]

On August 2, 2005, Lucent filed a Motion for Summary Judgment, Memorandum of Points and Authorities, and Proposed Findings in support. On January 13, 2006, February 15, 2006, and March 8, 2006, the parties filed Joint Status Reports. On May 15, 2006, the Government filed a Motion for an Order Denying Lucent's Motion for Summary Judgment Without Prejudice or, in the

---

[3] On May 6, 2005, the Government filed a Notice of Directly Related Cases [03-2258 ("*AT&T I*"), 04-1512 ("*AT&T II*")] and a Motion to Transfer and Suggestion of Appropriateness of Consolidation ("Motion to Transfer and Consolidate"). On May 11, 2005, the court convened a status conference. On May 18, 2005, Lucent filed a Response to the Government's Motion to Transfer and Consolidate. On October 13, 2005, *AT&T I* and *AT&T II* were transferred to the undersigned judge.

On November 1, 2005, the court issued an Order in response to the Government's Motion to Transfer and Consolidate, requesting briefing on the issue of consolidation. On November 21, 2005, Lucent filed a Supplemental Brief. On the same day, AT&T Corp. filed a Response to the Government's May 6, 2005 Motion to Transfer and Consolidate. On December 12, 2005, the Government filed a Response to the court's November 1, 2005 Order and Reply. On January 31, 2006, the court issued a Memorandum Opinion and Order granting the Government's Motion to consolidate *AT&T II* with the present action, but declining to consolidate *AT&T I*. *See Lucent Techs., Inc.* v. *United States*, 69 Fed. Cl. 512 (2006).

Alternative, Granting a Continuance to Permit Essential Discovery. On June 5, 2006, Lucent filed a Response. On June 23, 2006, the Government filed a Reply. On June 29, 2006, Lucent filed a Motion for a Hearing on the Government's May 15, 2006 Motion. On September 25, 2006, the court held a hearing. On September 26, 2006, the court issued an Order: (1) directing Lucent to withdraw the August 2, 2005 Motion for Summary Judgment and file an Amended Motion; and (2) adopting the parties' Joint Stipulation of Facts for the resolution of the Amended Motion for Summary Judgment. On November 9, 2006, Lucent filed an Amended Motion for Summary Judgment and Memorandum of Points and Authorities in support. On December 19, 2006, the Government filed a Response. On January 19, 2007, Lucent filed a Reply. On February 7, 2007, the Government filed a Motion for Leave to file a Surreply, which the court granted on February 14, 2007. The Government filed a Surreply on February 20, 2007. The court held an oral argument on March 28, 2007.

## III. DISCUSSION.

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States* v. *Testan*, 424 U.S. 392, 398 (1976)). Therefore, in order to come within the jurisdictional reach of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act.").

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under . . . the Contract Disputes Act of 1978, including a dispute concerning . . . rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2); *see Alliant Techsystems, Inc.* v. *United States*, 178 F.3d 1260, 1270 (Fed. Cir. 1999) (holding that "the Tucker Act grants the United States Court of Federal Claims jurisdiction to grant nonmonetary relief in connection with contractor claims, including claims requesting an interpretation of contract terms.").

The Contract Disputes Act, 41 U.S.C. §§ 601, *et seq.*, provides, as a prerequisite to this court's jurisdiction, that the plaintiff exhaust available administrative remedies by first submitting a "claim" to the responsible contracting officer and obtaining a "final decision" from that contracting officer. *See* 41 U.S.C. § 605(a), (b) (The "contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an

appeal or suit is timely commenced as authorized by this chapter."). Thereafter, a contractor may bring an action to the United States Court of Federal Claims within 12 months of the contracting officer's final decision. *See* 41 U.S.C. §§ 609(a)(1), (3).

The United States Court of Federal Claims also has "jurisdiction to render judgment upon any setoff or demand by the United States against any plaintiff in such court." *See* 28 U.S.C. § 1503; *see also* 28 U.S.C. § 2508 ("Upon the trial of any suit in the United States Court of Federal Claims in which any setoff, counterclaim, claim for damages, or other demand is set up on the part of the United States against any plaintiff making claim against the United States in said court, the court shall hear and determine such claim or demand both for and against the United States and plaintiff. If upon the whole case it finds that the plaintiff is indebted to the United States it shall render judgment to that effect, and such judgment shall be final and reviewable.").

In this case, there is no dispute that a contract existed between Lucent and the Government. *See* Counterclaim ¶ 156, Answer ¶ 156. In addition, on September 30, 2003, the DACO issued a final decision regarding the Government's entitlement, pursuant to 48 C.F.R. § 9904.413-50(c)(12). Lucent's September 29, 2004 Complaint challenging the final decision was timely filed. *See* 41 U.S.C. §§ 609(a)(1), (3). Accordingly, the court has jurisdiction to adjudicate Count I of Lucent's Complaint. *See* 41 U.S.C. §§ 605(a), (b), 609(a)(1), (3). In addition, the court has jurisdiction to adjudicate Count I of the Government's Counterclaim. *See* 28 U.S.C. §§ 1503, 2508.[4]

### B. Standard of Review On A Motion For Partial Summary Judgment – RCFC 56(c).

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See Moden* v. *United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) ("Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."); *see also* RCFC 56(c).

Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an

---

[4] In the Answer and Counterclaim, the Government contends that the court does not have subject matter jurisdiction over Count VI of the Complaint, Lucent's PRB claim. *See* Counterclaim at 17. This Memorandum Opinion does not address that issue, because it is not the subject of Lucent's Amended Motion for Summary Judgment.

otherwise properly supported motion for summary judgment[.]" *Id*. Therefore, to avoid summary judgment, the nonmoving party must put forth evidence sufficient for a reasonable factfinder to return a verdict for that party. *Id*. at 248-50 (citations omitted).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding the moving party must meet its burden "by 'showing' – that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case"); *see also Riley & Ephriam Constr. Co., Inc.* v. *United States*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact."). Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the nonmoving party to show the existence of a genuine issue for trial. *See Novartis Corp.* v. *Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial.").

A trial court is required to resolve all doubt over factual issues in favor of the nonmoving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). And, all reasonable inferences and presumptions must be resolved in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255; *see also Moden*, 404 F.3d at 1342 ("[A]ll justifiable inferences [are drawn] in favor of the party opposing summary judgment").

### C. The Genesis and Evolution Of Amended Cost Accounting Standard 413.

The Defense Production Act of 1950, as amended in 1970, established an independent five-member Cost Accounting Standards Board ("CAS Board") to "promulgate cost-accounting standards designed to achieve uniformity and consistency in the cost-accounting principles followed by defense contractors and subcontractors under Federal contracts." Pub. L. No. 91-379, § 719(g), 84 Stat. 796 (Aug. 15, 1970) (codified at 50 U.S.C. § 2168(g)). Thereafter, the CAS Board issued nineteen Cost Accounting Standards that measure, assign, and allocate a variety of costs, together with regulations governing contract coverage and disclosure requirements. *See Boeing N. Amer., Inc.* v. *Roche*, 298 F.3d 1274, 1282-83 (Fed. Cir. 2002) (*en banc*). On September 30, 1980, the CAS Board ceased operations, because Congress failed to appropriate funds. Section 719 of the Defense Production Act, however, was not repealed and the CAS regulations and disclosure requirements survived. *See* Pub. L. No. 100-679, § 5, 102 Stat 4055 (Nov. 17, 1988) (establishing current CAS Board and providing that: "All cost accounting standards, waivers, exemptions, interpretations, modifications, rules, and regulations promulgated by the Cost Accounting Standards Board under section 719 of the Defense Production Act of 1950 (50 U.S.C.App. 2168) shall remain in effect unless and until amended, superseded, or rescinded by the Board pursuant to this section."); *see also* Karen L. Manos, *Government Contract Costs & Pricing*, 1 GC-COSTS 2:C:2. On September 30, 1987, the Federal Acquisition Regulations ("FAR") were amended to incorporate the CAS rules and regulations promulgated by the original CAS Board. *See* 52 Fed. Reg. 35,612 (Sept. 22, 1987). In 1988, Congress enacted Office of Procurement Policy Act Amendments to reestablish the CAS Board within the Office of Procurement Policy of the Office of Management and Budget. *See* Pub.

L. No. 100-679, § 5, 102 Stat. 4055 (Nov. 17, 1988) (codified at 41 U.S.C. § 422 (2003)). In 1992, the new CAS Board recodified the CAS rules and regulations reported in FAR Part 30 into 48 C.F.R. Parts 9903 and 9904. *See* 57 Fed. Reg. 14,148 (Apr. 17, 1992), as corrected by 57 Fed. Reg. 34,078 (Aug. 3, 1992).

The original CAS 412 (4 C.F.R. § 412 (1975)) and the original CAS 413 (4 C.F.R. § 413 (1978)) were promulgated to regulate "the measurement, assignment, and allocation of pension costs to government contracts." *See Teledyne, Inc.* v. *United States*, 50 Fed. Cl. 155, 163 (2001) (describing regulatory history of CAS 413). As expressed in the preamble to the original CAS 412:

> The need for such measurement and assignment criteria for contracts is particularly critical because of the long-range projections used in computing pension cost and because the many techniques available for measuring and assigning such cost have significant impacts there-on. The significant amounts involved in annual pension cost calculations, the changes in the mix of contractors' Government and commercial business, and the settlement of individual contracts long before actual pension costs can be determined create a special need to provide criteria relative to the assignment of pension costs among cost accounting periods and the allocation of such costs to the cost objectives of the periods.

40 Fed. Reg. 43,873, 43,874 (Sept. 24, 1975).

The original CAS 412 required contractors with government contracts, including defined-benefit pension plans, to measure pensions plan costs for each cost accounting period using "an actuarial cost method" and allocate such costs to all applicable contracts. *See* 4 C.F.R. §§ 412.20, 412.40(b)(1) (1986). In addition, contractors were required to reconcile fluctuations in the annual pension costs by amortizing those costs over a period of time. *See* 4 C.F.R. § 412.50 (a)(1); *see also Teledyne, Inc.*, 50 Fed. Cl. at 163-64.[5]

The purpose of the original CAS 413 was:

> to provide guidance for adjusting pension cost by measuring actuarial gains and losses and assigning such gains and losses to cost accounting periods. The Standard also provides the bases on which pension cost shall be allocated to segments of an organization. The provisions of this Cost Accounting Standard should enhance uniformity and consistency in accounting for pension costs.

4 C.F.R. § 413.20.

---

[5] The original CAS 412 subsequently was amended, but the portions of the amended CAS 412 relevant to this case retained the original language. *See* 48 C.F.R. §§ 9904.412-20, 9904.412-40, 9904.412-50.

In addition, the original CAS 413 provided that: actuarial gains and losses must be calculated annually and assigned to specific cost accounting periods, *see* 4 C.F.R. § 413.40(a); pension costs must be allocated to segments of an organization, *see* § 413.40(c); actuarial gains and losses must be amortized over a 15-year period, *see* § 413.50(a)(2); and a cost adjustment of "previously-determined pension costs" must be performed whenever there is a "segment closing." *See* § 413.50(c)(12); *see also Teledyne, Inc.*, 50 Fed. Cl. at 164.

Regarding segment closings, the preamble, accompanying the final rule provided:

> As a general rule, [CAS 413] . . . is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost accounting periods in determining the costs for the segment. However, a problem arises in cases where a segment is closed. Because there are no future periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs. This adjustment is not an actuarial gain or loss as defined in the Standard.

4 C.F.R., Pt. 413, Preamble A.

The final rule was the culmination of several revisions and rounds of public comment. In June 1976, the CAS Board staff circulated a proposed version of CAS 413 for public comment that included the following language:

> If all, or substantially all, of a segment is closed, and a significant number of employees are thereby separated from the plan, the contractor shall compute a net gain or loss from the plan applicable to that segment. . . . The net gain (or loss) shall be used as a basis for determining any appropriate adjustments consistent with existing Government contract regulations. If the contracting parties agree, the net gain or loss may be assigned to the current or ensuing cost accounting period.

Cost Accounting Standards Board, Staff Paper, Cost Accounting Standard, Adjustment and Allocation of Pension Cost (Jan. 7, 1977).

On February 3, 1977, the CAS Board published proposed CAS 413 that provided in relevant part:

> if a segment is closed and a significant number of employees are thereby terminated from the plan, the contractor shall compute a net gain or loss from the plan applicable to that segment . . . The net gain or loss from the plan for the segment shall be used as a basis for negotiating any appropriate adjustments.

*See* 42 Fed. Reg. 6591, 6596 (Feb. 3, 1977).

The final version of the original CAS 413.50(c)(12), however, provided:

> If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The determination of the actuarial liability shall give consideration to any requirements imposed by agencies of the United States Government. In computing the market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraph (c)(5)(i) and (ii) of this section. The market value of the assets allocated to the segment shall be the segment's proportionate share of the total market value of the assets of the pension fund. The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment. If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date. The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.

42 Fed. Reg. 37,191, 37,198 (Jul. 20 1977); *see also* 4 C.F.R. § 413.50(c)(12) (1978).

Significantly, the term "segment," appears not to have been controversial and was defined as "[o]ne of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service." 4 C.F.R. § 413.30(a)(11).

In response to the concerns of the DOD Inspector General and others about over-funded pensions,[6] the new CAS Board amended the original CAS 413 in 1995 to provide a specific definition of "segment closing" and include formulas for allocating any pension surplus or deficit between the Government and contractors during a segment closing adjustment. *See Teledyne, Inc.,*

[6] When CAS 412 and 413 were originally promulgated, the primary concern was under-funded pension plans. As the new CAS Board explained: "Adequate or minimum, rather than excess funding, concerned pension managers of that era. Over the intervening years, government contractors' pension plans have become more adequately funded. At the same time, limits on the maximum amount of benefits that can be provided by a qualified pension plan have been considerably constrained in real terms[.]" 60 Fed. Reg. 16,534, 16,534-35 (March 30, 1995). Over-funded pension plans can also be "traced to changes in the tax laws, the economic market, and the diminishing size of the defense industry labor force." *See Teledyne, Inc.*, 50 Fed. Cl. at 166.

50 Fed. Cl. at 167; *see also* 48 C.F.R. §§ 9904.413-30(a)(20), 9904.413-50(c)(12).[7] The amended

---

[7] The amended CAS 413.50(c)(12), providing for a segment closing adjustment, states:

> (12) If a segment is closed, if there is a pension plan termination, or if there is a curtailment of benefits, the contractor shall determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The difference between the market value of the assets and the actuarial accrued liability for the segment represents an adjustment of previously-determined pension costs.
>
> (i) The determination of the actuarial accrued liability shall be made using the accrued benefit cost method. The actuarial assumptions employed shall be consistent with the current and prior long term assumptions used in the measurement of pension costs. If there is a pension plan termination, the actuarial accrued liability shall be measured as the amount paid to irrevocably settle all benefit obligations or paid to the Pension Benefit Guarantee Corporation.
>
> (ii) In computing the market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraphs (c)(5)(i) and (ii) of this subsection. The market value of the assets shall be reduced by the accumulated value of prepayment credits, if any. Conversely, the market value of the assets shall be increased by the current value of any unfunded actuarial liability separately identified and maintained in accordance with 9904.412-50(a)(2).
>
> (iii) The calculation of the difference between the market value of the assets and the actuarial accrued liability shall be made as of the date of the event (e.g., contract termination, plan amendment, plant closure) that caused the closing of the segment, pension plan termination, or curtailment of benefits. If such a date is not readily determinable, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date.
>
> (iv) Pension plan improvements adopted within 60 months of the date of the event which increase the actuarial accrued liability shall be recognized on a prorata basis using the number of months the date of adoption preceded the event date. Plan improvements mandated by law or collective bargaining agreement are not subject to this phase-in.
>
> (v) If a segment is closed due to a sale or other transfer of ownership to a successor in interest in the contracts of the segment and all of the pension plan assets and actuarial accrued liabilities pertaining to the closed segment are transferred to the successor segment, then no adjustment amount pursuant to this paragraph (c)(12) is required. If only some of the pension plan assets and actuarial accrued liabilities of

CAS 413 ("Amended CAS 413") defined a "segment closing" as follows:

> Segment closing means that a segment has (i) been sold or ownership has been otherwise transferred, (ii) discontinued operations, or (iii) discontinued doing or actively seeking Government business under contracts subject to this Standard.

48 C.F.R. § 9904.413-30(a)(20).

In addition, the new CAS Board provided the following guidance about the definition of "segment closing:"

> *Comment*. Four commenters suggested that the definition of a segment closing should be clarified. Concerns were raised that an internal reorganization would require a current period adjustment for a segment closing, even though neither the segment's nor the contractor's relationship to the Government had changed.

---

> the closed segment are transferred, then the adjustment amount required under this paragraph (c)(12) shall be determined based on the pension plan assets and actuarial accrued liabilities remaining with the contractor. In either case, the effect of the transferred assets and liabilities is carried forward and recognized in the accounting for pension cost at the successor contractor.
>
> (vi) The Government's share of the adjustment amount determined for a segment shall be the product of the adjustment amount and a fraction. The adjustment amount shall be reduced for any excise tax imposed upon assets withdrawn from the funding agency of a qualified pension plan. The numerator of such fraction shall be the sum of the pension plan costs allocated to all contracts and subcontracts (including Foreign Military Sales) subject to this Standard during a period of years representative of the Government's participation in the pension plan. The denominator of such fraction shall be the total pension costs assigned to cost accounting periods during those same years. This amount shall represent an adjustment of contract prices or cost allowance as appropriate. The adjustment may be recognized by modifying a single contract, several but not all contracts, or all contracts, or by use of any other suitable technique.
>
> (vii) The full amount of the Government's share of an adjustment is allocable, without limit, as a credit or charge during the cost accounting period in which the event occurred and contract prices/costs will be adjusted accordingly. However, if the contractor continues to perform Government contracts, the contracting parties may negotiate an amortization schedule, including interest adjustments. Any amortization agreement shall consider the magnitude of the adjustment credit or charge, and the size and nature of the continuing contracts.

48 C.F.R. § 9904.413-50(c)(12).

> *Response.* The definition has been revised to delineate three conditions requiring a current period adjustment. The first condition occurs when there is a change in ownership for the segment, not just a simple reorganization within the contractor's internal structure. The second event is the one addressed in the NPRM [Notice of Proposed Rulemaking]; that is, when the contractual relationship ends because the segment operationally ceases to exist. The third case addresses the end of the contractual relationship with the Government, whether the segment continues in operation or not.

60 Fed. Reg. 16,534, 16,539 (March 30, 1995).

Otherwise, the portions of Amended CAS 413 relevant to "segment closings" retained the language of the original CAS 413.

**D. Governing Precedent Regarding Interpretation Of Cost Accounting Standards.**

The United States Court of Appeals for the Federal Circuit has stated that the trial court's "task in interpreting the meaning of . . . FAR provisions [implementing a CAS] is ultimately to ascertain the CAS Board's intended meaning *when* it promulgated the CAS." *See Perry* v. *Martin Marietta Corp*., 47 F.3d 1134, 1137 (Fed. Cir. 1995) (emphasis added). Accordingly, the court's analysis begins "by first looking at the text of the relevant provisions and 'any guidance that the CAS Board has published to aid in interpretation.'" *Allegheny Teledyne, Inc*. v. *United States*, 316 F.3d 1366, 1373 (Fed. Cir. 2003) (emphasis added) (*quoting Perry*, 47 F.3d at 1137).[8]

Where the text of the CAS does not provide a definition of a particular term or phrase, the United States Court of Appeals for the Federal Circuit has instructed the trial court to consult dictionaries or definitions in related regulations for interpretative guidance. *See Rumsfeld* v. *United Tech. Corp*., 315 F.3d 1361, 1369-70 (Fed. Cir. 2003) ("We initially turn, therefore, to standard dictionary definitions and other pertinent regulations.") (citing *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992) (relying on dictionary definition and related statutory provisions to interpret the text of a statute)); *see also Wis. Dep't of Revenue* v. *William Wrigley, Jr., Co.*, 505 U.S. 214, 223 (1992) (referring to BLACK'S LAW DICTIONARY to interpret the text of a statute).

The United States Court of Appeals for the Federal Circuit, however, also has recognized that the principal sources of CAS Board guidance include: illustrations following the text of each

---

[8] Although an agency's interpretation of its own regulations is entitled to considerable deference, since CAS and FAR are not DOD regulations, as a matter of law, neither the DOD nor DCMA's interpretations are not entitled to deference. *See Perry*, 47 F.3d at 1137 (*citing Newport News Shipbuilding & Dry Dock Co.* v. *Garrett*, 6 F.3d 1547, 1551 (Fed. Cir. 1993) (holding that when the Navy interprets the FAR, it is not interpreting DOD regulations)).

regulation;[9] CAS Board interpretations; and CAS preambles that explain the regulations in "non-technical" language. *See Boeing* v. *United States*, 862 F.2d 290 (Fed. Cir. 1988) (relying on CAS 402, Interpretation No. 1); *see also Perry*, 47 F.3d at 1139 (citing 48 C.F.R. § 30.101(d) (1993) ("[Although] preambles are not regulatory[,] [they] are intended to explain why the Standards and related Rules and Regulations were written[.]")).

**E. The Parties Arguments.**

**1. Lucent's Arguments.**

**a. Regarding The Text Of Amended Cost Accounting Standard 413.**

For the purposes of this motion, Lucent has stipulated that the ATS Business Unit was a "segment," but asserts that it did not "close" the ATS Business Unit, because a "segment closing" occurs only when "a segment . . . has been sold or ownership has been otherwise transferred." *See* Pl. Mot. at 2 n.3, 8 (quoting 48 C.F.R. § 9904.413-30(a)(20)(i)). Therefore, Lucent asserts that "the plain meaning of these words is that the sale must include all the segment's CAS-covered contracts under performance and related assets to result in a segment closing." *Id.* at 9. First, Lucent argues that a *segment* must be "defined by the operations necessary to produce the products and services it sells under its contracts." *Id.* at 10 (citing 48 C.F.R. § 9904.413-30(a)(19)). Second, Lucent contends that a *segment closing* occurs only "when a segment's operations to produce goods or services sold under its contracts . . . end or cease." *Id.* (citing WEBSTER II NEW COLLEGE DICTIONARY 216 (3d ed. 2005)). Third, Lucent argues that a *sale* requires "a complete transfer of ownership . . . [so that] [t]he seller does not retain any rights." *Id.* at 11 (citing BLACK'S LAW DICTIONARY 1337 (6th ed. 1990) (something is "sold" when a "contract [exists] whereby property is transferred from one person to another for a consideration of value, implying the passing of the general and absolute title, as distinguished from a special interest falling short of complete ownership")). Therefore, Lucent concludes that, contrary to the definitions of "segment closing" and "sale," Lucent has retained ownership of certain ATS Business Unit, CAS-covered contracts and related assets. *Id.*; *see also* J. Stip. Order ¶¶ 1-3.

In support of this interpretation, Lucent relies on the fact that the definition of "segment closing" also includes: "(ii) discontinued operations, or (iii) discontinued doing or actively seeking Government business under contracts subject to this Standard." *See* Pl. Reply at 5-6; *see also* 48 C.F.R. § 9904.413-30(a)(20)(ii), (iii). Here, Lucent contends that the three types of segment closings are contemplated by Amended CAS 413 when "*nothing* remains." *Id.* at 6 (citing BLACK'S LAW DICTIONARY 464-65 (6th ed. 1990) (defining discontinuance as an end) (emphasis added)). Lucent also relies on the fact that the definition of a "segment closing" implies that a closing may not occur, even when a segment no longer has CAS-covered contracts, *if the contractor is still "seeking Government business." See* Pl. Reply at 14 (citing 48 C.F.R. § 9904.413-30(a)(20)(iii)) (emphasis

[9] The original and the amended CAS 413 also include illustrations to help contractors apply the provisions. *See* 48 C.F.R. 9904.413-60; *see also* 4 C.F.R. § 413.60.

added). Finally, Lucent relies on Illustrations 8,[10] 12,[11] and 14[12] to Amended CAS 413, to support

[10] Illustration 8 to Amended CAS 413 provides:

> (8) Contractor K has a five-year contract to operate a Government-owned facility. The employees of that facility are covered by the contractor's overall qualified defined-benefit pension plan which covers salaried and hourly employees at other locations. At the conclusion of the five-year period, the Government decides not to renew the contract. Although some employees are hired by the successor contractor, because Contractor K no longer operates the facility, it meets the 9904.413-30(a)(20)(iii) definition of a segment closing. Contractor K must compute the actuarial accrued liability for the pension plan for that facility using the accrued benefit cost method as of the date the contract expired in accordance with 9904.413-50(c)(12)(i). Because many of Contractor K's employees are terminated from the pension plan, the Internal Revenue Service considers it to be a partial plan termination, and thus requires that the terminated employees become fully vested in their accrued benefits to the extent such benefits are funded. Taking this mandated benefit improvement into consideration in accordance with 9904.413- 50(c)(12)(iv), the actuary calculates the actuarial accrued liability to be $12.5 million. The contractor must then determine the market value of the pension plan assets allocable to the facility, in accordance with 9904.413- 50(c)(5), as of the date agreed to by the contracting parties pursuant to 9904.413-50(c)(12)(iii), the date the contract expired. In making this determination, the contractor is able to do a full historical reconstruction of the market value of the assets allocated to the segment. In this case, the market value of the segment's assets amounted to $13.8 million. Thus, for this facility the value of pension plan assets exceeded the actuarial accrued liability by $1.3 million. Pursuant to 9904.413-50(c)(12)(vi), this amount indicates the extent to which the Government over-contributed to the pension plan for the segment and, accordingly, is the amount of the adjustment due to the Government.

48 C.F.R. 9904.413-60(c)(8).

the argument that a "segment closing" occurs only when the contractor no longer possesses any CAS-covered contracts, under which pension assets can be adjusted. *See* Pl. Mot. at 11-12.

Lucent observes that the text of Amended CAS 413 governing a "segment closing" does not include any qualifying language, in contrast to other sections of Amended CAS 413. *Id.* at 12-13 (citing 40 C.F.R. § 9904.413-50(c)(2) (requiring contractors to calculate separate segment pensions costs when certain conditions exist that have a "material" impact on pension costs allocated to a segment)); *see also* TR 12-13. Lucent also notes that the CAS Board staff's 1976 proposed CAS 413 required an adjustment, "[i]f all, or substantially all, of a segment is closed, and a significant number of employees are thereby separated from the plan," but the final version did not include this qualifying language. *See* Pl. Mot. at 14 (citing Cost Accounting Standards Board, Staff Paper, Cost Accounting Standard, Adjustment and Allocation of Pension Cost (Jan. 7, 1977), *circulated* June 18, 1976); *see also* TR 13, 74-75.

---

[11] Illustration 12 to Amended CAS 413 provides:

> (12) Contractor M sells its only government segment. Through a contract novation, the buyer assumes responsibility for performance of the segment's government contracts. Just prior to the sale, the actuarial accrued liability under the actuarial cost method in use is $18 million and the market value of assets allocated to the segment of $22 million. In accordance with the sales agreement, Contractor M is required to transfer $20 million of assets to the new plan. In determining the segment closing adjustment under 9904.413-50(c)(12) the actuarial accrued liability and the market value of assets are reduced by the amounts transferred to the buyer by the sale. The adjustment amount, which is the difference between the remaining assets ($2 million) and the remaining actuarial liability ($0), is $2 million.

48 C.F.R. 9904.413-60(c)(12).

[12] Illustration 14 to Amended CAS 413 provides:

> (14) Contractor O does not renew its government contract and decides to not seek additional government contracts for the affected segment. The contractor reduces the work force of the segment that had been dedicated to the government contract and converts the segment's operations to purely commercial work. In accordance with 9904.413-30(a)(20)(iii), the segment has closed. Immediately prior to the end of the contract the market value of the segment's assets was $20 million and the actuarial accrued liability determined under the actuarial cost method in use was $22 million. An actuarial accrued liability of $16 million is determined using the accrued benefit cost method as required by 9904.413-50(c)(12)(i). The segment closing adjustment is $4 million ($20 million--$16 million).

48 C.F.R. 9904.413-60(c)(14).

**b. Regarding The Policy Underlying Amended Cost Accounting Standard 413.**

Lucent contends that the policy underlying Amended CAS 413 is to "require an immediate adjustment when it is no longer possible to allocate adjustments of [a segment's] previously determined pension costs" to any of that segment's remaining contracts. *See* Pl. Mot. at 17; *see also* TR 18. Therefore, the court is required to interpret the term "segment closing" as a complete sale or transfer, because "in the circumstance of only a partial sale of a segment's CAS-covered contracts . . . current and/or future periods will exist in which adjustments of previously determined pension costs will be allocated to CAS-covered contracts," thus eliminating the need for a current period adjustment. *Id.* at 18-19; *see also* TR 10-14. In addition, Lucent contends that the existence of a partial sale, as opposed to a segment closing, is "a timing determination and not a denial of right," because an adjustment will take place whenever the last retained CAS-covered contract is sold or transferred. *Id.* at 20-21; *see also* Pl. Reply at 3-4; TR 21.

Accordingly, Lucent concludes that the CAS Board intended a bright-line test for a segment closing that entails the sale or transfer of all contracts and related assets, because anything else would be commercially unworkable. *See* Pl. Reply at 16-18 (citing *Kearfott Guidance & Navigation Corp*. v. *Rumsfeld*, 320 F.3d 1369 (Fed. Cir. 2003) (rejecting "an anomalous and cumbersome two-tier system of cost accounting," when the drafters did not evidence that they intended such a system); *Peterson Builders, Inc.* v. *United States*, 26 Cl. Ct. 1227, 1230-32 (1992) (when the proper interpretation of a term in a statute is unclear, the court should employ a bright-line test that "works substantial justice for the claimant and the government" and avoids unworkable contract administration requirements)). Lucent predicts that any ambiguity as to when a segment has been closed will result in "significant uncertainty and disputes and litigations." *Id.* at 18.

**2. The Government's Response.**

**a. Regarding The Text Of Amended Cost Accounting Standard 413.**

The Government responds that "a sale of *virtually all* of the contracts and related assets" of a segment is a closing under the plain meaning of Amended CAS 413, because "both as defined in the CAS, and in business and economic reality, a 'segment' is the operational unit, and more than the sum of its physical assets." Gov't Resp. at 7 (emphasis added); *see also* 48 C.F.R. § 9904.413-30(a)(19) (defining a "segment" as "one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service"). As the Government explained during oral argument:

> 413.30(a)(19) says segment means one of two or more divisions, product departments, plants or other subdivisions of an organization reporting directly to a home office usually identified with responsibility for profit and/or producing a product or service. *That's language of an operating unit.*

> Well, where is the operating unit after this transaction? Until the Court . . . has a satisfactory answer to that question it's not able to determine whether or not this operating unit, which no doubt previously existed prior to the transaction, it's listed on a disclosure statement, *the only way to figure out whether or not that segment continues to operate is to conduct a fact based inquiry and not an inquiry based on a narrow stipulation that addresses only a single fact, that is whether 100 percent of the contracts were transferred*.

TR 78 (emphasis added).

* * *

> If you look at the definitions of segment closing and of segment in the 1995 amendments as I mentioned earlier, segment is clearly an *operating unit*.
>
> It's not just a phantom or a book entry, it's something. It has a responsibility. It reports to a home office, and generally has a responsibility for profit and for providing a product or a service. So you can't have a phantom segment. Segments are real operating, functioning entities. *When you say did this segment close, the question is not, well, did the contractor keep the contracts and have them be performed by some other segment?*
>
> That doesn't prove that the segment that used to perform the contracts is still an operating, functioning entity. That's why we think you have to look into that. If you look at the definition of segment closing it's not just sale.

TR 48-49 (emphasis added).

Therefore, the Government insists that "[w]here, as here, a contractor sells and transfers *virtually all* of a segment's contract, assets (tangible and intangible), and employees, it could not be clearer that . . . a segment has ceased to exist as an operating unit and has been closed, both from the seller's and buyer's perspective." Gov't Resp. at 8 (emphasis added). The Government also asserts that the CAS Board did not include qualifying language in Amended CAS 413, such as the "substantially all" found in the staff proposal, because the CAS Board believed it was clear that "segment closing" included the sale of substantially all of the segment's contracts and assets. *See* Gov't Resp. at 17-19. As the Government counsel further explained during oral argument:

> The staff paper, which was simply submitted out for comment, it was never a notice of proposed rulemaking and never advanced notice of proposed rulemaking, it was just that, a staff paper. . . . This at best ambiguous regulatory history. . . . We don't know why the CAS Board chose to use the language that it did. It's as likely, indeed more likely that they decided well, we didn't need to say it in that detail because everyone knows that's what the rule will be because it makes common sense.

> Because otherwise our intent would be so easily frustrated we're not going to do that. Now, if the CAS Board had said in any of its explanatory documents running up to the issuance of CAS 413 or the preamble itself, if the CAS Board had said well, we thought about this and although we had proposed language -- although they never did, it was the staff -- but assuming they had, we proposed this language but we thought better of it, that makes it easier. Then you'd have something. But all you have right now is the bare fact that . . . the staff made a proposal and a proposal that addressed several aspects. The Board went a different way without explanation, without any language that suggested that we want to make this an all or nothing, a lock, stock and barrel test and in this way make it easy to frustrate our intent because there's no doubt that their intent would be frustrated.

TR 60-61.

In addition, the Government contends that Illustrations 8, 12, and 14 provide no support for Lucent's interpretation, because neither of these involved a transaction where all but one or several CAS-covered contracts and related assets were sold or transferred to the contractor. *See* Gov't Resp. at 19.

**b. Regarding The Policy Underlying Amended Cost Accounting Standard 413.**

The Government's chief policy argument is that Lucent's interpretation deprives the Government of the segment closing adjustment that is a cental component of Amended CAS 413. *See* Gov't Resp. at 15-17. For example, the Government warns that, "[d]epending upon the size of the single CAS-covered contract that was retained in relation to the contracts that were transferred in the segment closing, it could take decades or even centuries for the Government to recover – through reduced pension costs on the single contract that the contractor retained – the amount of the CAS 413 segment closing adjustment to which it is entitled." *Id.* at 16. In the meantime, the surplus – excess pension assets in the seller's pension fund at the time of segment closing that resulted from the Government's past over-contributions to the segment's pension costs – would remain in the seller's pension plan, lowering the pension costs for the remaining customers. *Id.* Moreover, Lucent's interpretation of Amended CAS 413 awards a contractor an asymmetrical right of recovery, because the contractor could ensure that the Government paid the adjustment on a pension deficit by transferring all the CAS-covered contracts and related assets, but avoid paying the adjustment on a pension surplus by retaining only one CAS-covered contract. *Id.* at 17. The Government's counsel emphasized this point during oral argument:

> But it's not simply a question of timing. If that's not a segment closing, . . . then when does a segment closing occur? Is it when that last retained contract ends? What if whoever is performing that retained contract, what if that unit gets more contracts? Does that mean you have to wait for the closing of whatever unit happens to be performing the retained contract? That can't be what they intended.

TR 56.

Moreover, the Government's counsel predicted:

> If you have 100 CAS covered contracts, and you have a substantial surplus build up over the years and you can defeat the [G]overnment's right to a segment closing by retaining one of them then as I mentioned it's not a question of timing. The [G]overnment will never see its money because that money will be diluted and dissipated by being applied to reduce the pension costs on all of the remaining contracts of that contractor.
>
> The 99 contracts that go off to the buyer, *the pension costs will never be reduced in the future because of the surplus that was built up because at that point it's the buyer's pension plan, and the buyer's pension costs that determine the pension cost that's going to be allocated to those contracts.* The fact that there is unfinished business with respect to those contracts back at the seller makes not the slightest bit of difference when the buyer goes to calculate its pension cost.
>
> That's why the regulatory history and the clearly stated purpose of the CAS Board have to be given effect to, and they can't be if the Court adopts the 100 percent test that Lucent espouses. *So the test is -- in our view -- it's not a 100 percent test, it's not an all or nothing test, it's let's look and see in fact is this segment an operating unit? Is there still a segment that's an operating unit?*

TR 62-63 (emphasis added).

**F. The Court's Resolution Of Lucent's November 9, 2006 Amended Motion For Summary Judgment.**

Lucent's November 9, 2006 Amended Motion for Summary Judgment as to Count I of the September 29, 2004 Complaint and Count I of the Government's January 28, 2005 Counterclaim requires the court to determine whether Lucent closed a segment, pursuant to Amended CAS 413, when it transferred some, but not all, of the ATS Business Unit's CAS-covered contracts and related assets to General Dynamics. *See* J. Stip. Order ¶ 2.

As previously discussed, the United States Court of Appeals for the Federal Circuit has stated: "When interpreting provisions of the CAS our task is to 'ascertain the [Board's] intended meaning when promulgated under the CAS. We accomplish this by first looking at the text of the relevant provisions and 'any guidance that the [Board] has published to aid in this interpretation.'" *See Allegheny Teledyne, Inc.*, 316 F.3d at 1373 (quoting *Perry*, 47 F.3d at 1137-38). The CAS Board has defined the terms "segment" and "segment closing." *See* 48 C.F.R. § 9904.413-30(a)(19) (defining a "segment" as "one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service); 48 C.F.R. § 9904.413-30(a)(20) ("Segment closing means that a segment has (i) been sold or ownership has been otherwise transferred, (ii) discontinued operations, or (iii) discontinued doing or actively seeking Government business under contracts subject to this Standard."). Therefore, there is no need in this case to resort

to dictionary definitions. The text of Amended CAS 413 compels the court to conclude that a "segment closing" occurs when a "segment," which is an operational business unit, is sold or transferred. By focusing on the definition of "closing" and "sale," Lucent would have the court ignore the central issue, *i.e.*, whether the ATS Business Unit that formerly performed the CAS-covered contracts that were transferred, remains an operating business segment, as *defined* in Amended CAS 413. *See* 48 C.F.R. § 9904.413-30(a)(19). Indeed, if the ATS Business Unit is no longer a "segment," it has been closed.

> THE COURT: You're basically saying we don't know whether a segment has been sold unless we know what a segment is.
>
> GOVERNMENT COUNSEL: Exactly. The corporate documents will tell you what was sold, but that won't tell you whether what was sold was the entire segment and whether there was anything left that isn't being performed by other segments. And if they're being performed by other segments, Your Honor, then it's pretty clear that the segment that used to perform them is gone because it was closed. Therefore, there is an entitlement to a segment closing adjustment.

TR 81-82.

Accordingly, the Government argues that the court cannot determine whether there was a "segment closing" on summary judgment, because a fact-based inquiry is required to consider the number, size, and relative value of the contracts sold or transferred, as compared with those retained, and the intent of the parties to the transaction:

> What we would say is [the contractors] don't get to define when the segments are closed because that's a matter of looking at the business, and economic and performance reality on the ground, and it's not a matter of counting up contracts. You know, did you transfer 100 percent or did you transfer 99.8 percent? That test, the bright line test, is easy to administer, it has a certain superficial appeal, but the problem is it's just dead wrong.[13]

---

[13] The Government also argues that, throughout administration of the CAS, contracting officers are required to make discretionary determinations, based on reasoned judgment. *See* Gov't Surreply at 9-10.

> It frustrates the CAS Board's clearly expressed intent. That's why we would urge the Court to deny the motion and let the parties go to the next stage, which is to determine through discovery --

TR 65-66; *see also* Gov't Resp. at 8-9.

Lucent's counsel argues to the contrary:

> The [G]overnment puts forth an argument that they need discovery to make an assessment. What is the assessment they're going to make? There is nothing in the CAS language that indicates what that assessment would be. The only thing that's in that language that makes sense is a bright line test.
>
> There's no adjectives, there's no adverbs, there's nothing in there to describe what a segment closing means if it's not a complete closure. There's just no standard. And so the [G]overnment is asking for discovery so that they can go try to craft some sort of standard, and then we're going to be back before you with some amorphous type of standard that's being argued. I don't think the CAS Board had that in mind at all. I think they intended a bright line test.

TR 75.

For the reasons expressed herein, both the text of Amended CAS 413 *and* agency guidance compel the court to conclude that the determination of a "segment closing" cannot be made in the abstract, but requires a fact-based inquiry. Contrary to Lucent's assertion, requiring a fact-based inquiry does not make Amended CAS 413 unworkable, but rather upholds the CAS Board's intent.

Regarding agency guidance, the United States Court of Appeals for the Federal Circuit has held that the CAS Board "*intended* the segment closing provision to apply in situations where 'there are *no future periods* in which to adjust' the appropriate costs." *See Allegheny Teledyne, Inc.*, 316 F.3d at 1374 (quoting 4 C.F.R., Pt. 413, Preamble A: As a general rule, [CAS 413] . . . is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost accounting periods in determining the costs for the segment. However, a problem arises in cases where a segment is closed. Because there are no future periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to

provide a basis for adjusting such costs.) (emphasis added).[14] Therefore, to account for past over or under-estimates of pension costs allocated to a segment, without causing large swings in the amount charged from year to year, Amended CAS 413 requires the contractor to amortize any "actuarial" gain or loss over a 15-year period. *See* 48 C.F.R. § 9904.413-50(a)(2). When a segment is closed, however, these gains or losses can no longer be allocated to the segment's pension costs in future years. *See* 4 C.F.R., Pt. 413, Preamble A; *see also* 60 Fed. Reg. 16,534, 16,539. In these circumstances, a segment adjustment is required to ensure that both the contractor and the Government pay the correct amount. *Id.*

Lucent argues that when "only a partial sale of a segment's CAS-covered contracts [takes place] . . . current and/or future periods will exist in which adjustments of previously determined pension costs will be allocated to CAS-covered contracts." Pl. Mot. at 18-19. As a practical matter, however, this is not always the case. If a segment closing, and therefore an adjustment, were to occur only when all the contracts of a segment were sold or transferred, regardless of their relative size or value, the Government could be faced with a situation where it could not recover "the appropriate costs," contrary to the CAS Board's intent. *See Allegheny Teledyne, Inc.*, 316 F.3d at 1374. For example, if there was a surplus on a segment resulting from the Government's past over-estimates and therefore over-contributions to pension costs, the Government could recover any surplus only by reducing the pension costs paid on a segment's CAS-covered contracts in future years. Accordingly, if a contractor sold or transferred virtually all of a segment's contracts to another contractor, but retained a few, relatively small CAS-covered contracts, pension costs could be reduced on the retained contracts, but not below zero. Therefore, the Government could only recover a limited amount on the selling contractor's retained contracts. In the meantime, the surplus would reduce the buying contractor's yearly costs on both government and commercial contracts that formerly were part of the segment, until the surplus was depleted. If and when the selling contractor sold the retained contracts, no surplus would remain. As the Government's counsel protested at oral argument:

> [The Government] will never be paid off within lives and being within 21 years or 121 years for this[.] . . . Once you have the pension surplus that is in the plan the way that reduces pension cost is, for example, if the plan is in an overall surplus position then it can't bill any pension cost to the [G]overnment.

---

[14] The legislative history cited by the United States Court of Appeals for the Federal Circuit in *Allegheny Teledyne,* and by the parties in this case, concerns the term "segment closing" in the original CAS 413. The CAS Board is deemed to have had knowledge of the history and intent of the original CAS 413, when it again used the term "segment closing" in Amended CAS 413. *See Accord Lorillard* v. *Pons*, 434 U.S. 575, 580 (1980) (holding that Congress is presumed to be aware of the initial interpretation of a statute when it reenacts a statute, without change). The comments to Amended CAS 413 (60 Fed. Reg. 16,534, 16,539 (March 30, 1995)) also restate the policy set forth in Preamble A to the original CAS 413 (4 C.F.R., Pt. 413, Preamble A).

The effect of the surplus is to postpone into the future any pension costs being billed to the [G]overnment.

* * *

[I]n my hypothetical assume you have a $50 million surplus, you have a single CAS covered contract that is retained by the selling contractor, everything else goes to the buyer. You have a surplus of $50 million that has been generated by past over-contributions with respect to all of those contracts, the one that was retained and the rest of them that went to the buyer.

The only way that surplus will then depress the pension cost at the selling contractor, depress the cost that is charged to that one specific contract, it will also depress the pension cost that's charged to all the contracts, all the final cost objectives of the contractor.

The effect of that is that whereas the [G]overnment was entitled to arguably a segment closing, assuming this was a 100 percent government segment, the [G]overnment would be entitled to 100 percent of that surplus because the [G]overnment's reimbursement of contributions created that surplus.

That $50 million will be dissipated and diluted because all the other contracts will get the benefit of it. To the extent that the other contracts are doing commercial work then they will undoubtedly be very happy that their pension costs that they would otherwise have to pay have been reduced.

That's why we think this cannot be what the CAS Board intended because the language was clear, and it's not just the old CAS Board. The old CAS Board said we

> have a problem, and the problem is what to do about this unfinished business. The new CAS Board said the same thing I must say in a slightly terser language[.][15]

TR 37-40; *see also* TR 88-90.

Therefore, in certain circumstances, Lucent's bright-line interpretation of Amended CAS 413 would lead not simply to a deferral of when the Government may recover a surplus, but a denial of the right to a full recovery, contrary to the CAS Board's intent.

---

[15] During Notice and Comment Rulemaking for Amended CAS 413, the new CAS Board responded to a comment about the segment closing adjustment as follows:

> *Response.* Under this final rule, the 9904.413-50(c)(12) adjustment is determined as a current period adjustment, whether or not assets actually revert from the trust. The Board believes a current period adjustment is appropriate when there is a disruption of the contracting relationship, a discontinuance of the operational segment, or a discontinuance of the pension plan. When such events occur, pension costs can no longer be computed and adjusted on an on-going basis since there are either no future accounting periods in which credits or charges can be allocated to contracts or future periods in which benefits will be earned.
>
> If a contractor will continue to have a contracting relationship with the Government, the final rule does not permit the cognizant Federal official and the contractor to negotiate an amortization schedule. This provision will allow a contractor to allocate an adjustment credit to future years during which it can recover the amount of credited assets either through decreased pension costs or through prices charged to other customers benefitting form the future work performed by plan participants.

60 Fed. Reg. 16,534, 16,539 (March 30, 1995).

## IV. CONCLUSION.

For the reasons discussed herein, the court denies Plaintiff's November 9, 2006 Amended Motion for Summary Judgment.[16] The court will convene a telephone status conference on May 4, 2007 at 2:00 p.m. to discuss a schedule for discovery and future proceedings.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

[16] The court has determined that Lucent's other arguments also are not persuasive. The CAS Board staff's 1976 proposal is not probative, however, the adopted preambles and comments are direct evidence of the CAS Board's intent. Moreover, Illustrations 8, 12, and 14 provide no support for Lucent's interpretation, because none involve a transaction where the contractor sold all, but one or several CAS-covered contracts.